Brian Segee (Bar No. 200795)
Center for Biological Diversity
660 S. Figueroa St. Suite 1100
Los Angeles, CA 90017
tel: (805) 750-8852
email: bsegee@biologicaldiversity.org

Catherine Kilduff (Bar No. 256331)
Kristen Monsell (Bar No. 304793)
Center for Biological Diversity
1212 Broadway, Suite #800
Oakland, CA 94612
tel: (510) 844-7100
fax: (510) 844-7150
email: ckilduff@biologicaldiversity.org
kmonsell@biologicaldiversity.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; and FRIENDS OF THE EARTH,<br><br>     Plaintiffs,<br><br>     v.<br><br>NOAA FISHERIES; CHRIS OLIVER, in his official capacity as Assistant Administrator for NOAA Fisheries; U.S. COAST GUARD; ADMIRAL KARL L. SCHULTZ, in his official capacity as Commandant of the U.S. Coast Guard,<br><br>     Defendants. | Case No. 3:21-cv-345<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     Plaintiffs Center for Biological Diversity and Friends of the Earth challenge the

failure of the National Oceanic and Atmospheric Administration Fisheries ("NOAA Fisheries")

and the U.S. Coast Guard ("USCG") to comply with the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, in relation to USCG's regulatory codification of shipping lanes—formally known as Traffic Separation Schemes ("TSS")—governing vessel approaches to two of the world's busiest port complexes, located in Los Angeles/Long Beach and the San Francisco Bay region.

2.      In both northern and southern California, these shipping lanes intersect with seasonally dense populations of blue, fin, and humpback whales. This intersection has resulted in significant numbers of fatal ship collisions (known as "ship strikes") with whales, as well as other ESA-listed species including leatherback sea turtles. As these whale populations slowly recover from historic hunting that drove them to the brink of extinction, their recovery is now literally on a collision course with the increasingly busy shipping traffic off the California coast.

3.      Ship strikes have become the *number one* killer of blue and fin whales off the California coast, and the second largest mortality source for humpback whales. Much of the mortality is undetected—leading whale researchers estimate that every observed "stranding" of a blue, fin, or humpback whale represents *at least* ten unobserved and undetected whale deaths, because these great creatures typically sink to the bottom of the ocean after being struck. Leatherback sea turtles killed by ship strikes are even less likely to be observed.

4.      As the federal agency that regulates and directs vessel traffic off the California coast, section 7(a)(2) of the ESA mandates that USCG ensure through consultation with NOAA Fisheries that its actions will not jeopardize blue, fin, and humpback whales, leatherback sea turtles, and other listed species.

5.      USCG approved revised TSSs in the approaches to both the San Francisco Bay region and Los Angeles/Long Beach ports in June 2013. In February 2017, NOAA Fisheries issued a Biological Opinion concluding that the TSS designations would not jeopardize the continued existence of any ESA-listed species.

6.      As detailed in this Complaint, NOAA Fisheries' Biological Opinion is arbitrary, capricious, and violates the ESA in several respects. 16 U.S.C. § 1536(a)(2). The Biological

Opinion fails to provide an accurate analysis of the effects of the USCG's lane designations on large whales or leatherback sea turtles, does not include a lawful incidental take statement, and otherwise fails to establish a rational connection between the facts found and the conclusions made. Because of these fatal flaws, USCG cannot rely on the Biological Opinion to meet its substantive duties under section 7 of the ESA.

7.     Even if the Biological Opinion was originally lawful, that is no longer the case. Since its completion in February 2017, significant new information has arisen revealing that the USCG TSS actions will affect ESA-listed whales and leatherback sea turtles in a manner or to an extent not previously considered, requiring the agencies to reinitiate consultation under section 7 of the ESA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16(a)(1)-(4) (2019).

8.     Categories of new information which have arisen since NOAA Fisheries' issuance of the Biological Opinion include new scientific literature demonstrating that: (1) whale mortality from ship strikes is many factors greater than observed mortality; (2) this mortality is negatively impacting whale and sea turtle recovery; (3) non-regulatory approaches to reducing ship speeds, including voluntary speed reductions, mariner alerts, and incentive programs, are of limited efficacy; and (4) in order to protect whales, shipping lane modifications and enforceable regulatory speed limits are needed not only in TSS approaches, but other vessel transit areas along the California coast.

9.     Accordingly, Plaintiffs seek declaratory and injunctive relief that the Biological Opinion is unlawful and that NOAA Fisheries and USCG are thus in violation of the ESA, an order compelling the agencies to complete reinitiated consultation within six months, and the implementation of measures intended to reduce ship strikes (*e.g.*, temporary vessel speed reduction and/or routing measures) pending completion of such consultation.

**JURISDICTION**

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346, because the case presents a federal question under the laws of the United States, including the ESA and Administrative Procedure Act ("APA").

11.     Pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), Plaintiffs

provided the Secretary of Commerce, NOAA Fisheries, and USCG with sixty (60) days' notice of their intent to sue the agencies for ESA violations on March 2, 2020, and provided supplemental notice of their ESA violations on August 18, 2020, more than 60 days prior to the commencement of this case. Defendants have not taken sufficient action to remedy their continuing ESA violations by the date of this Complaint's filing. Therefore, an actual and present controversy exists between the parties, and the requested relief is proper under within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201, the APA, 5 U.S.C. §§ 701-706, and the ESA citizen suit provision, 16 U.S.C. § 1540(g).

## VENUE

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e), as a substantial part of the events or omission giving rise to the claims has occurred in this district due to decisions made by Federal Defendants. The USCG Eleventh District and Pacific Area headquarters, which coordinate vessel traffic and implement TSS off the California coast, including those in the Santa Barbara Channel, approaching Los Angeles and Long Beach, and off San Francisco, are located within the jurisdiction of this Court, on Coast Guard Island in Alameda. In addition, Plaintiff Center for Biological Diversity is incorporated in California and both Plaintiffs maintain an office of business in this District. No real property is involved in this action.

## INTRADISTRICT ASSIGNMENT

13.     Pursuant to Civil Local Rule 3-2(c)-(d), the appropriate intradistrict assignment of this case is to the San Francisco or Oakland Division.

## PARTIES

14.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit environmental organization dedicated to the protection of endangered species and wild places through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with offices throughout the United States, including in Oakland and Los Angeles. The Center has more than 81,000 members.

15.     Plaintiff FRIENDS OF THE EARTH is a tax-exempt, 501(c)(3) organization

and a not-for-profit corporation. It has offices in Berkeley, California and Washington, D.C., where it is incorporated. Friends of the Earth is a membership organization consisting of over 120,000 members, including more than 56,000 members who live in California. Additionally, Friends of the Earth has more than 1.5 million activist supporters on its email list throughout the United States, with more than 190,000 in California. It is also a member of Friends of the Earth International, which is a network of grassroots groups in 74 countries worldwide. Its mission is to protect our natural environment, including air, water, and land, and to achieve a healthier and more just world, using public education, advocacy, legislative processes, and litigation. Friends of the Earth is concerned about the adverse impacts that vessel traffic has on the environment, including ESA-listed species. Therefore, on behalf of its members and activists, Friends of the Earth's Oceans and Vessels Program actively engages in advocacy to influence policy and law governing vessel traffic.

16.     Plaintiffs bring this action on their own behalf, and on behalf of their staff and members who derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from the California coastline and adjacent waters of the Pacific Ocean where the shipping lanes, whales, and sea turtles are located.

17.     Plaintiffs' members and staff live in and regularly visit the waters of the Pacific Ocean off the California coast where blue, fin, and humpback whales often congregate, and where leatherback sea turtles can occasionally be observed, in order to enjoy, study, photograph, recreate, observe, and attempt to observe the whales and sea turtles. Specific areas where Plaintiffs' members regularly visit include the Santa Barbara Channel, including but not limited to whale "hot spot" areas within the Channel such as the western Channel adjacent to San Miguel and Santa Rosa Islands, as well as areas within the San Francisco Bay and vessel approaches to the ports within the Bay. Plaintiffs' members have experienced the joy of observing blue, fin, and humpback whales within the Santa Barbara Channel and San Francisco Bay region, and have also experienced the heartbreak of observing dead whales on adjacent coastlines after being struck by large vessels transiting the area. Many of Plaintiffs' staff and members live in the coastal areas of the Santa Barbara Channel, and the San Francisco Bay

area, while additional of Plaintiffs' members and staff have specific intentions to continue to use and enjoy these areas, and the adjacent waters of the Pacific Ocean, frequently and on an ongoing basis in the future.

18.     Plaintiffs have a long history of advocacy in relation to ship strike whale mortality off the California coast that is directly relevant to this case. For example, on September 25, 2007, the Center submitted a formal Petition pursuant to the APA requesting that NOAA Fisheries initiate rulemaking to establish a seasonal speed limit of 10 nautical miles ("nm") per hour on all vessels 65 feet or larger in the Santa Barbara Channel. In its January 8, 2008 denial of the Center's petition, NOAA Fisheries pledged that "[i]f circumstances similar to those occurring in 2007 recur, or if there are equal or a greater number of blue whale deaths in the future, [NOAA Fisheries] will reassess the situation in light of available information and make a decision whether a regulatory response is appropriate." In the meantime, when large congregations of blue whales were detected, NOAA Fisheries would rely on advisories recommending that vessels voluntarily reduce their speed to 10 knots or less. More than 13 years later, NOAA Fisheries' reliance on non-regulatory efforts has proven to be ineffectual, ship strikes are now the largest mortality source for numerous species of large whales off the California coast, and NOAA Fisheries has failed to "reassess the situation" as promised.

19.     The interests of Plaintiffs' members described above have been, are being, and will continue to be adversely harmed by NOAA Fisheries' and USCG's failure to meet their procedural and substantive duties under section 7 of the ESA. Through NOAA Fisheries' and USCG's actions and failures to act, ships are being directly routed to areas of high whale densities, inescapably resulting in significant mortality and injury to large whales and sea turtles, which in turn significantly and directly harms Plaintiffs' members. The injuries described are actual, concrete injuries presently suffered by Plaintiffs and their members, and they will continue to occur unless this Court grants relief. The relief sought herein—including an Order declaring the Biological Opinion to be unlawful and compelling NOAA Fisheries and USCG to reinitiate and complete section 7 consultations for the challenged actions while taking immediate corrective actions to reduce ship strike mortality including routing measures and

1   speed restrictions—would redress those harms. Plaintiffs and their members have no other

2   adequate remedy at law.

3          20.     Defendant NOAA FISHERIES is an agency within the National Oceanic and

4   Atmospheric Administration and is sometimes referred to as the National Marine Fisheries

5   Service. NOAA is in turn an agency of the Department of Commerce. NOAA Fisheries is the

6   agency to which the Secretary of Commerce has delegated the authority to conserve

7   endangered and threatened marine and anadromous species under the ESA.

8          21.     Defendant CHRIS OLIVER is sued in his official capacity as Assistant

9   Administrator for NOAA Fisheries.

10         22.     Defendant U.S COAST GUARD ("USCG") is an agency within the U.S.

11  Department of Homeland Security. The USCG is responsible for designating and implementing

12  TSS and other routing measures for vessels operating off the California coast, including in the

13  approaches to the Los Angeles-Long Beach and San Francisco Bay Region ports.

14         23.     Defendant ADMIRAL KARL L. SCHULTZ is sued in his official capacity as

15  the Commandant of USCG. He is USCG's top service official, responsible for all worldwide

16  USCG activities. As Commandant, he is responsible for ensuring the USCG, including officials

17  and employees under his supervision, comply with all applicable federal laws, including the

18  ESA.

19                              **LEGAL BACKGROUND**

20                            **Endangered Species Act**

21         24.     The ESA, 16 U.S.C. §§ 1531–1544, is "the most comprehensive legislation for

22  the preservation of endangered species ever enacted by any nation." *TVA v. Hill*, 437 U.S. 153,

23  180 (1978). Its fundamental purposes are "to provide a means whereby the ecosystems upon

24  which endangered species and threatened species depend may be conserved [and] to provide a

25  program for the conservation of such endangered species and threatened species . . . ." 16

26  U.S.C. § 1531(b).

27         25.     To achieve these objectives, the ESA directs the Secretary of Commerce,

28  through NOAA Fisheries, to determine which species of plants and animals are "threatened"

and "endangered" and place them on the list of protected species. *Id*. § 1533. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range," or "likely to become endangered in the near future throughout all or a significant portion of its range," respectively. *Id*. § 1532(6), (20).

26.     Once a species is listed, the ESA provides a variety of procedural and substantive protections to ensure not only the species' continued survival, but its ultimate recovery, including the designation of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation. *Id*. §§ 1533(a)(3), (f), 1538, 1536.

27.     The section 9 "take" provision prohibits actions "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any individual of an ESA-listed species, or "attempt to engage in such conduct." *Id*. 1532(19). Through its implementing regulations, NOAA Fisheries defines "harm" within the definition of "take" to mean "an act which actually kills or injures fish or wildlife." 50 C.F.R. § 222.102 (2015).

28.     Section 7(a)(2) of the ESA requires that "[e]ach Federal agency shall, in consultation with . . . [NOAA Fisheries], [e]nsure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat]." 16 U.S.C. § 1536(a)(2). This section 7(a)(2) consultation process has been described as the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).

29.     NOAA Fisheries' regulations define an agency "action" to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02 (2019).

30.     If listed or proposed species may be present in the project area, the action agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action. *Id*. § 402.12 (2019).

31.     If the action agency determines that its proposed action may affect any listed

species or critical habitat, the agency must normally engage in "formal consultation" with NOAA Fisheries. *Id*. § 402.14 (2019).

32.     Through the formal section 7 consultation process, NOAA Fisheries prepares a "biological opinion." *Id*. § 402.14(g).

33.     The biological opinion must include a summary of the information upon which the opinion is based, an evaluation of "the current status and environmental baseline of the species," the "effects of the action," and the "cumulative effects" of the agency action. *Id*. § 402.14(g)(2), (g)(3).

34.     The "environmental baseline" consists of "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id*. § 402.02. "Cumulative effects" include "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the project area." *Id*.

35.     Accordingly, in issuing a biological opinion, NOAA Fisheries must consider not just the isolated share of responsibility for impacts to the species traceable to the agency action, but also the aggregate effects of that action when added to all other activities and influences that affect the status of that species, including the environmental baseline. *Id*. § 402.14(g)(4).

36.     NOAA Fisheries' consideration of these aggregate impacts forms the basis for its required decision "as to whether the action is likely to jeopardize the species or destroy or adversely modify critical habitat." *Id*.; 16 U.S.C. § 1536(b)(3)(A). A likelihood of jeopardy is found when "an action [] reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Recovery is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate." *Id*.

37.     If NOAA Fisheries determines that jeopardy is likely, it must provide the action agency with "reasonable and prudent alternatives" to avoid that result. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2)(2019).

38.     If the biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse modification of critical habitat, NOAA Fisheries must provide an "incidental take statement," specifying the amount or extent of such incidental taking on the species and any "reasonable and prudent measures" that NOAA Fisheries considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the action agency to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i) (2019).  Additionally, when the listed species to be incidentally taken are marine mammals, the take must also be authorized by NOAA Fisheries pursuant to the Marine Mammal Protection Act ("MMPA"), and the incidental take statement must include any additional measures necessary to comply with the MMPA take authorization. *Id*.

39.     The take of a listed species in compliance with the terms of a valid incidental take statement is not prohibited under section 9 of the ESA. 16 U.S.C. §§ 1536(b)(4), (o)(2).

40.     Agencies must reinitiate and complete consultation on agency actions over which the action agency retains, or is authorized to exercise, discretionary involvement or control, if: (1) the amount or extent of taking specified in the incidental take statement is exceeded; (2) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16(a)(1)-(4) (2019).

41.     After the initiation or reinitiation of section 7 consultation, but before that consultation is completed, the action agency is prohibited from making "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of

1  foreclosing the formulation or implementation of any reasonable and prudent alternative

2  measures which would not violate subsection (a)(2)." 16 U.S.C. § 1536(d).

3       42.     During the consultation process, federal agencies must "use the best scientific

4  and commercial data available." *Id*. § 1536(a)(2); 50 CFR § 402.14(d).

5                              **Ports and Waterways Safety Act**

6       43.     Congress passed the Ports and Waterways Safety Act ("PWSA") in 1967 in

7  reaction to the grounding of the oil supertanker *Torrey Canyon* in the English Channel. The

8  wreck of the *Torrey Canyon* "had a catastrophic impact on the environment," and "brought to

9  the world's attention, essentially for the first time, the enormous sizes to which tankers had

10 evolved, and the potential for their cargoes for damaging the marine environment." Jeffrey A.

11 Weiss, *Maritime disasters through the ages*, 32 J. Mar. L. & Com. 215, 234 (April 2001).

12      44.     Accordingly, the PWSA emphasizes protection of "marine environment" from

13 its first provision. 46 U.S.C. § 70001. The PWSA expansively defines "marine environment" to

14 include "the navigable waters of the United States and the land and resources within and under

15 those waters," fishery resources, "and the recreational, economic, and scenic values of such

16 waters and resources." *Id*. § 70031(1)(A)-(D).

17      45.     The PWSA directs USCG to "provide safe access routes" for large vessels

18 through the establishment of TSS. *Id*. § 70003(a). Like lanes on a paved road, TSS are "aimed

19 at the separation of opposing streams of traffic." 33 C.F.R. § 167.5(b) (2000).

20      46.     In establishing TSS, USCG may designate "areas to be avoided," which are

21 areas "within defined limits in which either navigation is particularly hazardous or it is

22 exceptionally important to avoid causalities and which should be avoided by all ships or certain

23 classes of ships." *Id*. § 167.5(a). It may also designate a "precautionary area," which is a

24 "routing measure comprising an area within defined limits where ships must navigate with

25 particular caution. . . ." *Id*. § 167(b).

26      47.     Before establishing the TSS, the PWSA requires that USCG "undertake a study

27 of the potential traffic density and need for safe access routes." 46 U.S.C. § 70003(c)(1)(A). The

28 PWSA mandates that this "port access route study" ("PARS") consider nine specific factors,

1  including environmental, and requires that USCG "consult with and receive and consider the

2  views" of various stakeholders, including "representatives of environmental groups." *Id.*

3  § 70004(1)-(A)-(I).

4       48.    The PWSA also provides USCG with the general authority to "establish[] vessel

5  size, speed, or draft limitations and vessel operating conditions" when necessary to address

6  "hazardous circumstances." *Id.* § 70001(a)(4)(C).

7  **Marine Mammal Protection Act**

8       49.    Recognizing that "certain species and population stocks of marine mammals are,

9  or may be, in danger of extinction or depletion as a result of man's activities," Congress passed

10  the MMPA in 1972 to ensure that marine mammals are "protected and encouraged to develop

11  to the greatest extent feasible." 16 U.S.C. § 1361(1), (6). The central purpose of the MMPA is

12  to prevent marine mammal stocks from falling below their "optimum sustainable population"

13  levels, defined as the "number of animals which will result in the maximum productivity of the

14  population or the species, keeping in mind the carrying capacity of the habitat and the health of

15  the ecosystem of which they form a constituent element." *Id.* §§ 1361(2), 1362(9).

16       50.    The MMPA requires NOAA Fisheries to prepare a "stock assessment" for each

17  marine mammal population in U.S. waters, documenting the population's abundance and trend.

18  Based on that stock assessment, the agency must estimate the "potential biological removal"

19  ("PBR") level for each stock, *id.* § 1386(a), defined as "the maximum number of animals, not

20  including natural mortalities, that may be removed from a marine mammal stock while

21  allowing that stock to reach or maintain its optimum sustainable population." *Id.* § 1362(2).

22  **Administrative Procedure Act**

23       51.    The APA grants a right of judicial review to "[a] person suffering legal wrong

24  because of agency action, or adversely affected or aggrieved by agency action. . . ." 5 U.S.C. §

25  702.

26       52.    Under the APA, a court must "hold unlawful and set aside agency action . . .

27  found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

28  with law. . . ." *Id.* § 706(2)(A). An agency action is "arbitrary and capricious if the agency has

1   relied on factors which Congress has not intended it to consider, entirely failed to consider an

2   important aspect of the problem, offered an explanation for its decision that runs counter to the

3   evidence before the agency, or is so implausible that it could not be ascribed to a difference in

4   view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual*

5   *Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

6        53.    Under the APA, a court must also "hold unlawful and set aside" any agency

7   action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

8   right." 5 U.S.C. § 706(2)(C).

9                 **FACTUAL BACKGROUND**

10               **Great Whales Off the California Coast**

11        54.    All large baleen whale species, including blues, fins, and humpbacks, were

12   hunted to the brink of extinction during the nineteenth and twentieth centuries. It is estimated,

13   for example, that 380,000 blue whales were killed by whalers in the twentieth century—largely

14   for the manufacture of soap and margarine—resulting in extirpation of some populations and

15   reduction of others by more than 99 percent. Scientists posit that the ocean endured a

16   multispecies, megafaunal collapse as a result of the reduction of great whales by post-WWII

17   industrial whaling. The rapid removal of large quantities of whales that formerly consumed half

18   of the primary production in the ocean had cascading and detrimental ecosystem effects that

19   continue today.

20        55.    The International Whaling Commission prohibited hunting of these large baleen

21   whales in 1966, and subsequently enacted a moratorium on commercial hunting of all whale

22   species that became effective in 1985. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478

23   U.S. 221 (1986).

24        56.    Domestically, all baleen species of whales, including blues, fins, and

25   humpbacks, were listed as endangered globally under the ESA's predecessor, the Endangered

26   Species Conservation Act of 1969, 35 Fed. Reg. 8,491 (June 2, 1970), and remained on the list

27   of threatened and endangered species after the 1973 passage of the ESA. Although these whale

28   species have shown signs of recovery, all remain vulnerable to population level impacts.

Complaint                                    

57.     Blue whales are the largest living animal on earth and occur globally throughout the world's oceans. The blue whale, which remains a single listed entity despite the presence of five currently recognized subspecies, has an estimated global population abundance of 10,000 to 25,000 whales, or approximately three to eleven percent of its population in the early twentieth century. Blue whales off the California coast are part of the Eastern North Pacific stock, one of two North Pacific stocks identified by distinct, stereotypic calls. The current best population number estimate for the Eastern North Pacific stock ranges from approximately 1,000 to 2,300 whales. NOAA Fisheries has determined that the Eastern North Pacific stock of blue whales can incur only two non-natural deaths (such as those resulting from ship collisions) per year in U.S. waters while still reaching or maintaining its optimal sustainable population (this figure represents the "potential biological removal" level or PBR under the MMPA).

58.     In 1998, NOAA Fisheries approved a final recovery plan for the blue whale pursuant to section 4 of the ESA. The plan, and its November 2020 revision, identify ship strikes as one of the primary threats to the species in the Pacific Ocean. The recovery plan recommends that NOAA Fisheries and other relevant agencies such as USCG identify areas where ship collisions with blue whales might occur and to identify and implement methods to reduce such collisions. The plan recognizes that implementation of such measures is essential to blue whale recovery.

59.     Fin whales are the second largest living animal on earth. Like blue whales, fin whales are a cosmopolitan species widely distributed throughout the world's oceans. Fin whales are less well studied and their population dynamics and trends are less well known than both blue whales and humpback whales. The pre-whaling population of fin whales in the North Pacific is estimated to be 42,000 to 45,000 animals. The most recent minimum population estimate for the California/Oregon/Washington stock is 8,127 whales.

60.     Although fin whales appear to be recovering globally, population numbers off the central and southern California coast do not exhibit a significant trend. Fin whales in the

Southern California Bight—an offshore area between Point Conception on the Santa Barbara County coast and a point just south of the U.S.–Mexico border—may be a resident population.

61.     In 2010, NOAA Fisheries approved a final recovery plan for the fin whale pursuant to section 4 of the ESA. The plan recognizes that a third of observed fin whale strandings resulted from ship collisions, and that there have been numerous confirmed fin whale deaths from the California/Oregon/Washington stock. The recovery plan notes that estimates of death and injury should be considered minimum estimates. Because the fin whale is not as well studied as other large whales, the recovery plan characterizes the threat to the species as unknown but potentially high. The recovery plan recommends that NOAA Fisheries and other relevant agencies such as USCG identify areas where ship collisions with fin whales might occur and to identify and implement methods to reduce such collisions.

62.     Humpback whales are the only member of the three large whale species for which NOAA Fisheries has revised the ESA listing, 81 Fed. Reg. 62,260 (Sept. 8, 2016) (Identification of 14 Distinct Population Segments and Revision of Species-Wide Listing), and the only member for which NOAA Fisheries has proposed designating critical habitat. 84 Fed. Reg. 54,354 (Oct. 9, 2019) (Proposed Rule To Designate Critical Habitat for the Central America, Mexico, and Western North Pacific Distinct Population Segments of Humpback Whales).

63.     Humpback whales along the U.S. West Coast comprise a single stock for MMPA purposes, the California/Oregon/Washington stock, which includes two feeding groups: (1) a California and Oregon feeding group and (2) a northern Washington and southern British Columbia feeding group. The former includes whales from the endangered Central America Distinct Population Segment ("DPS"), which feeds almost exclusively off California and Oregon, and the threatened Mexico DPS, which feeds off Washington and British Columbia as well. Population estimates for these DPSs in 2016, when listed under the ESA, were 411 and 3,264, respectively.

64.     Humpback whales regularly travel through and near shipping lanes, and the species' tendency to inhabit coastal waters makes it the second most common species to be

injured or killed by collisions with ships. Humpbacks use these areas off the California coast for feeding as well as migrating to and from their calving grounds along the West Coast of Mexico and Central America. Thus, traffic within shipping lanes poses a particular danger to migrating reproductive females and juveniles.

65.     NOAA Fisheries' 2019 proposed critical habitat rule recognizes ship strikes as a primary threat to humpback whales off the California coast. As noted in that proposed rule, scientists estimate that ship strikes kill at least 22 humpback whales per year. This level of mortality exceeds the entire PBR level for U.S. waters for the California/Oregon/Washington stock.

**Ship Strike Impacts to Blue, Fin, and Humpback Whales Off the California Coast**

66.     Ship strikes threaten the continued recovery of blue, fin, and humpback whales.

67.     Collisions with ships have been a documented source of whale mortality for more than a century. Fatal ship strikes were first documented in the early 20th century as steam-powered ships began to reach higher travelling speeds, but these records remained infrequent until the 1950s. Reports of mortality among all large whale species then rose as the number and speed of vessels increased during the 1950s through 1970s. These trends have continued, and ship strike mortality is today a leading source of mortality for blue, fin, and humpback whales.

68.     Since the 1970s, marine mammal stranding programs under the MMPA have provided a basis for documenting collisions between ships and whales. These records reflect that whales struck by ships suffer violent, painful, and likely often slow deaths with propeller cuts, gashes, fractured or shattered skulls, broken vertebrae, blunt trauma, bruises, and other grievous injuries. Some collisions inflict only internal injuries that can only be identified by flensing carcasses to the bone. For some species (*e.g.*, humpbacks), a high proportion of struck whales are calves or juveniles.

69.     Ship strikes are rarely witnessed and typically not documented, however, as the carcasses of most whales killed by collisions sink before "stranding" or washing up on a beach.

Accordingly, the number of actual ship strikes is likely vastly underestimated, and could be ten to twenty times (or more) higher than suggested by the documented strandings.

70.    Important feeding "hotspots" for blue, fin, and humpback whales occur near the ports of Los Angeles/Long Beach and San Francisco Bay region, where USCG has established vessel traffic lanes (TSS) pursuant to the PWSA. Due to this overlap, significant ship strike whale mortality has long been specifically documented in the approaches to California's major ports.

71.    For example, according to NOAA Fisheries data, there were 20 observed whales that were killed by ships within the Gulf of Farallones and Cordell Bank National Marine Sanctuaries region (where shipping lanes into the San Francisco Bay region ports have been established) from 1988 to 2011.

72.    There have been periodic "pulses" of observed strandings from ship strike collisions in the approaches to the Los Angeles/Long Beach ports, including in 1998, 2002, and September 2007, when there were five sightings of dead blue whales in a twelve-day period in southern California. Historically high numbers of blue whales were documented in the Santa Barbara Channel immediately prior to this cluster of observable ship strike mortalities, leading to heightened recognition that recovering whale populations would be increasingly susceptible to ship strike events and mortality in the absence of immediate corrective action.

73.    In 2013, researchers estimated that blue whale ship strike mortality within the Santa Barbara Channel alone greatly exceeded the MMPA's  take threshold for the species along the U.S. West Coast.

74.    In 2019, researchers estimated that 18 blue whales, 22 humpback whales, and 43 fin whales are killed each year by ship strikes off the U.S. West Coast during the peak whale season from July to December, with an average of 6 additional humpbacks killed annually between January and April. This analysis confirmed that the shipping lanes for the San Francisco Bay region Los Angeles/Long Beach ports are two of the highest-risk regions for ship collisions with whales.

75.     There are two main categories of operational measures that are proven to reduce the risk of ship strikes: (1) routing changes (including temporary, or "dynamic", and seasonal changes) that reduce the overlap of shipping traffic with areas of high whale densities; and (2) mandatory and enforced vessel speed restrictions. NOAA Fisheries, which has issued mandatory ship speed restrictions to protect North Atlantic right whales in key habitat areas along the U.S. East Coast, has refused to take similar measures off the California coast. USCG asserts it has no authority to implement speed restrictions.

**Ship Strike Impacts to Leatherback Sea Turtles Off the California Coast**

76.     Leatherback sea turtles in California undertake a lengthy migration from nesting grounds in the Indo-Pacific region to exploit temperate foraging habitats off central California. These "West Pacific" leatherbacks embark on their trans-Pacific migrations to forage on the seasonally abundant West Coast jellyfish aggregations.

77.     Illustrating the importance of waters off California for leatherback foraging success, NOAA Fisheries revised an existing critical habitat designation to also include waters off California with sufficient condition, distribution, diversity, abundance and density of prey species (*i.e.* jellyfish) necessary to support growth, reproduction, and development of leatherbacks, and the need to conserve those waters. 77 Fed. Reg. 4,169 (Feb. 27, 2012) (Final Rule to Revise the Critical Habitat Designation for the Leatherback Sea Turtle).

78.     Though the leatherback sea turtle has been federally protected under the ESA since its enactment (and like baleen whales, were listed under its predecessor law), it is still one of the marine animals most at-risk of extinction in the United States. NOAA Fisheries considers the Pacific leatherback one of nine marine species whose extinction is almost certain in the immediate future if existing threats are not dramatically reduced.

79.     Population declines have been documented at nesting beaches throughout the Indo-Pacific region. The total West Pacific leatherback population was estimated in 2007 to include 2,700 to 4,500 breeding females. Last year, NOAA Fisheries estimated that the total index of nesting female abundance of the West Pacific leatherback is 1,277 females. 85 FR 48332, 48387 (Aug. 10, 2020) (12-Month Finding on a Petition To Identify the Northwest

Complaint                                                                                           Page 18

Atlantic Leatherback Turtle as a Distinct Population Segment and List It as Threatened Under the Endangered Species Act).

80.     Scientists expect there to be half that amount by 2040, which is too small a population to recover.

81.     The number of Pacific leatherback sea turtles in California waters has declined consistently with the decline observed in the Pacific population. NOAA Fisheries scientists estimated an annual average of 128 leatherback sea turtles were off California between 1990 and 2003. In 2020, a NOAA Fisheries scientist estimated the average number of Pacific leatherbacks in California waters from 2004 to 2017 to be 55 individuals annually.

82.     According to NOAA Fisheries scientists, mortality of leatherbacks on the U.S. West Coast must be kept to *less than one every six years* to avoid delaying the population's rebuilding.

83.     Stranding records provide only a minimum of information about the magnitude of the threat of vessel strikes to leatherback sea turtles.

84.     The 2017 Biological Opinion notes that from 1989 through 2014 there have been 12 reported incidents of vessel-struck leatherback sea turtles in California.

85.     Observations of turtles struck by vessels underestimate the actual impact because carcasses that sink or strand in an area where they cannot be detected go unreported or unobserved.

86.     Given that the waters off California are an important foraging area for leatherbacks during the summer and fall, it is likely that leatherbacks are especially affected by ship traffic seasonally. It is certain that the impact to the leatherback sea turtle population from commercial ship traffic is greater than what is observed.

**The Coast Guard's Codification of Traffic Separation Schemes Concentrates Vessel Traffic at Unregulated Speeds in Areas of High Whale Density**

87.     Acting pursuant to the PWSA, USCG completed Port Access Route Studies for the approaches to the Los Angeles/Long Beach and San Francisco Bay ports in 2011. Port

Access Route Study: The Approaches to San Francisco, Docket USCG-2009-0576 (February 2011) ("San Francisco Bay PARS"); Port Access Route Study: Approaches to Los Angeles-Long Beach and in the Santa Barbara Channel, Docket USCG-2009-0765 (September 2001) ("Los Angeles/Long Beach PARS").

88.    Both of these PARS processes resulted in routing changes that continue to concentrate large vessel traffic in areas of high whale densities.

89.    The Los Angeles/Long Beach PARS process was catalyzed by vessel traffic bypassing the existing Santa Barbara Channel TSS in order to avoid new air emissions requirements established by the California Air Resources Board requiring the use of low sulfur cleaner fuels within 24 nm of the coast. Ships using this route were transiting outside of any established TSS and through the Navy's Point Mugu sea range.

90.    USCG received comments on the PARS from leading whale researchers, environmental organizations, and others urging the agency to impose vessel speed restrictions and to develop routing measures in order to reduce vessel strikes of large whale species and other marine wildlife. As acknowledged by USCG during the PARS process, the Santa Barbara Channel is host to one of the densest seasonal blue whale populations in the world, and "[s]hip strikes on whales, specifically in the Santa Barbara TSS, are a concern."

91.    USCG further noted that "[r]esearch by [NOAA Fisheries] and the Channel Islands National Marine Sanctuary indicates a single TSS south of the Channel Islands would appear to minimize the overall risk of ship strikes on whales."

92.    In response to public input on this and other issues, USCG presented five options in the Los Angeles/Long Beach PARS: (1) continue the status quo; (2) create western traffic lanes south of the Channel Islands; (3) eliminate the existing Santa Barbara traffic lane and create a new TSS south of the Channel Islands; (4) reduce the width of the separation zone from 2 nm to 1 nm in the Santa Barbara Channel TSS, keeping the northern outbound lane in its current position and moving the southern inbound lane 1 nm toward the northern lane (to move the incoming lane away from the 200 meter isobath off San Miguel and Santa Rosa

Islands where high concentrations of whales are known to congregate); and (5) establish a TSS for the voluntary traffic lanes endorsed by the Harbor Safety Committee.

93.     USCG initially chose a combination of option 2 and option 4 to forward to the International Maritime Organization ("IMO") for approval. However, the USCG ultimately submitted only option 4 to the IMO. Although option 4 provided some measure of risk reduction for ship strikes within the western portion of the Santa Barbara Channel, by not choosing option 3, USCG's action did not minimize the overall risk of ship strikes on whales. Accordingly, the USCG's final decision—subject to section 7 consultation under the ESA—directed all large vessel traffic into the Los Angeles/Long Beach ports through the Santa Barbara Channel.

94.     Despite the PWSA's grant of authority to USCG to regulate ship speeds, 46 U.S.C. § 70001(a)(4)(C), USCG refused to propose speed restrictions in order to reduce ship strikes.

95.     The San Francisco Bay PARS was catalyzed by USCG's desire to increase predictability of vessel traffic patterns in a popular offshore fishing area near the northern approach in the vicinity of Point Reyes. In contrast to the single TSS approach to Los Angeles/Long Beach ports, there are three TSS approaches to San Francisco: northern, western, and southern. These three TSS approaches pose varying levels of ship strike risk.

96.     Like the Los Angeles/Long Beach PARS, USCG received comments on the PARS from leading whale researchers, environmental organizations, and others urging the agency to impose vessel speed restrictions and to develop routing measures in order to reduce vessel strikes of large whale species and other marine wildlife.

97.     In response to public input on this and other issues, USCG presented six options in the San Francisco Bay PARS: (1) extend the northern approach by 8.5 nm and southern approach by 16.5 nm to the limit of the vessel traffic service ("VTS") area, as well as further realignment and reconfiguration; (2) extend all approaches to the limit of the VTS area with no changes to alignment or configuration; (3) extend the northern approach to the VTS limit, while combining the southern and western approach into a single southwest approach, and extending

that southwest approach to the limit of the VTS; (4) extend the northern and southern approaches to the limit of the VTS, while adding a turn in the northern approach away from Point Reyes and avoiding Cordell Bank; (5) make the same changes to the northern approach as option 4, while combining the southern and western approaches into a single southwestern approach as described in option 3; and (6) continue the status quo.

98.    In its final recommendation, USCG chose a combination of these options, extending the northern approach 16.7 nm to the end of the VTS area and adding a turn to avoid fisheries conflicts; narrowing the western approach while extending that approach by 3 nm and changing the layout of the approach; and extending the southern approach by 8 nm to the limit of the VTS area.

99.    USCG stated that the changes in the western approach would "keep vessels on a straightened course to the edge of the continental shelf, reducing the risk of whale strikes in an area of potential high whale density," but did not otherwise address the potential impacts of the changes on whales, or the overlap of newly designated TSS areas with whale densities. Like the Los Angeles/Long Beach PARS, USCG refused to propose speed restrictions as part of the San Francisco Bay PARS in order to reduce ship strikes.

100.    The TSS changes described in the final PARS for the Los Angeles/Long Beach and San Francisco Bay ports were approved by the IMO and became effective June 1, 2013.

### The Biological Opinion and Its Deficiencies

101.    On October 24, 2013, USCG initiated ESA section 7 consultation on its codification of regulations modifying the TSS. This section 7 process took more than three years to complete, and culminated with NOAA Fisheries' issuance of the February 23, 2017 Biological Opinion.

102.    The Biological Opinion defines the action area as the waters within and around the TSS approaches to Los Angeles/Long Beach (both the immediate approach and the approach through Santa Barbara Channel) and San Francisco Bay region ports, including some areas beyond these defined boundaries of the TSS as ships begin to align with the lanes at some point before entering and exiting them.

1      103.    In the Biological Opinion, NOAA Fisheries concluded that the proposed action

2 is not likely to jeopardize the continued existence of blue or humpback whales, and that effects

3 on fin whales and leatherback sea turtles are extremely unlikely. This conclusion is

4 contradicted by the best available scientific data, and is built upon a fundamentally flawed

5 analytical framework.

6      104.    In assessing impacts on ESA-listed species, NOAA Fisheries developed an

7 analytical approach called the "no-lane scenario." Under this analytical approach, NOAA

8 Fisheries "considered how the codification of the TSSs and resultant ship traffic using the TSSs

9 was different than the no-lane scenario and how this difference would affect the exposure,

10 response, and risk of interactions between whales and leatherback sea turtles in the proposed

11 action areas." (TSS BiOp, at p. 18).

12      105.    Under this approach, NOAA Fisheries compared the effects of the TSS

13 designations with a nonexistent world in which there are no shipping lanes at all, and thus

14 "ships would be spread out or fanned out over a larger area than they would be when using the

15 TSSs." (TSS BiOp, at p. 88). Using this strawman as a reference point, NOAA Fisheries

16 concludes that the TSS designations will decrease "the overall exposure profile for whales and

17 leatherback sea turtles," as compared to the hypothetical no-lanes reference point. (TSS BiOp

18 at p. 88).

19      106.    The use of the no-lane analytical approach arbitrarily masks the impacts of

20 USCG's TSS designations, and artificially changes the scope of the agency action, which

21 involved affirmative agency decisions to route shipping traffic through areas of high whale

22 densities. These affirmative agency decisions were made despite acknowledged alternative

23 routing measures that would have reduced the risk of ship collisions with blue, fin, and

24 humpback whales, and leatherback sea turtles, in the approaches to the Los Angeles/Long

25 Beach and San Francisco Bay region ports.

26      107.    USCG's specific consideration of several detailed TSS options during the PARS

27 process for both Los Angeles/Long Beach and San Francisco region ports illustrates the

28 discretionary authority USCG has in deciding how many TSS to establish, where to establish

Complaint                          

1   those TSS, and how to configure the chosen TSS. In addition, the PWSA vests USCG with

2   authority to restrict ship speeds, 43 U.S.C. § 70001(a)(4)(C),  although the agency denies it can

3   use that authority for the protection of whales.

4        108.    These choices, in turn, resulted in varying degrees of impacts to endangered blue

5   whales, fin whales, humpback whales, and leatherback sea turtles. The Los Angeles/Long

6   Beach PARS, for example, concluded that the best available scientific information "indicates a

7   single TSS south of the Channel Islands would appear to minimize the overall risk of ship

8   strikes on whales." USCG did not choose this recommendation, however, but instead made a

9   discretionary decision to continue directing traffic through the Santa Barbara Channel.

10       109.    NOAA Fisheries justifies its reliance on the no-lane scenario by obliquely

11  suggesting that the TSS designations have little practical impact. *See*, *e.g*., TSS BiOp, at p. 64

12  ("Hence the general distribution of ships, with or without the TSSs, is influenced by the

13  economics of international trade."); *id*. at p. 65 ("Regulatory actions have and will impact

14  shipping traffic patterns and this is true with or without the TSSs in place."). To the contrary,

15  studies repeatedly demonstrate that vessel operators will comply with measures to protect

16  whales from ship strikes when those measures are made mandatory and are enforced. For

17  example, NOAA Fisheries acknowledged in the Biological Opinion that the changes in the San

18  Francisco TSS northern approach moving that lane away from the Gulf of the Farallones and

19  Cordell Bank National Marine Sanctuaries "indicated a 69% reduction in the footprint of ship

20  traffic" in those waters.

21       110.    By comparing the potential effects of the TSS designations with a hypothetical

22  no-lane framework, the Biological Opinion fails to consider the real world impacts of the

23  USCG TSS actions on ESA-listed species. This hypothetical approach has no basis or relevance

24  to the real-world governance of international shipping or the basic reliance on TSSs as a way to

25  safely organize that traffic. The use of the hypothetical no-lane approach thus does not provide

26  a rational basis for determining the "effects of the action."

27       111.    By relying on the hypothetical no-lane analytical approach, the Biological

28  Opinion also failed to properly consider the environmental baseline, which includes "past and

present impacts of all Federal, State, or private actions and other human activities in the action area." 50 C.F.R. § 402.02.

112.    For example, the Biological Opinion fails to incorporate past USCG actions, beginning in 1969, under the PWSA to establish TSS in the approaches to Los Angeles/Long Beach and San Francisco region ports in its baseline analysis.

113.    These past USCG decisions are directly relevant to the species' baseline, as they have concentrated vessel traffic within areas of high whale densities, yet the impacts of these decisions have never been previously assessed under the ESA. For example, in the approaches to Los Angeles/Long Beach ports, USCG has repeatedly chosen to direct all traffic into a single TSS through the Santa Barbara Channel, which contains some of the highest seasonal whale densities in the world. For example, a 1982 PARS found that 93 percent of shipping traffic was using the Santa Barbara TSS by 1979.

114.    Building upon the arbitrary effects analysis and baseline analysis, the Biological Opinion's incidental take statement fails to include any of the statutorily required contents. Instead, NOAA Fisheries concludes that no take of any ESA-listed species will occur.

115.    Contrary to NOAA Fisheries' unsupportable conclusions, the best available scientific data indisputably demonstrate that large vessel traffic transiting into or from the Los Angeles/Long Beach and San Francisco region ports, the location of which is regulated and directed by USCG's establishment of TSSs and lack of speed restrictions, kills, injuries, or otherwise results in the "take" of blue whales, fin whales, humpback whales, and leatherback sea turtles.

116.    Yet the Biological Opinion includes none of the required nondiscretionary measures that are necessary and appropriate to minimize the impact of incidental take.

**New Information Since Issuance of the Biological Opinion**

117.    Since completion of the February 2017 Biological Opinion, significant new information has arisen revealing effects of the USCG TSS actions that affect listed whales and leatherback sea turtles in a manner or to an extent not previously considered, and demonstrating

1    that the amount or taking specified in the incidental take statement ("ITS") is exceeded (as the

2    ITS did not authorize any level of take).

3        118.    The categories of new information which NOAA Fisheries did not previously

4    consider in the Biological Opinion include: (1) new scientific study showing that whale

5    mortality from ship strikes is many factors greater than observed mortality, and that this

6    mortality is negatively impacting whale recovery; (2) non-regulatory approaches to reducing

7    ship speeds, including incentive programs, voluntary speed restrictions, and mariner alerts, are

8    ineffective at reducing ship strike risk; and (3) in order to protect whales and leatherback sea

9    turtles, shipping lane modifications and enforceable regulatory speed limits are needed not only

10   in TSS approaches, but other vessel transit areas along the California coast.

11       119.    With respect to the ratio of actual to observed whale mortality from ship strikes,

12   newly published scientific literature shows that mortality estimates for blue, fin, and humpback

13   whales are far higher than earlier believed, and greatly exceed the annual PBR limits

14   established by NOAA Fisheries pursuant to the MMPA. This literature concludes that death

15   from vessel collisions may be a significant impediment to population growth and recovery.

16       120.    Scientific literature published since the 2017 Biological Opinion also affirms

17   that this mortality cannot be effectively addressed through voluntary or incentive-based

18   approaches. Studies on both the West and East Coasts of the United States have shown little

19   compliance with voluntary speed reductions. These studies conclude that in order to conserve

20   and recover endangered whale species off the U.S. West Coast, mandatory speed reductions

21   should be instituted year-round, and that imposing legal requirements in the California shipping

22   lanes will be necessary to reduce whale mortality below PBR levels.

23       121.    Finally, new scientific study completed since the 2017 Biological Opinion

24   provides strong evidence that in order to avoid whale mortality and assist recovery of

25   endangered populations, additional routing measures and slower ship speeds in areas outside

26   established TSS are likely necessary. This new science has identified implementation of a

27   graduated slow-steaming requirement within the U.S. Exclusive Economic Zone where ships

28

travel at increasingly reduced speed as they move closer to shore as the recommendation with the greatest potential to mitigate the widespread threat of vessel strikes.

## CLAIMS FOR RELIEF

### Claim I
### NOAA Fisheries' Issuance of Unlawful Biological Opinion
### (ESA Violation of 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.14(g))

122.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

123.    NOAA Fisheries' Biological Opinion is a final agency action within the meaning of the APA.

124.    In completing a biological opinion and making its jeopardy determination pursuant to section 7(a)(2) of the ESA, NOAA Fisheries, in its capacity as the expert consulting agency, must consider whether the aggregate effects of the factors considered in the environmental  baseline, effects of the action, and cumulative effects, when viewed against the status of the species, are likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(g).

125.    NOAA Fisheries' determination in the Biological Opinion that the TSS designations will not jeopardize the continued existence of blue, fin, and humpback whales, and leatherback sea turtles, is based on an arbitrary no-lane analytical approach, fails to consider aggregate impacts including the environmental baseline and cumulative effects, and is not based on the best scientific and commercia data available.

126.    The use of the no-lane analytical approach arbitrarily masks the impacts of USCG's TSS designations, and artificially changes the scope of the agency action, which involved affirmative agency decisions to route shipping traffic through areas of high whale densities. These affirmative agency decisions were made despite acknowledged alternative routing measures that would have reduced the risk of ship collisions with blue, fin, and humpback whales, and leatherback sea turtles, in the approaches to the Los Angeles/Long Beach and San Francisco Bay region ports.

127.     NOAA Fisheries' Biological Opinion also failed to consider the aggregate effects of the action, including the environmental baseline, which includes "past and present impacts of all Federal, State, or private actions and other human activities in the action area." 50 C.F.R. § 402.02.

128.     The Biological Opinion also fails to include an incidental take statement that would account for, minimize, require the reporting of, and authorize take of blue, fin, and humpback whales, and leatherback sea turtles, in accordance with the ESA. An ITS must specify the amount or extent of such incidental taking on the species and any "reasonable and prudent measures" that NOAA Fisheries considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the action agency to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The Biological Opinion fails to contain an ITS that includes any of these required contents.

129.     The Biological Opinion also fails to analyze effects on the recovery of ESA-listed species, includes an inadequate cumulative effects analysis, and fails to rely on the best available scientific data.

130.     Plaintiffs and their members are injured by NOAA Fisheries' violations of ESA section 7(a)(2) and ESA regulatory requirements governing the contents of Biological Opinions.

131.     NOAA Fisheries' violations of section 7(a)(2) of the ESA and ESA regulatory requirements governing the contents of Biological Opinions are subject to judicial review under the APA, 5 U.S.C. §§ 701-706.

**Claim II**
**USCG's Reliance on Unlawful Biological Opinion**
**(ESA Violation of 16 U.S.C. § 1536(a)(2))**

132.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

133.     USCG has an independent, substantive duty under section 7 of the ESA to ensure that its actions are not likely to jeopardize the blue, fin, or humpback whales, or leatherback sea turtles. 16 U.S.C. § 1536(a)(2).

134.    For the reasons described in Claim I, *supra*, NOAA Fisheries' Biological Opinion is unlawful under section 7(a)(2) and governing regulations.

135.    NOAA Fisheries' Biological Opinion violates the ESA and is unlawful; therefore, USCG's reliance on the Biological Opinion to fulfill its section 7 procedural and substantive duties also violates the ESA.

136.    Plaintiffs and their members are injured by USCG's violations of ESA section 7(a)(2).

137.    USCG's violations of section 7(a)(2) of the ESA are subject to judicial review under the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1).

**Claim III**
**USCG's and NOAA Fisheries' Failure to Reinitiate and Complete ESA Section 7 Consultation to Ensure USCG Action to Designate TSSs Does Not Jeopardize Listed Species or Destroy or Adversely Modify Critical Habitat**
**(ESA Violation of 16 U.S.C. § 1536(a)(2) and 50 C.F.R. § 402.16)**

138.    The ESA places ongoing obligations on federal agencies to ensure that their actions do not jeopardize the continued existence of endangered species or adversely modify or destroy their designated critical habitat, including the duty to reinitiate section 7 consultation in four circumstances. 50 C.F.R. § 402.16(a)(1)-(4). Agencies must reinitiate consultation, for example,"[i]f the amount or extent of taking specified in the incidental take statement is exceeded," when "[n]ew information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or when "[t]he identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." *Id*. § 402.16(a)(1)-(3).

139.    Since completion of the February 2017 NOAA Fisheries Biological Opinion, significant new information has arisen revealing effects of the USCG TSS actions that affect ESA-listed whales and leatherback sea turtles in a manner or to an extent not previously considered, and demonstrating that the amount or taking specified in the incidental take statement is exceeded (as the ITS did not authorize any level of take). The need for reconsultation is particularly evident given the existing inadequacies of the Biological Opinion,

1   and NOAA Fisheries' failure to lawfully consider the effects of the regulatory codification of

2   TSSs near the ports of Los Angeles/Long Beach and the San Francisco region in the aggregate

3   with other effects and in the context of a properly defined environmental baseline, as well as

4   the failure to provide a lawful ITS.

5        140.    On April 29, 2020, USCG wrote to NOAA Fisheries, stating that it believed that

6   reinitiation of consultation was necessary under the ESA, agreeing with Plaintiffs' March 2,

7   2020 NOI that new scientific literature, published since February 2017, may reveal previously

8   unrecognized effects of the regulatory codification of the TSS that may affect listed species in a

9   manner or to an extent not previously considered in the Biological Opinion. USCG wrote to

10  Plaintiffs on the same day informing them of the request to NOAA Fisheries.

11       141.    On April 30, 2020, NOAA Fisheries wrote to USCG acknowledging the

12  agency's request for reinitiation of consultation, but not agreeing to such consultation.

13       142.    In its August 18, 2020 supplemental ESA notice of intent to sue, Plaintiffs

14  inquired whether NOAA Fisheries has yet to agree to the reinitiation of consultation, and

15  requested a timeframe for the completion of the consultation. Neither agency has provided any

16  acknowledgment of, or response to, Plaintiffs' supplemental notice of intent.

17       143.    By failing to reinitiate and complete consultation despite the fact that the

18  reinitiation criteria are satisfied, USCG and NOAA Fisheries are in violation of 50 C.F.R.

19  § 402.16, and are in ongoing violation of the substantive ESA section 7(a)(2) requirement that

20  federal agencies ensure their actions are not likely to jeopardize the continued existence of any

21  listed species or result in the destruction or adverse modification of designated critical habitat.

22  16 U.S.C. § 1536(a)(2).

23       144.    Plaintiffs and their members are injured by USCG's and NOAA Fisheries'

24  violations of ESA section 7(a)(2) and failure to reinitiate and complete consultation.

25       145.    USCG's and NOAA Fisheries' violations of section 7(a)(2) of the ESA and 50

26  C.F.R. § 402.16 are subject to judicial review under the ESA citizen suit provision, 16 U.S.C. §

27  1540(g)(1), and/or the APA, 5 U.S.C. §§ 701-706.

28

**Claim IV**

**Unlawful Irreversible or Irretrievable Commitment of Resources
Pending Completion of Consultation
(ESA Violation of 16 U.S.C. § 1536(d))**

146.     Plaintiffs incorporate all preceding paragraphs by reference.

147.     ESA section 7(d) provides that once an agency initiates or reinitiates section 7 consultation, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2)." 16 U.S.C. § 1536(d). The purpose of section 7(d) is to prevent harm to endangered species and designated critical habitat pending the completion of section 7 consultation.

148.     Even if USCG and NOAA Fisheries have in fact reinitiated consultation, the agencies have not provided a timeline for the completion of such consultation, or addressed how USCG will meet its ESA section 7(d) duties during the pendency of this consultation. Methods to meet this duty could include, for example, temporary speed restrictions or routing measures that would be effective in reducing the mortality of whales and sea turtles during the pendency of the reinitiated consultation.

149.     Plaintiffs and their members are injured by USCG's violations of ESA section 7(d).

150.     USCG's violations of section 7(d) of the ESA are subject to judicial review under the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1).

**Claim V**

**Unlawful Take of ESA-Listed Species
(ESA Violation of 16 U.S.C. § 1538(a))**

151.     Plaintiffs incorporate all preceding paragraphs by reference.

152.     USCG's TSS designations route vessel traffic into the ports of Los Angeles/Long Beach and the San Francisco Bay region through areas containing high seasonal densities of blue, fin, and humpback whales, and leatherback sea turtles.

153.    Vessels transiting TSS into the ports of Los Angeles/Long Beach and the San Francisco Bay region collide with blue, fin, and humpback whales, and leatherback sea turtles, causing death or injury to those species.

154.    USCG's regulation of ship traffic through TSS designations is directly related to the resultant possibilities of vessel strikes of blue, fin, and humpback whales, and leatherback sea turtles, in the approaches to the ports of Los Angeles/Long Beach and the San Francisco Bay region.

155.    USCG's TSS designations are the cause of the ongoing take of blue, fin, and humpback whales, and leatherback sea turtles, in the approaches to the ports of Los Angeles/Long Beach and the San Francisco Bay region, from ship strike collisions.

156.    NOAA Fisheries' Biological Opinion did not include an incidental take statement for the indisputable and ongoing take of blue, fin, and humpback whales, and leatherback sea turtles, occurring from collisions with vessels transiting TSS in the approaches to the ports of Los Angeles/Long Beach and the San Francisco Bay region.

157.    Plaintiffs and their members are injured by USCG's violations of ESA section 9.

158.    USCG's violations of section 9 of the ESA are subject to judicial review under the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that NOAA Fisheries' February 23, 2017 Biological Opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in violation of section 7(a)(2) of the ESA and 50 C.F.R. § 402.14(g);

2.    Declare that USCG's reliance on the February 23, 2017 Biological Opinion is unlawful, and thus the agency has unlawfully failed to ensure that its actions do not jeopardize the continued existence of blue, fin, and humpback whales, and leatherback sea turtles, and is in violation of section 7(a)(2) ESA;

3.    Declare that NOAA Fisheries and USCG are violating section 7(a)(2) of the ESA and 50 C.F.R. § 402.16 by failing to reinitiate and complete consultation in order to

1  ensure that USCG's designation of TSS in the approaches to the Los Angeles/Long Beach and

2  San Francisco Bay region ports does not jeopardize the continued existence of blue, fin, or

3  humpback whales, or leatherback sea turtles;

4       4.     Declare that USCG is violating section 7(d) of the ESA by failing to develop

5  measures that would reduce ship strike risk pending the completion of reinitiated consultation;

6       5.     Declare that USCG is violating section 9 of the ESA;

7       6.     Order NOAA Fisheries and USCG to complete reinitiated consultation and

8  USCG to issue a new Biological Opinion within six months;

9       7.     Order USCG to adopt measures that will reduce ship strike risk to ESA-listed

10  species pending the completion of reinitiated consultation;

11       8.     Grant Plaintiffs their reasonable attorneys' fees and costs associated with this

12  action, as provided by the ESA, 16 U.S.C. § 1540(g)(4), or the Equal Access to Justice Act, 28

13  U.S.C. § 2412, or other authority; and

14       9.     Grant such other and further relief as the Court may deem just and proper.

15  Respectfully Submitted this 14th day of January, 2021.

16
17                       /s/ Brian Segee
                     Brian Segee (Cal. Bar No. 200795)

18                       Center for Biological Diversity
                     660 S. Figueroa Street, Suite 1000

19                       Los Angeles, CA 90017
                     tel: (805) 750-8852

20                       bsegee@biologicaldiversity.org

21                       /s/ Catherine Kilduff
                     Catherine Kilduff (Bar No. 256331)

22                       Kristen Monsell (Bar No. 304793)
                     Center for Biological Diversity

23                       1212 Broadway, Suite #800
                     Oakland, CA 94612

24                       tel: (510) 844-7100

25                       email: ckilduff@biologicaldiversity.org
                     kmonsell@biologicaldiversity.org

26
27
28

---

Complaint