Brian Segee (Bar No. 200795)
Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
tel: (805) 750-8852
Email: bsegee@biologicaldiversity.org

Catherine Kilduff (Bar No. 256331)
Kristen Monsell (Bar No. 304793)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
tel: (510) 844-7100
fax: (510) 844-7150
email: ckilduff@biologicaldiversity.org
kmonsell@biologicaldiversity.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Center for Biological Diversity, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> NOAA Fisheries, *et al*. <br><br> Defendants. | Case No.: 4:21-cv-00345-KAW <br><br> **PLAINTIFFS' NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Date: August 4, 2022 <br> Time: 1:30 p.m. <br> Dept: Courtroom 4, Third Floor <br> Judge: Hon. Kandis A. Westmore |

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... iii

TABLE OF ADMINISTRATIVE RECORD SCIENTIFIC REFERENCES ........................... viii

TABLE OF ACRONYMNS ............................................................................................. x

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT .................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

STATEMENT OF ISSUES ............................................................................................. 1

FACTUAL BACKGROUND ........................................................................................... 2

    I.     Large Whales Off the California Coast ........................................................ 2

    II.    Ship Strikes are a Primary Threat to Blue, Fin, and Humpback Whales ............... 5

    III.   Ship Strikes Threaten Leatherback Sea Turtles ...................................... 7

    IV.   Ship Strikes in the Approaches to California's Ports Can Be Reduced Through Routing Measures and Speed Restrictions ............................................. 8

    V.    The USCG TSS Designations Direct Shipping Traffic Through Areas of High Whale Density ............................................................................ 9

    VI.   The Biological Opinion ..................................................................... 11

LEGAL BACKGROUND ............................................................................................. 12

    I.     Endangered Species Act ...................................................................... 12

    II.    Standard of Review ............................................................................ 13

ARGUMENT ............................................................................................................. 14

    I.     Plaintiffs Have Associational Article III Standing ................................... 14

    II.    NMFS Violated the ESA by Failing to Properly Evaluate the Impacts of Shipping Lane Designations on Endangered Whales and Sea Turtles ............................... 16

A.   The "No-Lane" Analytical Approach is Structurally Flawed and Counter to ESA Requirements .................................................................17

1.   The "No-Lane" Framework is Built on the Arbitrary Assumption that USCG TSS Designations are of Little Consequence .............17

2.   The ESA Demands a Comprehensive and Aggregative Jeopardy Analysis, not the Comparative Approach of the "No-Lane" Framework. ...................................................................................21

3.   NMFS Improperly Included Effects of USCG TSS Designations in the Environmental Baseline .........................................................24

B.   NMFS Failed to Consider the Best Available Science Regarding Humpback Whales .................................................................................25

C.   NMFS Failed to Develop a Lawful Incidental Take Statement ................28

III.   The USCG Arbitrarily Relied on the Unlawful Biological Opinion ...................30

CONCLUSION..............................................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) .................................................................................. 13-14

*Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*,
175 F.3d 1156 (9th Cir. 1999) ........................................................................................24

*Am. Rivers, Inc. v. NOAA Fisheries*,
No. CV-04-0061-RE, 2006 U.S. Dist. LEXIS 32931 (D. Or. May 23, 2006)...........................23

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................... 13-14

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .................................................................13, 22, 27

*Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*,
97 F. Supp. 3d 1210 (D. Haw. 2015) ..........................................................................30

*Cottonwood Envtl. Law Ctr. v. U. S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ...........................................................................14, 15

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
422 F. Supp. 2d 1115 (N.D. Cal. 2006) .......................................................................27

*Ctr. for Biological Diversity v. Kempthorne*,
607 F. Supp. 2d 1078 (D. Ariz. 2009) .........................................................................6

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) ...................................................................................29

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) .................................................................................14

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 1101 (9th Cir. 2012) ..................................................................................30

*Defenders of Wildlife v. Gutierrez*,
532 F.3d 913 (D.C. Cir. 2008) ................................................................ 19, 20, 24-25

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,
707 F.3d 462 (4th Cir. 2013) ...................................................................................27

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
  528 U.S. 167 (2000) ..................................................................................14, 15

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
  80 F. Supp. 2d 1137 (W.D. Wash. 2000) ..................................................26

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) ...........................................................................14

*Intertribal Sinkyone Wilderness Council v. Nat'l Marine Fisheries Serv.*,
  970 F. Supp. 2d 988 (N.D. Cal. 2013) ......................................................27

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986) ..............................................................................3

*Miccosukee Tribe v. United States*,
  566 F.3d 1257 (11th Cir. 2009) ..............................................................29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...........................................................................14

*Nat. Res. Def. Council v. Kempthorne*,
  506 F. Supp. 2d 322 (E.D. Cal. 2007) ......................................................28

*Native Ecosystems Council v. U.S. Forest Serv.*,
  418 F.3d 953 (9th Cir. 2005) ..............................................................14

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* [*NWF I*],
  Civ. No. 1-640-RE, 2005 U.S. Dist. LEXIS 16345 (D. Or. May 26, 2005) ...............22, 23

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* [*NWF II*],
  422 F.3d 782 (9th Cir. 2005) ..............................................................22, 23

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* [*NWF III*],
  481 F.3d 1224 (9th Cir. 2007) .........................................................18, 22, 23

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* [*NWF IV*],
  524 F.3d 917 (9th Cir. 2008) ..............................................................22, 23

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2004) ................................................................15

*Or. Nat. Res. Council v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) ............................................................29, 30

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.,*
    265 F.3d 1028 (9th Cir. 2001) ..................................................................22

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs,*
    538 F. Supp. 2d 242 (D.D.C. 2008) ..........................................................19

*Pub. Empls. for Env't. Responsibility v. Beaudreu,*
    25 F. Supp. 3d 67 (D.D.C. 2014) ...............................................................30

*Sierra Club v. Marsh,*
    816 F.2d 1376 (9th Cir. 1987) ...................................................................13

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978) ............................................................................ 11-12

*Tulalip Tribes v. Kelly,*
    Civ. No. 17-652, 2018 U.S. Dist. LEXIS 7852 (W.D. Wash. Jan. 17, 2018) .....................19, 20

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
    878 F.3d 725 (9th Cir. 2017) .....................................................................23

*W. Watersheds Project v. Kraayenbrink,*
    632 F.3d 472 (9th Cir. 2011) .....................................................................12

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010) .....................................................................30

**Statutes**

5 U.S.C. § 706 ........................................................................................13

5 U.S.C. § 706(2) ......................................................................................1

16 U.S.C. § 1362(20) ..................................................................................4

16 U.S.C. § 1532(19) .................................................................................28

16 U.S.C. § 1533(f) ....................................................................................6

16 U.S.C. § 1536(a)(2) .................................................................1, 12, 13, 26

16 U.S.C. § 1536(b)(3)(A) ...........................................................................13

16 U.S.C. §§ 1536(b)(4) ....................................................................13, 28, 29

16 U.S.C. § 1536(b)(4)(i) ...........................................................................29

16 U.S.C. §§ 1536(o) ...........................................................................................13

16 U.S.C. § 1540(g) ...............................................................................................1

46 U.S.C. § 70003(a) ..............................................................................................9

46 U.S.C. § 70003(c)(1) ..........................................................................................9

46 U.S.C. § 70004(2) .............................................................................................10

**Regulations**

33 C.F.R. § 167.5(b) (1983)....................................................................................9

50 C.F.R. § 402.02 (1986) ........................................................................12, 13, 24

50 C.F.R. § 402.14(d) (1986)................................................................................13

50 C.F.R. § 402.14(g) (1986).................................................................................12

50 C.F.R. § 402.14(g)(2) (1986)............................................................................12

50 C.F.R. § 402.14(g)(3) (1986)............................................................................12

50 C.F.R. § 402.14(g)(4) (1986)...............................................................12, 13, 21

50 C.F.R. § 402.14(g)(5) (1986)............................................................................13

50 C.F.R. § 402.14(g)(7) (1986)........................................................................... 29

50 C.F.R. § 402.14(g)(8) (1986)......................................................................13, 26

50 C.F.R. § 402.14(h) (1986).................................................................................12

50 C.F.R. § 402.14(h)(2) (1986)............................................................................13

50 C.F.R. § 402.14(i) (1986)..................................................................................29

50 C.F.R. § 402.14(i)(1) (1986).............................................................................13

50 C.F.R. § 402.14(i)(1)(ii)–(iv) (1986)................................................................29

50 C.F.R. § 402.14(i)(5) (1986).............................................................................29

Plfs.' Mot. for Summ. J. and Mem. of P. & A.
Case No. 4:21-cv-00345-KAW

Page vi

**Rulemaking**

35 Fed. Reg. 8491 (June 2, 1970) (Conservation of Endangered Species and Other Fish and Wildlife) .................................................................................................................3

47 Fed. Reg. 27,430 (June 24, 1982) (Port Access Route Study: Notice of Study Results) (Southern California) ................................................................................................18

47 Fed. Reg. 46,043 (Oct. 14, 1982) (Port Access Route Study: Notice of Study Results) (Central and Northern California) ....................................................................................18

75 Fed. Reg. 17,562 (April 7, 2010) (Port Access Route Study: In the Approaches to Los Angeles-Long Beach and in the Santa Barbara Channel ..................................................10

76 Fed. Reg. 35,805 (June 20, 2011) (Port Access Route Study: In the Approaches to San Francisco Bay) .......................................................................................................11

77 Fed. Reg. 4170 (Feb. 27, 2012) (Final Rule to Revise the Critical Habitat Designation for the Endangered Leatherback Sea Turtle ...............................................................................7

81 Fed. Reg. 62,260 (Sept. 8, 2016) (Identification of 14 Distinct Population Segments and Revision of Species-Wide Listing) ...................................................4, 5, 25, 26, 28

84 Fed. Reg. 44,976 (Aug. 27, 2019) (Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation) ....................................................12, 25

84 Fed. Reg. 54,354 (Oct. 9, 2019) (Proposed Rule to Designate Critical Habitat for the Central America, Mexico, and Western North Pacific Distinct Population Segments of Humpback Whales) ..............................................................................................................7

85 Fed. Reg. 48,332 (Aug. 10, 2020) (12-Month Finding on a Petition to List) ...........................8

86 Fed. Reg. 21,082 (Apr. 21, 2021) (Final Rule to Designate Critical Habitat for the Central America, Mexico, and Western North Pacific Distinct Population Segments of Humpback Whales) ............................................................................................................4, 7

# TABLE OF ADMINISTRATIVE RECORD
## SCIENTIFIC REFERENCES[1]

A.S. Jensen and G.K. Silber. Large whale ship strike database (2003) (AR 11631-11669) ..........6

A. Vanderlaan, et al. (2008). Reducing the lethal encounters: vessels and right whales in the Bay of Fundy and on the Scotian Shelf. (AR 18738-18752) ................................................8

C. Jensen et al. (2015). Spatial and temporal variability in shipping traffic off San Francisco, California. (AR 9316-9330) ................................................................................6

C. Keiper et al. (2012). Risk assessment of vessel traffic on endangered blue and humpback whales in the Gulf of Farallones and Cordell Bank National Marine Sanctuaries. Summary of Research Results (AR 17964-17983) ........................................................5, 8

D.W. Laist et al. (2001) Collisions between ships and whales. (AR 19104-19144) ....................5

Gulf of the Farallones and Cordell Bank National Marine Sanctuaries Advisory Council. Vessel Strikes and Acoustic Impacts (2012). (AR 18768-18812)..........................................6, 9

J. Calambokidis. Insights into the population structure of blue whales in the Eastern North Pacific from recent sightings and photographic identification (AR 19617-19633) ....................4

J. Firestone (2009). Policy Considerations and Measures to Reduce the Likelihood of Vessel Collisions with Great Whales, 36 B.C. Envtl. L. Rev. (2009) (AR 17943-17955) ....................9

J.V. Carretta et al. (2016). NOAA Technical Memorandum. U.S. Pacific Marine Mammal Stock Assessments: 2016 (AR 16132-16557) ................................................................4

J.V. Redfern et al. (2013) Assessing the risk of ships striking large whales in marine spatial planning. (AR 19590-19600) ......................................................3, 5, 7, 9

L.M. Irvine et al. (2014). Spatial and temporal occurrence of blue whales off the U.S. West Coast, with implications for management. (AR 9367-9376) ........................................4

M. Berman-Kowalewski et al. (2010) Association between blue whale mortality and ship strikes along the California coast. (AR 15704-15711) ..........................................................8

M.F. McKenna, et al. (2012). Response of commercial ships to a voluntary speed reduction measure: Are voluntary strategies adequate for mitigating ship-strike risk? (AR 18894-18912) ..9

NOAA Fisheries (1991). Endangered Whales: Status Update (AR 20036-20055) ....................2

NOAA Fisheries (1998). Recovery plan for the blue whale (AR 9536-9583) ..........................3, 6

---

[1] This table is provided for the Court's convenience because the administrative record index for References does not include corresponding Bates numbers.

NOAA Fisheries (2010). Recovery plan for the fin whale (AR 10446-10566) .........................4, 6

S.A. Mizroch (1984). The blue whale, *Balaenoptera musculus*. (AR 9787-9792)  ...................... 3

S. Bettridge et al. (2015). NOAA Technical Memorandum. Status review of the Humpback Whale. (AR 15327-15589) ...........................................................................................................4

S.A. Eckert (1999). Habitats and migratory pathways of the Pacific leatherback sea turtle (AR 9584-9598) ...........................................................................................................................7

**TABLE OF ACRONYMNS**

| Acronym | Definition |
|---------|------------|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| DPS | Distinct Population Segment |
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| MMPA | Marine Mammal Protection Act |
| NMFS | NOAA Fisheries (National Marine Fisheries Service) |
| PARS | Port Access Route Study |
| PBR | Potential Biological Removal |
| PWSA | Ports and Waterways Safety Act |
| TSS | Traffic Separation Scheme |
| USCG | U.S. Coast Guard |

1

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

On August 4, 2022, at 1:30 p.m., or as soon as possible thereafter, Plaintiffs Center for Biological Diversity and Friends of the Earth ("Plaintiffs") will move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs move for summary judgment because there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law.

Pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), Plaintiffs seek an order declaring that (1) Defendant NOAA Fisheries (hereafter, "NMFS") violated section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), in issuing a 2017 Biological Opinion addressing the impacts of the U.S. Coast Guard's ("USCG") codification in regulation of Traffic Separation Schemes ("TSS") in the approaches to the ports of Los Angeles-Long Beach and the San Francisco Bay ("2017 Biological Opinion" or "Biological Opinion"); and (2) Defendant USCG violated the ESA, 16 U.S.C. § 1536(a)(2), in relying on that invalid Biological Opinion in adopting the TSS.

This Motion is based on the Notice of Motion; the supporting Memorandum of Points and Authorities and declarations attached hereto; all pleadings and documents on file in this action; the administrative records; and such oral and documentary evidence as may be presented at or before the hearing on the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF THE ISSUES

Ship strikes are killing endangered blue, fin, and humpback whales off the California coast, impeding their recovery and driving them closer to extinction. In their TSS designations for both Northern and Southern California, USCG chose to continue routing shipping traffic into the Los Angeles-Long Beach and San Francisco Bay ports through areas with some of the highest seasonal densities of large whales on the planet. Nevertheless, NMFS issued a Biological Opinion concluding that the USCG's TSS designations would have a negligible effect on those species, as well as the endangered leatherback sea turtle. In this action, Plaintiffs seek to

invalidate this Biological Opinion, and compel NMFS and USCG to fulfill their statutory obligations under the ESA to better protect endangered whales and sea turtles from getting struck, harmed, and killed by ships off the California coast.

Specifically, Plaintiffs challenge the Biological Opinion's failure to accurately assess the impacts of the USCG TSS designations where NMFS relied on an analytical framework that compared the effects of the such designations with a hypothetical "no-lanes" scenario in which no designations exist. This no-lane approach was based on the arbitrary assumption that USCG TSS designations have little effect on shipping traffic, which in turn led NMFS to the inexorable conclusion that the TSS designations also have little effect on ship strikes of listed species, depriving the imperiled whales and sea turtles of important conservation measures intended to avoid or minimize ship strikes that would be prescribed in a lawful Biological Opinion.

Plaintiffs also challenge NMFS's failure to utilize the best available scientific information in relation to its analysis of humpback whales in particular, because the agency relied on outdated and inaccurate population data. Finally, Plaintiffs challenge USCG's unlawful reliance on NMFS's Biological Opinion to ensure its TSS designations do not jeopardize these imperiled species.

Accordingly, the Court should grant Plaintiffs' motion for summary judgment.[2]

## FACTUAL BACKGROUND

### I.    Large Whales Off the California Coast

Scientists estimate that humans have killed more than 2.5 million large whales during the past 400 years. AR 20038. In recent decades intentional killing of whales has finally been largely eliminated through concerted international and domestic efforts. Internationally, the International Whaling Commission prohibited hunting of large baleen whales in 1966 and subsequently

---

[2] Pursuant to the Court's October 26, 2021 further case management conference minutes and scheduling order (Dkt. No. 40), the Parties will subsequently brief remedies separately in the event the Court grant Plaintiffs' motion.

enacted a moratorium on commercial hunting of all whale species that became effective in 1985. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986).[3]

Domestically, all baleen species of whales—including blues, fins, and humpbacks—were listed as endangered under the ESA's predecessor, the Endangered Species Conservation Act of 1969, 35 Fed. Reg. 8491 (June 2, 1970). These whales remained on the list of threatened and endangered species after the 1973 passage of the ESA, which prohibited any act that killed them. Members of this family of whales, known as *Balaenopteridae*, use their fringed baleen plates rather than teeth to feed, capturing krill, other pelagic crustaceans, and schooling fish as water filters through. AR 9788.[4] This makes baleen whales especially important for the health of the ocean ecosystem by circulating nutrients to and from the ocean floor, key to stimulating ocean productivity and storing carbon.

Despite the ESA's protection, many whale populations remain significantly depleted compared to their pre-whaling populations. *See*, *e.g.*, AR 9542 ("The world's stocks of blue whales were depleted by modern whaling, and the number of blue whales in the world's oceans is now only a fraction of what it was in the early 20th century . . . some populations have shown signs of recovery; others have not been adequately monitored."). The Pacific Ocean waters off the California coastline include essential habitat for these recovering whale populations, including seasonal feeding areas for humpback and blue whales, and year-round aggregations of fin whales. AR 19591.

**Blue Whales:** The blue whale "is not only the largest of the whales, [but] is also the largest living animal," reaching 100 feet in length and weighing as much as 160 metric tons. AR 9788. Blue whales do not exhibit "well defined social or schooling structure, and in most of their range they are generally solitary or found in small groups." AR 9788.

---

[3] Unless otherwise noted, internal citations and quotations are omitted from case law citations.

[4] Defendants filed their Notice of Lodging of Administrative Records on October 1, 2021. Dkt. No. 33. This brief cites to the NMFS administrative record as "AR" and the USCG administrative record as "USCG AR."

Blue whales off the California coast are part of the Eastern North Pacific stock, one of two North Pacific stocks identified by distinct patterns of whale vocalizations. AR 19626. Recent population estimates range from about 500 to nearly 2,000 animals. AR 9367. NMFS has determined that this population cannot sustain more than 2.3 human-caused deaths annually if the population is to recover.[5] AR 16335.

**Fin Whales**: Fin whales are the second largest whale by length. AR 10460. Like blue whales, fin whales are a cosmopolitan species with a range that spans the world's oceans. Fin whales are long-bodied and slender; less well studied than both blue whales and humpback whales; and their population dynamics and trends are less well known. The pre-whaling population of fin whales in the North Pacific is estimated to be 42,000 to 45,000 animals. AR 10472. Scientists estimate there are now approximately 1,400 fin whales off the California coast and approximately 3,000 whales in the California/Oregon/Washington population. AR 16342. NMFS has determined that this fin whale population can sustain no more than 16 human-caused deaths annually if it is to recover. *Id*.

**Humpback Whales:** Humpback whales are the only member of the three large whale species for which NMFS has revised its ESA listing, 81 Fed. Reg. 62,260 (Sept. 8, 2016) (Identification of 14 Distinct Population Segments and Revision of Species-Wide Listing), and the only member for which NMFS has designated critical habitat. 86 Fed. Reg. 21,082 (April 21, 2021) (Final Rule to Designate Critical Habitat for the Central America, Mexico, and Western North Pacific Distinct Population Segments of Humpback Whales). Male humpback whales sing complex songs that can last up to 20 minutes and be heard up to 20 miles away. AR 15355.

Humpback whales along the U.S. West Coast comprise a single stock for MMPA purposes—the California/Oregon/Washington stock—which includes two feeding groups: (1) a California and Oregon feeding group and (2) a northern Washington and southern British

---

[5] This "potential biological removal" ("PBR") threshold is defined under the Marine Mammal Protection Act as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20).

Columbia feeding group. The former includes whales from the endangered Central America Distinct Population Segment ("DPS"), which feeds almost exclusively off California and Oregon, and the threatened Mexico DPS, which feeds off Washington and British Columbia. Population estimates for these DPSs in 2016, when listed under the ESA, were 411 and 3,264, respectively. 81 Fed. Reg. at 62,305, 62,307. Following the recent reclassification of humpbacks under the ESA, NMFS had not yet updated its estimate of the annual level of human-caused mortality that can be sustained for these two DPS.

## II. Ship Strikes Are a Primary Threat to Blue, Fin, and Humpback Whales

Collisions with speeding ships have been a documented source of whale mortality for more than a century. AR 19119.  Ship strikes, however, remained a "genuine rarity" before the 1950s and were "treated as great curiosities." As one example, a whale "carried into Baltimore harbor by a tanker in 1940 attracted a crowd of 10,000 people." AR 19121.

Reports of mortality among all large whale species then rose as the number and speed of vessels increased during the 1950s through 1970s. AR 19121. This "apparent increase in the number of ship-struck whales . . . also corresponds with the period when the maximum speed of most large oceangoing ships began to exceed 14–15 [knots]." AR 19121.

Since the 1970s, marine mammal stranding programs have provided a basis for documenting collisions between ships and whales. AR 19110. These records reflect that whales struck by ships suffer violent, painful, and likely often slow deaths with propeller cuts, gashes, fractured or shattered skulls, broken vertebrae, blunt trauma, bruises, and other grievous injuries. AR 19111–19112. For some species, including humpback whales, a high proportion of struck whales are calves or juveniles. AR 19124.

Ship strikes are rarely witnessed and typically go undocumented because the carcasses of most whales killed by collisions sink before "stranding" or washing up on a beach. AR 19596; *see also* AR 17966 ("Dead whale strandings along the coast related to ship strikes may represent only a small portion of true ship strike mortality; most cetacean deaths are never recovered because they either sink or do not come ashore."). In a study of right whales, researchers

estimated a carcass detection rate of 17 percent. AR 19596. Right whales, however, tend to float after death, whereas blue, fin, and humpback whales are negatively buoyant. (*i.e.*, they sink after death). AR 19596. Thus for each documented ship strike mortality of these whales, scientists estimate that there are numerous additional undocumented deaths. *See* AR 11633 (NMFS large whale ship strike database stating that "the actual number of strikes is undoubtedly much greater than reported here.").

Ship strikes of large whales in the approaches to California's ports have been documented for decades. AR 18776 ("Documented vessel strikes appear to be most prevalent around California's major ports of San Diego, Los Angeles/Long Beach, and the entrance to San Francisco Bay."). For example, there were 20 observed whales that were killed by ships within the Gulf of Farallones and Cordell Bank National Marine Sanctuaries region (where TSS designations into the San Francisco Bay region ports have been established) from 1988 to 2011. AR 18775; *see also* AR 9319 ("[t]here [were] 15 documented ship strikes of blue, humpback, and gray whales off San Francisco between 2005 and 2014," but "[t]he true number of strikes is likely much higher because ship strikes have a low probability of detection."). In southern California, there were 10 documented large whale ship strike deaths between 1998 and 2011, "with a large number likely struck by vessels in the Santa Barbara Channel and waters around the Channel Islands." AR 6455.

Under the ESA, NMFS is required to prepare a recovery plan for listed species, 16 U.S.C. § 1533(f), which provides the "basic road map to recovery, *i.e.*, the process that stops or reverses the decline of a species and neutralizes threats to its existence." *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1088 (D. Ariz. 2009). The recovery plans for blue and fin whales both identify ship strikes as a significant threat, and they direct NMFS and other relevant agencies such as USCG to (1) identify areas where ship collisions with whales might occur and (2) identify and implement methods to reduce such collisions. AR 9548–9549, 9556–9557 (blue whale); AR 10485, 10510 (fin whale).

The humpback whale recovery plan was prepared in 1991, before ship strike mortality had emerged as a primary threat to recovering whale populations. However, NMFS recently finalized a critical habitat rule recognizing ship strikes as a primary threat to humpback whales off the California coast. 86 Fed. Reg. at 21,147 (noting the "current extinction risk" for humpbacks off the California coast from ship strikes and other threats).

During that rulemaking process, NMFS estimated that ship strikes kill at least 22 humpback whales per year. 84 Fed. Reg. 54,354, 54,356 (Oct. 9, 2019) (scientists "estimate that the mortality due to ship strikes . . . is greater than the estimated fishery bycatch and is equal to the potential biological removal (PBR) level for the California/Oregon/Washington stock of humpback whales."). Similarly, the estimated annual blue whale ship strike mortality from ship strikes in southern California alone greatly exceeds the sustainable take threshold for the species along the U.S. West Coast. AR 19598 ("Even conservative estimates of the number of blue whale ship strikes . . . are higher than the potential biological removal").

### III.   Ship Strikes Threaten Leatherback Sea Turtles

Leatherback sea turtles are the oldest and largest of the marine turtles, with fossil evidence indicating that the species is more than 90 million years old. AR 9585. Leatherbacks found off the California coast belong to a West Pacific population that undertakes a lengthy migration from nesting grounds in the South China Sea to forage on the seasonally abundant West Coast aggregations of their primary prey, brown sea nettles (a type of jellyfish). AR 48. NMFS designated critical habitat for leatherbacks along the U.S. West Coast in 2012, including waters off California. 77 Fed. Reg. 4170 (Feb. 27, 2012).

The leatherback sea turtle is one of the most highly imperiled marine animals in the United States. The number of Pacific leatherback sea turtles in California waters has declined consistently with the decline observed in the Pacific population. AR 45. NMFS estimated an annual average of 178 leatherback sea turtles were off California between 1990 and 2003. AR 47–48. The population has continued to decline in recent years. In 2015, NMFS estimated the average number of Pacific leatherbacks in California waters from 2005–2014 dropped to 54

individuals annually. 85 Fed. Reg. 48,332, 48,390 (Aug. 10, 2020) ("[A] 27-year aerial survey study indicates a decline . . . of 5.6 percent annually.").

Ship strikes are a documented threat to leatherbacks, but stranding records provide only minimum information about the magnitude of that threat. AR 60. Despite the paucity of data or study, from 1989 through 2014 there were 12 reported incidents of vessel-struck leatherback sea turtles in California. AR 60-61. Observations of turtles struck by vessels underestimate the actual impact, even more so than whales. AR 60 ("It is impossible to know how many leatherbacks have been affected by ship strikes because it is likely that animals are not seen or their bodies have been destroyed as a result of either blunt force trauma or getting caught in ship's propellers."). Leatherbacks spend nearly half of their time at the ocean's surface, which "may make [them] particularly vulnerable to vessel strikes in foraging areas." AR 48.

## IV.    Ship Strikes in the Approaches to California's Ports Can Be Reduced Through Alternative Routing Measures and Speed Restrictions

The threat ship strikes pose to large whales received increased attention after two major mortality events occurred in both Southern and Northern California. In Southern California, there were five sightings of dead blue whales in a 12-day period in September 2007, largely within or near the Santa Barbara Channel. AR 15705. And during July, September, and October 2010, three endangered whales were killed by ship strikes in the San Francisco Bay area, including an 84-foot pregnant female. AR 17965.

Prior to these California mortality events, the best scientific information—developed primarily to address ship strikes of the endangered North Atlantic right whale—already demonstrated there are two main categories of operational measures proven to reduce the risk of ship strikes: (1) routing changes (including temporary, or "dynamic," and seasonal changes) that reduce the overlap of shipping traffic with areas of high whale densities; and (2) mandatory and enforced vessel speed restrictions. *See, e.g.*, AR 18748 ("[T]he most pragmatic means of reducing vessel strikes to whales are to (1) reduce the probability of a vessel encountering a whale through modified vessel routing (seasonal or otherwise), (2) reduce the lethality of vessel

strikes, should a collision occur, through vessel-speed restrictions, and (3) reduce overall risk through modified routing coupled with speed restrictions."); AR 17947 ("Government officials are essentially left with two possible options to reduce collision fatality risk to [large whales]— re-route vessels and thereby decrease the probability of a collision and/or impose speed restrictions on vessels to decrease the impact-force should any collision occur.").

The Southern California and Northern California mortality events catalyzed extensive research into ways in which these general principles could be applied to the worsening problem of California ship strikes. Consequently, specific alternative routing measures have been proposed for both Northern and Southern California ports. In Northern California, where three approaches allow more flexibility, an advisory council work group suggested a "whale sensitive designation" that would require vessels to "either use the designated lane and following a speed limit of 10 knots, or use a different lane but maintain normal speed." AR 18783 (cleaned up). In Southern California, scientists concluded that "[o]ne possible way to reduce both of these conflicts is to designate a new TSS at an optimal location south of the northern Channel Islands and determine whether this new TSS should replace or be established in conjunction with the existing TSS." AR 19599; *see also* AR 18910 ("avoiding a recurrence of collision events similar to those in 2007 in the [Santa Barbara Channel] likely will require a more comprehensive conservation plan," including vessel re-routing and mandatory ship speed regulation).

## V.      The USCG TSS Designations Direct Shipping Traffic Through Areas of High Whale Density

The Ports and Waterways Safety Act ("PWSA") directs USCG to "provide safe access routes" for large vessels through the establishment of TSS designations. 46 U.S.C. § 70003(a). Like lanes on a paved road, TSS designations are "aimed at the separation of opposing streams of traffic." 33 C.F.R. § 167.5(b). Before establishing a TSS, the PWSA requires that USCG "undertake a study of the potential traffic density and need for safe access routes." 46 U.S.C. § 70003(c)(1). The PWSA mandates that this "port access route study" consider nine specific factors, including environmental, and requires that USCG "consult with and receive and consider

the views" of various stakeholders, including "representatives of . . . environmental groups." *Id.* § 70004(2).

Acting pursuant to the PWSA, USCG completed Port Access Route Studies for the approaches to the Los Angeles-Long Beach and San Francisco Bay ports in 2011. USCG AR 952–953.[6] Both studies culminated in routing designations that continue to concentrate large vessel traffic in areas with high whale densities.

USCG considered multiple TSS configurations during the study process for both ports, including configurations that would significantly differ from the existing TSS designations. The agency considered five options in Southern California, including an option that would have eliminated the existing Santa Barbara Channel TSS and created a new TSS south of the Channel Islands, and another option that would have retained the Santa Barbara Channel TSS but also created a new TSS on the southern side of the northern Channel Islands. 75 Fed. Reg. 17,562 (April 7, 2010).

However, the USCG ultimately chose to largely maintain the status quo. USCG did not move the TSS out of the Santa Barbara Channel or create a second TSS option outside of the Channel. Instead, the agency narrowed the "separation zones" between the inbound and outbound lanes comprising the Santa Barbara Channel TSS and shifted those lanes slightly. Although this option provided some measure of risk reduction for ship strikes, USCG's action did not minimize the overall risk of ship strikes on whales, and it continues to direct all large vessel traffic approaching from the north into the Los Angeles-Long Beach ports through the Santa Barbara Channel.

---

[6] Port Access Route Study: The Approaches to San Francisco, Docket USCG-2009-0576 (February 2011), https://www.navcen.uscg.gov/pdf/PARS/Port_Access_Route_Study_The_Approaches_San_Francisco.pdf; Port Access Route Study: Approaches to Los Angeles-Long Beach and in the Santa Barbara Channel, Docket USCG-2009-0765 (September 2001), https://www.navcen.uscg.gov/pdf/PARS/Port_Access_Route_Study_Approaches_LosAngeles_LongBeach_Santa_Barbara_Channel.pdf

Similarly, the USCG considered seven TSS options in the San Francisco Port Access Route Study. 76 Fed. Reg. 35,805 (June 20, 2011). In contrast to the single TSS approach to Los Angeles-Long Beach ports, there are three TSS approaches to San Francisco: northern, western, and southern. Like the Southern California decision, USCG's TSS designation largely continued the status quo—making several slight adjustments to the three approaches, primarily to avoid fisheries conflicts—but also included an adjustment to the western approach that was expected to provide an incremental reduction of ship strike risk.

Both TSS changes became effective June 1, 2013. AR 7.

## VI.   The Biological Opinion

On October 24, 2013, the USCG wrote to NMFS to initiate ESA section 7 consultation on its codification of the TSS designations. USCG AR 515–525. In its letter, USCG stated that the action may affect blue, fin, and humpback whales, leatherback sea turtles, and other species. USCG AR 520.

NMFS finalized its Biological Opinion on February 23, 2017. AR 1–143. In assessing impacts on ESA-listed species, NMFS developed an analytical approach called the "no-lane scenario," under which the agency "considered how the codification of the TSSs and resultant ship traffic using the TSSs was different than the no-lane scenario and how this difference would affect the exposure, response, and risk of interactions between whales and leatherback sea turtles in the proposed action areas." AR 20. Under this approach, NMFS compared the effects of the TSS designations with a nonexistent world in which there are no TSS at all. In the no-lane hypothetical, NMFS further assumed that ships would traverse the same areas as the TSS but would "be spread out or fanned out over a larger area than they would be when using the TSSs." AR 87, 90. Using this comparative lens, the opinion concluded that USCG's TSS designations were not likely to jeopardize blue or humpback whales, and that any effects on fin whales or leatherback sea turtles "are extremely unlikely." AR 98.

1

**LEGAL BACKGROUND**

2

**I.     Endangered Species Act**

3        The ESA is "the most comprehensive legislation for the preservation of endangered

4   species ever enacted by any nation" and embodies Congress's "plain intent" to "halt and reverse

5   the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153,

6   180, 184 (1978). Under section 7(a)(2) of the ESA, if a federal agency proposes an action that

7   may affect a listed marine species or critical habitat, the agency must normally engage in "formal

8   consultation" with NMFS to ensure that such action "is not likely to jeopardize the continued

9   existence of any endangered species or threatened species or result in the destruction or adverse

10  modification of [critical] habitat." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14 (2017).[7] During

11  the consultation process, federal agencies must "use the best scientific and commercial data

12  available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8). This consultation process has

13  been described as the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472,

14  495 (9th Cir. 2011).

15       The formal section 7 consultation process culminates with NMFS's issuance of a

16  "Biological Opinion." 50 C.F.R. § 402.14(g), (h). A Biological Opinion must include a summary

17  of the information upon which the opinion is based, an evaluation of "the current status and

18  environmental baseline of the listed species," "the effects of the action," and "cumulative effects

19  on the listed species." 50 C.F.R. § 402.14(g)(2), (3).  The "environmental baseline includes the

20  past and present impacts of all Federal, State, or private actions and other human activities in the

21  action area." *Id*. § 402.02. "Effects of the action" is defined as "the direct and indirect effects of

22  an action on the species or critical habitat," as well as "interrelated or interdependent" activities,

23

24  [7] This brief cites to the 50 C.F.R. part 402 joint counterpart consultation regulations that were in
    effect when the Biological Opinion was finalized in February 2017 (Segee Decl., Exh. 1). On
25  August 27, 2019, U.S. Fish and Wildlife Service and NMFS issued a final rule that significantly
    changed several aspects of those regulations. 84 Fed. Reg. 44,976 (Aug. 27, 2019). Plaintiff
26  Center for Biological Diversity has challenged the legality of these rules. *Ctr. for Biological
    Diversity v. Haaland*, No. 4:19-cv-05206-JST (N.D. Cal. filed Aug. 19, 2019). While the Court
27  applies the regulations in place at the time of the agency's decision, NMFS's Biological Opinion
    would also be unlawful under the contested 2019 regulations.
28

"added to the environmental baseline." *Id*.

In issuing a Biological Opinion, NMFS must consider not just the isolated share of responsibility for impacts to the species traceable to the agency action, but also the aggregate effects of that action when added to all other activities and influences that affect the status of that species, including the environmental baseline. *Id*. § 402.14(g)(4). NMFS's consideration of these aggregate impacts forms the basis for its required decision "as to whether the action is likely to jeopardize the . . . species or result in the destruction or adverse modification of critical habitat." *Id*.; *see also* 16 U.S.C. § 1536(b)(3)(A) (NMFS "shall provide . . . a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat.").

If NMFS determines that jeopardy is likely, it must provide the action agency with "reasonable and prudent alternatives" to avoid that result. *Id*.; 50 C.F.R. § 402.14(h)(2); *see also id*. § 402.14(g)(5) (similar). If NMFS instead determines the action will not result in jeopardy, then the agency typically must provide an "incidental take statement" that specifies (1) the amount or extent of such incidental taking on the species, (2) "reasonable and prudent measures" to minimize such impact, and (3) the "terms and conditions" with which the action agency must comply to implement those measures. 16 U.S.C. §§ 1536(b)(4), 1536(o); 50 C.F.R. § 402.14(i)(1).

These "substantive and procedural provisions of the ESA are the means determined by Congress to assure adequate protection [for listed species]," and "[o]nly by requiring substantial compliance with the [ESA's] procedures can [courts] effectuate the intent of the legislature." *Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir. 1987); *see also Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (NMFS "cannot ignore available biological information" and must "give the benefit of the doubt to the species.").

## II.    Standard of Review

Judicial review of NMFS's Biological Opinion is governed by section 706 of the APA. 5 U.S.C. § 706; *Bennett v. Spear*, 520 U.S. 154, 175–79 (1997) (review of a Biological Opinion

arises under the APA). "Under the APA, courts shall 'hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1112 (9th Cir. 2018) (alteration in original) (quoting 5 U.S.C. § 706(2)(A)).

The APA requires the court "to engage in a substantial inquiry," consisting of "a thorough, probing, in-depth review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). Even where an agency with "special expertise" acts "within its area of expertise," a court "need not defer to the agency when the agency's decision is without substantial basis in fact." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018). An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Importantly, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*

## ARGUMENT

### I.    Plaintiffs Have Associational Article III Standing

To establish standing, plaintiffs must show that: (1) they are under threat of suffering 'injury-in-fact' that is concrete and particularized, and that threat must be actual and imminent, not conjectural or hypothetical; (2) the alleged harm must be fairly traceable to the challenged action of the defendant; and (3) it must be likely that a favorable judicial decision will prevent or redress the injury. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000). An organization has standing when (1) at least one of its members would have standing to sue in his or her own right; (2) the interest it seeks to protect is germane to its purpose; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Cottonwood Envtl. Law Ctr. v. U. S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

"An organization can satisfy the concrete harm requirement by alleging an injury to the recreational or even the mere esthetic interests of its members." *Cottonwood* at 1079; *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2004) (injury-in-fact is shown through "an aesthetic or recreational interest in a particular place, or animal, or plant species" if "that interest is impaired by defendant's conduct.").

Plaintiffs' affidavits in this case show aesthetic, recreational, scientific, and spiritual interests in the protection of particular species (blue whales, fin whales humpback whales, and leatherback sea turtles) within particular places (the waters of the Santa Barbara Channel, in the approaches to San Francisco Bay, and adjoining coastlines) that are harmed by NMFS's and the USCG's actions. Bevington Decl.; Hartl Decl.; Keever Decl.[8] Plaintiffs' members demonstrate interest in the specific areas of the coast where USCG has designated TSS, including Santa Barbara Channel, areas within San Francisco Bay, and vessel approaches to the ports within the Bay. Bevington Decl. ¶¶ 3, 10; Hartl Decl. ¶ 5, 9; Keever Decl. ¶ 6. Plaintiffs' members have not only experienced the joy of seeking out and observing blue, fin, and humpback whales within the Santa Barbara Channel and San Francisco Bay region, they have also experienced the heartbreak of observing dead whales on adjacent coastlines after being struck by vessels transiting the area. Bevington Decl. ¶¶ 23-25.

Plaintiffs' interests are injured-in-fact by the unlawful Biological Opinion. The Biological Opinion determined that the TSS designations do not harm the whales or sea turtles at issue, and based on this determination, did not include any required conservation measures to help avoid, minimize, or mitigate ship strikes. These injuries would likely be redressed by a favorable decision. *Laidlaw*, 528 U.S. at 180–81. Further, Plaintiffs have standing to sue on their members' behalf because these "members would have standing to sue in their own right, the interests at stake are germane to the organization[s'] purpose[s], and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*. at 181.

---

[8] All declarations cited herein are being filed concurrently with this memorandum.

1

2

## II.   NMFS Violated the ESA by Failing to Properly Evaluate the Impacts of Shipping Lane Designations on Endangered Whales and Sea Turtles

3

4

In its Biological Opinion, NMFS acknowledges that ship strikes are a primary threat to

5

large whales and leatherback sea turtles. AR 27 ("Vessel strikes are the primary threat currently

6

facing blue whales."); AR 41 ("Humpback whales, especially calves and juveniles, are highly

7

vulnerable to ship strikes"); AR 31 ("Threats to fin whales include vessel strikes and

8

interactions."); AR 60 ("Vessel strikes have been identified as a threat to leatherback sea turtles

9

although the magnitude of the threat is unquantified. On the U.S. East Coast, vessel strikes have

been identified as the cause of death for many sea turtles.").

10

The agency also recognizes that the "particular areas" traversed by the USCG TSS

11

designations through the Santa Barbara Channel and in the three approaches to the San Francisco

12

Bay ports are "very productive" and "important habitat for many species, with high densities of

13

some cetacean species, especially blue, fin, and humpback whales." AR 51.

14

And NMFS admits that there are high levels of ship strike mortality for all three whales.

15

The Biological Opinion, for example, acknowledges that the estimated ship strike mortality *in*

16

*Southern California alone* is more than five times the annual sustainable take *for all human-*

17

*caused mortality* of blue whales *along the entire West Coast*, and that this shipping traffic also

18

results in significant mortality of humpback and fin whales. *Id*. ("Redfern (2013) assumed a

19

minimum 17% carcass-detection rate and estimated 5.9 humpback whales, 10.6 blue whales, and

20

7.1 fin whales were struck by ships each year."). AR 60. The Biological Opinion further

21

acknowledges that in the likely event "the carcass-detection rate is lower for blue, fin, and

22

humpback whales than right whales, the actual number of strikes could be higher." *Id*.

23

Despite all these admissions, NMFS concluded that the USCG TSS designations

24

essentially have no effect on the listed species. AR 97 ("[W]e find that the likelihood of a whale

25

being struck because of the proposed action is indistinguishable from the existing risk of a strike

26

and this likelihood is not increased by the proposed action.").

27

28

As demonstrated below, NMFS was only able to reach this result through reliance on its unlawful "no lanes" analytical framework.

### A. The "No-Lane" Analytical Framework is Structurally Flawed and Counter to ESA Requirements

The Biological Opinion correctly defines the agency action being consulted on as "the establishment of these TSSs in the configurations as described by the USCG." AR 9; *see also* AR 7 ("this consultation request was viewed not as a modification of an existing action but as the establishment of a TSS for the purposes of the ESA analysis."). Rather than directly considering the effects of this action, however, NMFS instead engineered the no-lane framework under which it measured the impacts of the lane designations against a hypothetical scenario in which no TSS designations exist. NMFS's reliance on this approach to determine effects was unlawful because (1) the no-lane framework is based upon an arbitrary, nonsensical assumption that TSS designations have essentially no impact on shipping traffic patterns; (2) in using this framework, NMFS produced a fundamentally flawed comparative analysis of effects rather than comprehensive approach demanded by the ESA and its implementing regulations; and (3) NMFS further minimized and concealed the effects of the TSS designations by improperly characterizing those effects as part of the environmental baseline. As a result, the Biological Opinion fails in its basic task of analyzing the resultant effects of the TSS designations on ESA-listed species and critical habitats, rendering the jeopardy analysis arbitrary and unlawful.

### 1. The "No-Lane" Framework Is Based on the Arbitrary Assumption that USCG TSS Designations are of Little Consequence

NMFS used the no-lane framework as the primary analytical vehicle for its conclusion that USCG TSS designations will essentially have no effect on listed species. AR 90 (result of TSS designations "is that the overall exposure profile for whales and leatherback sea turtles is expected to decrease compared to the no-lane scenario."). However, the no-lane framework *itself* is also built on the assumption that the designations merely *reflect* locations of existing shipping traffic, rather than *directing* where ships traverse. *See, e.g.*, AR 66 ("It is reasonable to assume

that shipping existed in the general areas where TSSs were later implemented as reflective of a

no-lane scenario."); AR 69 (NMFS assumption that ship traffic "would generally occur in the

same areas, that is, the ports of [Los Angeles-Long Beach] and [San Francisco Bay] and through

the [Santa Barbara Channel], with the TSSs in place or under the no-lane scenario."). This

assumption has no rational basis in fact or law, but instead was "little more than an analytical

sleight of hand, manipulating the variables to achieve a 'no jeopardy' finding." *Nat'l Wildlife

Fed'n v. Nat'l Marine Fisheries Serv.*, 481 F.3d 1224, 1239 (9th Cir. 2007)[*NWF III*].

      Contrary to NMFS's assumptions underlying the no-lane scenario and effects analysis

generally, the use of the Santa Barbara Channel or three existing approaches to the San Francisco

Bay ports as primary shipping routes is not a foregone conclusion. Indeed, TSSs do not merely

reflect, but direct, the ship routes and traffic, as demonstrated by both the historic use of TSSs

and the process underlying the USCG's most recent TSS designations.

      After the initial TSS designation for Southern California, "[t]he area which showed the

most significant change was the Santa Barbara Channel." 47 Fed. Reg. 27,430, 27,431 (June 24,

1982). As the USCG noted, the increase "seems to indicate that mariners have become more

comfortable with the [Santa Barbara Channel] TSS as it has been in existence since 1969." *Id.*

With respect to Northern California, USCG stated that the San Francisco Bay TSS "has

demonstrated itself to be an effective tool in the coordination of an estimated 10,000 vessel

transits annually." 47 Fed. Reg. 46,043, 46,045 (Oct. 14, 1982). For both areas, the record

reflects that USCG TSS designations in fact affect mariner headings well beyond their

boundaries. AR 17971 ("Many ships appear to continue on the same heading after exiting the

TSS, or to set their headings so that they are aimed toward the entry of the TSS. As a result, the

positioning of the traffic lanes affects the intensity of ship traffic well beyond the end of the

lanes.")

      The rulemaking process at issue here further illustrates the consequential effects of

USCG TSS designations on listed whale species. In the Southern California Port Access Route

Study that provides the foundation for TSS designations in the approaches to Los Angeles-Long

Beach ports, USCG considered an option that would have eliminated the Santa Barbara Channel TSS, as well as an option that would have retained the existing lane but also designated a second lane on the southern side of the Channel Islands. NMFS expressly concluded in the Los Angeles-Long Beach Port Access Route Study that the best available scientific information "indicates a single TSS south of the Channel Islands would appear to minimize the overall risk of ship strikes on whales." PARS, at p. 17. USCG did not choose this recommendation, however, but instead made the decision to designate a single TSS that continues directing traffic through the Santa Barbara Channel.

Although NMFS relies on the no-lane analytical framework to arrive at its conclusion, its assertion that USCG TSS designations have no real impact on shipping traffic and thus also have no consequence on ESA-listed species is a familiar one—and has been rejected in at least two prior judicial opinions. In the first, *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008), conservation groups brought an ESA suit against the USCG and NMFS alleging violations related to the endangered North Atlantic right whale. There, the USCG had refused to undertake any ESA section 7 consultation on its TSS decisions, claiming that the agency had only "a minor and purely ministerial role" in TSS designations. *Id.* at 926. Writing for the panel, Chief Judge Sentelle squarely rejected these arguments, holding as follows:

> [T]he record shows quite a different role for the [USCG] in this process. Most significantly, the [USCG] is the sole body charged with promulgating traffic separation schemes. Appellees point to no congressional authorization permitting the State Department to promulgate traffic separation schemes. Nor can they point to any provision that gives the International Maritime Organization, which was created as a 'consultative and advisory' body, authority to promulgate regulations in U.S. waters. . . . By giving the [USCG] authority to promulgate traffic separate schemes, Congress intended to make the [USCG] accountable for them.

*Id.*

More recently, in *Tulalip Tribes v. Kelly*, Civ. No. 17-652, 2018 U.S. Dist. LEXIS 7852 (W.D. Wash. Jan. 17, 2018), tribal plaintiffs with cultural and spiritual interests in ESA-listed southern resident killer whales sued the USCG and NMFS for again refusing to conduct ESA consultation, this time regarding the impacts of the codification of TSS designations in and

around the Salish Sea. Defendants moved to dismiss on standing, arguing that the alleged harm of increased ship strikes and oil spills is not "fairly traceable" to the USCG's action to designate TSSs, and since the TSSs had been in effect for several prior years, USCG's action did not "cause" the threats to the southern residents. *Tulalip Tribes*, 2020 U.S. Dist. LEXIS 7852, at *7.

Like the D.C. Circuit, the *Tulalip Tribes* court concluded that the USCG "regulates ship traffic through the TSSs and the presence of ship traffic is directly connected to the resultant possibilities of oil spills and vessel strikes." *Id.* at *8. And there, like here, the USCG had itself acknowledged that the "expected benefits associated with codifying the existing TSSs include a potential reduction in the instances of groundings, collisions, and other vessel casualties . . . , which are inextricably tied to the dangers which marine traffic poses to the endangered species." *Id.*; *see* AR 87-88 (noting that "the broad distribution of ships . . . was the primary reason that the USCG began the PARS process, as they recognized that vessels dispersed across a large area caused a maritime safety risk.").

In this case, rather than simply conducting no section 7 consultation at all, the USCG and NMFS instead engaged in a formal section 7 process that culminated with an ultimately meaningless Biological Opinion. By contorting its analysis through the comparative no-lane framework—which is itself built on the very assumption that courts rejected in both *Gutierrez* and *Tulalip Tribes*, (*i.e.,* TSS designations have no effect)—the actual impacts of the TSS designations have been almost wholly obscured. Based on the conclusion of no impacts, NMFS then omitted the key conservation elements of biological opinions, including the elements of incidental take statements and potential inclusion of reasonable and prudent alternatives (if a draft jeopardy determination is made).

The Biological Opinion is consequently of little conservation value to the listed whales and leatherback sea turtle and deprives these species of the protections Congress intended the consultation process to provide. Because NMFS's underlying assumption for the no-lane framework was arbitrary and without a rational basis, the Biological Opinion and its jeopardy analysis is unlawful.

2.      **The ESA Demands a Comprehensive and Aggregative Jeopardy Analysis, Not the Comparative Approach of the "No-Lane" Framework**

The ESA and section 7 consultation regulations mandate that biological opinions incorporate a comprehensive, aggregative approach to the effects analysis. The longstanding regulatory definition for "effects of the action" includes direct, indirect, and interrelated threats that are added to the environmental baseline in order to determine jeopardy. 50 C.F.R. § 402.02. The Section 7 Consultation Handbook further instructs NMFS to find whether:

> the aggregate effects of the factors analyzed under "environmental baseline," "effects of the action," and "cumulative effects" in the action area . . . are likely to jeopardize the continued existence of the species or result in destruction or adverse modification of critical habitat.

ESA Consultation Handbook, at 4-33 (Mar. 1988), https://media.fisheries.noaa.gov/dam-migration/esa_section7_handbook_1998_opr5.pdf (emphasis omitted); 50 C.F.R. § 402.14(g)(4) (directing NMFS to "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat" when formulating a jeopardy opinion).

Rather than conducting a comprehensive analysis of the impacts of the entire proposed action on listed species as required by the ESA and its regulations, NMFS based its Biological Opinion on a two-part analytical framework that compares those effects to the hypothetical no-lane scenario. AR 63 ("To evaluate the likely effects of the proposed action . . . NMFS considered the likely patterns of shipping traffic without the proposed action, that is, shipping in the proposed action areas without the TSSs (a no-lanes scenario)."); AR 73–74 (NMFS describing "fundamental questions" in determining effects in Biological Opinion as "1) would ships using the TSSs be expected to co-occur in space and time with blue, fin, and humpback whales; and 2) *how does this exposure compare to the no-lane scenario?*") (emphasis added).

As addressed in section II.A.1, *supra*, the underlying assumptions of the no-lane framework are arbitrary and have no rational basis in fact or law. Based on these assumptions, NMFS not only concluded that the USCG's TSS designations are not likely to adversely affect

listed species but would in fact *decrease* "the overall exposure profile for whales and leatherback sea turtles." AR 90.

NMFS's use of the no-lane reference point relies on a comparative approach to the Biological Opinion's jeopardy analysis that is directly counter to the aggregative approach that ESA regulations demands. In other words, "[o]nly a comprehensive approach to jeopardy will meet the statutory mandate." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, Civ. No. 1-640-RE, 2005 U.S. Dist. LEXIS 16345, *46 (D. Or. May 26, 2005) [hereinafter *NWF I*] (citing 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)). In *NWF I*, the district court rejected the "basic analytical framework" NMFS used in its Biological Opinion because that framework relied on "the comparison, rather than the aggregation, of the effects of the proposed action." *Id.* at *23–24. The Ninth Circuit repeatedly upheld this core holding through various phases of the case. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782 (9th Cir. 2005) [hereinafter *NWF II*] (appeal of preliminary injunction); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 481 F.3d 1224 (9th Cir. 2007) [hereinafter *NWF III*] (appeal of summary judgment merits); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) [hereinafter *NWF IV*] (amended holding); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1036–37 (9th Cir. 2001) (holding that "[i]f individual projects are diluted to insignificance and not aggregated," then "NMFS's assessment . . . is tantamount to assuming that no project will ever lead to jeopardy of a listed species.").

In the *NWF* cases, NMFS originally concluded that the action at issue caused jeopardy to listed species, but it changed its approach in a new biological opinion "by segregating from the proposed action all elements it deems nondiscretionary, thereby consigning the effects of those elements to the environmental baseline." *NWF I*, 2005 U.S. Dist. LEXIS 16345, at *43. As the court summarized in rejecting that approach, "[w]hat NOAA has in effect done in the [biological opinion] is compare the proposed action to the share of the proposed action it chose to re-categorize as part of the environmental baseline, rather than properly evaluating the proposed

action in its entirety." *Id.*; *see also id.* at \*46 ("This has the effect of substantially lowering the threshold required for the mitigation elements of the proposed action.")

The Ninth Circuit reached a similar conclusion in a case concerning loggerhead sea turtles. *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 738 (9th Cir. 2017) ("Here, the NMFS improperly minimized the risk of bycatch to the loggerheads' survival by only comparing the effects of the fishery against the baseline conditions that have already contributed to the turtles' decline."); *see also Am. Rivers, Inc. v. NOAA Fisheries*, No. CV-04-0061-RE, 2006 U.S. Dist. LEXIS 32931, at \*18 (D. Or. May 23, 2006) ("NOAA's <u>comparison</u> of the effects of the action to the environmental baseline (reference operation), rather than <u>aggregating</u> those effects, results in a jeopardy analysis that is insufficiently comprehensive to 'insure' that any action carried out by a federal agency is 'not likely to jeopardize the continued existence' of a listed species.")(emphasis in original).

NMFS attempted to obscure the effects of USCG's TSS designations by using the no-lane framework, and in doing so, it relied on a more elaborate but equally unlawful comparative lens to that the Ninth Circuit rejected in *NWF II–IV* and *Turtle Island*. Here, the Biological Opinion's effects analysis considers exposure, response, and risk, and it expressly acknowledges that the Santa Barbara Channel and the three San Francisco Bay TSS designations route large vessels through areas of high whale densities. *See, e.g.*, AR 74 ("Whales in the [western portion] of the [Santa Barbara Channel] TSS may be exposed to ships anywhere along the lane although likelihood of exposure is higher in areas of high concentration, particularly the [far western end] or along the 200 meter water depth"); AR 75 (Figure 13) (showing core feeding area of blue whales at the entrance of Santa Barbara Channel); AR 80 ("The [San Francisco] TSS area covers an important foraging area for blue and humpback whales and leatherback sea turtles. The western and northern approaches of the [San Francisco] TSS pass over the 200 meter depth and slope, which have been identified as feeding areas for blues and humpbacks. The area also contains designated leatherback critical habitat."); AR 82 ("[T]here is a likelihood of co-

occurrence between ships and blue and humpback whales across nearly all of the [San Francisco] TSS action areas, particularly in the summer and fall.").

However, rather than simply using this effects analysis to inform its ultimate jeopardy determination, NMFS then took the additional step of using the no-lane scenario as an arbitrary comparative sieve to obscure those effects. By assuming that general shipping patterns are unaffected by the USCG TSS designations, and then building that assumption into the no-lane comparative framework, NMFS effectively excludes any impact arising from those shipping patterns from its jeopardy analysis.

Thus, even though the USCG made an affirmative decision to route shipping traffic through some of the densest seasonal aggregations of large whales on the planet, as well as areas of importance to the leatherback sea turtle, the no-lane framework effectively assured NMFS would conclude that this decision has little to no effect. This nonsensical and unlawful approach should be rejected. *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1162 n. 6 (9th Cir. 1999) (upholding biological opinion jeopardy determination where court agreed with NMFS "that any action agency can [not] 'stay the course' just because doing so has been shown slightly less harmful to the listed species than previous operations.").

### 3. NMFS Improperly Included the Effects of USCG TSS Designations in the Environmental Baseline

NMFS further concealed the effects of the USCG TSS designations by incorrectly characterizing those effects as part of the environmental baseline. While there are some elements of shipping that are not under USCG's discretion and thus properly considered as part of the baseline (*e.g.*, the California Air Resources Board rule and emissions control area), the Biological Opinion also improperly conflates the effects of the action—Coast Guard shipping lane designations—with its baseline discussion. AR 52–61; *see also* 50 C.F.R. § 402.02 (defining environmental baseline).

The USCG has discretion in its TSS designations. *See Gutierrez*, 532 F.3d at 927 ("The [USCG] has conducted port access route studies, . . . accepted comments on a proposed

route, . . . and ensured that [TSS designations] appear in the Code of Federal Regulations. . . . These tasks are not merely ministerial; they require a significant amount of discretion."). Here, the USCG used that discretion to approve several modifications to the TSSs through Santa Barbara Channel and in the approaches to the San Francisco Bay but left the bulk of the existing lanes unchanged. The ESA mandates that all the impacts of those discretionary designations on listed species be assessed as an effect, not as part of the environmental baseline, in determining jeopardy. This principle was reaffirmed during the rulemaking process for the 2019 revisions to the 402 consultation regulations. 84 Fed. Reg. 44,976, 44,978 ("discretionary activities . . . that are part of the proposed action but for which no change is proposed" are to be analyzed "as part of the effects of the action, even those operations that the Federal agency proposes to keep the same.").

This conflation of project effects with the baseline is part and parcel of the Biological Opinion's broader framework, discussed *supra*, which arbitrarily excludes any analysis of TSS effects on listed species on the false assumption that TSS designations do not drive shipping patterns. *See* AR 66 ("The purpose of [the no-lane] approach was to allow NMFS to determine if there were effects to listed species as a result of shipping traffic as organized by TSSs versus the existing effects to listed species from shipping traffic that occurs into and out of these Ports already."); AR 90 ("The baseline risk of vessel strikes is a result of the existence of ships and shipping traffic to, from, and between ports is not an effect of the proposed action.").

### B. NMFS Failed to Consider the Best Available Science Regarding Humpback Whales

NMFS also violated its obligation to rationally assess the impacts of the TSS designations utilizing the best available scientific information. As a primary example, the year before issuing its Biological Opinion, NMFS determined that (1) the Central America DPS of humpback whales is endangered, (2) vessel collisions pose one of the greatest threats to their continued existence and (3) especially high levels of large vessel traffic are found in its range off Panama, Southern California, and San Francisco. 81 Fed. Reg. at 62,307.

Nevertheless, NMFS concluded that the USCG's TSS designations—which indisputably focus and concentrate vessel traffic in areas with high density of whales—would not jeopardize the species' continued existence. In reaching this conclusion, NMFS erred in two primary ways: (1) it ignored highly pertinent information representing the best available science on the abundance of and threats to humpback whales, and (2) it otherwise failed to make a rational connection between the facts found and choices made. Each of these faults render the Biological Opinion unlawful.

The ESA requires NMFS to use the "best scientific and commercial information available" in forming its Biological Opinion. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). This command means the "'agency 'cannot ignore available biological information or fail to develop projections' which may indicate potential conflicts between the proposed action and the preservation of endangered species." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000) (quoting *Conner*, 848 F.2d at 1454).

Yet that is just what NMFS unlawfully did with this Biological Opinion. NMFS failed to use the best available science by ignoring available information indicating that the number of Central America humpback whales is perilously small—about 400—and the threatened Mexico DPS abundance estimate was also reduced significantly in the listing decision. Compounding the problem, the Biological Opinion ignored recent data about increasing deaths in fishing gear off California.

The Biological Opinion gave a Central America DPS population estimate of approximately 400 to 600 humpbacks, and an estimate of 6,000 to 7,000 Mexico DPS humpbacks. AR 40. Yet months earlier, NMFS concluded that the number of Central America DPS humpbacks was 411, 81 Fed. Reg. at 62,307, and that the Mexico DPS was only 3,264 humpbacks. *Id.* at 62,305. Similarly, NMFS asserted in the Biological Opinion that the population of Mexico humpback whales is increasing, AR 40, even though in its earlier listing decision it acknowledged that it did "not have specific evidence that this DPS is actually increasing in overall population size." 81 Fed. Reg. at 62,306.

1    As courts have explained, when a Biological Opinion uses "data [that] are either outdated

2 or inaccurate, it should, at the very least, analyze the new data or explain why it nevertheless

3 chose to rely on the older data." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707

4 F.3d 462, 473 (4th Cir. 2013); *see also Intertribal Sinkyone Wilderness Council v. Nat'l Marine*

5 *Fisheries Serv.*, 970 F. Supp. 2d 988, 998–1002 (N.D. Cal. 2013) (invalidating NMFS's reliance

6 on outdated exposure thresholds the agency had abandoned elsewhere). That is particularly true

7 here, where NMFS listed the relevant humpback DPSs in part because of the magnitude of the

8 ship strike threat. But NMFS failed to acknowledge its own science showing lower population

9 estimates and uncertain population trends. Instead, it used old data that inflated the status of the

10 species, thereby diminishing the true import of the threat of ship strikes to ESA-listed humpback

11 whale DPSs.

12    Inexplicably, the Biological Opinion also relies on information regarding the

13 California/Oregon/Washington humpback whale "stock," as designated under the Marine

14 Mammal Protection Act, while acknowledging that it does not align with the humpback whale

15 DPS designations under the ESA. AR 52 ("NMFS uses the information on these stocks as the

16 best available scientific and commercial information to support our analysis of impacts to the

17 ESA-listed species."). The information on the California/Oregon/Washington humpback whale

18 stock does not adequately protect the endangered Central America DPS and threatened Mexico

19 DPS because it aggregates the DPSs into one management unit with a larger population. This is

20 antithetical to the ESA because "[t]o the extent that there is any uncertainty as to what constitutes

21 the best available scientific information, Congress intended 'to give the benefit of the doubt to

22 the species.'" *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1127

23 (N.D. Cal. 2006) (quoting *Conner*, 848 F.2d at 1454). Erasing the discreteness of a dangerously

24 small humpback whale population while purporting to analyze the impacts of a primary threat to

25 that population does not meet the ESA's mandate.

26    NMFS also ignored available information regarding recent entanglement-related

27 humpback whale injury and death. The Biological Opinion cited science that estimates that—in

28

Southern California alone—vessel collisions kill on average 5.9 humpbacks annually. AR 60. It provided no annual estimate of entanglements but noted that in a 15-year period (1998–2013), 53 humpback whales died or were seriously injured due to fisheries. Yet the Biological Opinion failed to consider that NMFS, in its rule listing humpback DPSs on the ESA, noted that there were 31 confirmed humpback deaths resulting from entanglements off the coasts of California, Oregon, and Washington in 2015 alone. 81 Fed. Reg. at 62,305.

NMFS apparently recognized that data regarding how many whales were caught in fishing gear each year was relevant to the analysis in its Biological Opinion, *see, e.g.*, AR 61–62, yet it did not consider the most recent data—that far exceeded the number of entanglements previously estimated—in its evaluation. *Id*. Entanglement information from 2015 is especially relevant because of the drastic increase in entanglements off the U.S. West Coast. *Id*. In short, NMFS failed to evaluate relevant data, despite knowing that the endangered whales and sea turtles at issue in the Biological Opinion are increasingly harmed by fishing gear.

The population abundance and entanglement data that NMFS failed to consider here are precisely the type of data that courts have found are needed to conduct a lawful jeopardy analysis. *See, e.g.*, *Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 362, 367 (E.D. Cal. 2007) (holding Biological Opinion issued in 2005 arbitrary and capricious for failing to consider annual population surveys of endangered species at issue that were "regularly compiled . . . and relied upon by the agency in the past"). The need to consider such information is particularly important given the highly imperiled status of the Central America DPS of humpback whales, with only 411 whales remaining, and the drastic increase in deaths from entanglements.

## C.   NMFS Failed to Develop a Lawful Incidental Take Statement

When a federal action is not likely to jeopardize listed species, a biological opinion must analyze whether a "taking" of listed species may occur. 16 U.S.C. § 1536(b)(4). The definition of "take" includes actions that "harass", "harm", "wound," or "kill" a listed species. *Id*. § 1532(19). Whenever "such take is reasonably certain to occur," a biological opinion must provide an

"incidental take statement," 50 C.F.R. § 402.14(g)(7), (i). An incidental take statement serves several important functions. First, it "serves as a check on the agency's original decision that the incidental take of listed species resulting from the proposed action will not [jeopardize the continued existence of the species]." *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012). Second, it establishes a level for permitted incidental take that, if exceeded, invalidates the "safe harbor" provision that protects an agency from liability for authorizing an action that causes take. *See* 50 C.F.R. § 402.14(i)(5) (waiving the take prohibition for actions authorized and in compliance with an incidental take statement); *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1039–40 (9th Cir. 2007) (invalidating an incidental take statement because it failed to establish a trigger to invalidate the safe harbor provision and require reinitiation of the consultation process). And third, it must contain "reasonable and prudent measures" that NMFS considers necessary or appropriate to minimize the impact of the take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(ii)–(iv).

"This statutory and regulatory language obligates [the action agency] to minimize the impact of the proposed action and also acts as a trigger for the reinitiation of formal consultation." *See Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 258 (D.D.C. 2008). To provide the required "trigger," an incidental take statement must "'[s]pecif[y] the impact of such incidental taking on the species' . . . in a way that will alert the agency when the allowed incidental take has been exceeded." *Miccosukee Tribe v. United States*, 566 F.3d 1257, 1271–72 (11th Cir. 2009) (alteration in original) (quoting 16 U.S.C. § 1536(b)(4)(i)). If it is impossible to quantify take, a biological opinion must identify a surrogate that would provide a reasonable estimate. *Id.* at 1275 (rejecting agency's argument that because the birds in the case have "secretive" behavior, "cryptic" colors, and "move over expansive and remote areas," a surrogate measure of take was not required); *Or. Nat. Res. Council*, 476 F.3d at 1037–38 (invalidating Biological Opinion that "offers no explanation of why the [agency] was unable numerically to quantify the level of take of northern spotted owls. . . . The [agency] … never states that it is not possible to update the survey data in order to

estimate the number of takings, only that it has not actually done the surveys."). "Difficulty" in crafting a numerical incidental take statement is not a lawful justification for not doing one. *Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210, 1234–35 (D. Haw. 2015).

Here, the Biological Opinion contains a heading titled "Incidental Take Statement," but that purported statement fails to meet any of the ESA's requirements. Using the same rationale as its determination that the TSS designations will essentially have no effect on listed species— based on a comparison of the effects of lane designations to the hypothetical no-lane scenario— NMFS gave no take estimate of any kind and did not address the other required elements of incidental take statements. AR 98 ("[B]ased upon the overall reduced exposure of whales to vessel traffic, the behavior and number of ships in the action area and the relative density and variability in habitat use by whales, NMFS could not detect a change in the risk profile from the proposed action such that take is considered likely to occur as a result of the proposed action.").

As discussed *supra*, NMFS's reliance on no-lane framework resulted in arbitrary conclusions regarding the effects of the action. These conclusions have equally invalidated the Incidental Take Statement, which is essentially no statement. This lack of an incidental take statement violates the ESA. *Pub. Empls. for Env't Responsibility v. Beaudreu*, 25 F. Supp. 3d 67, 114–15 (D.D.C. 2014).

### III.    The USCG Arbitrarily Relied on the Unlawful Biological Opinion

Section 7 of the ESA also "imposes on the [USCG] a substantive duty to ensure that its [actions] are not likely to jeopardize the continued existence" of the listed whales and leatherback sea turtle. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010). Consistent with this key premise, "an [action] agency cannot meet its section 7 obligations by relying on a Biological Opinion that is legally flawed or by failing to discuss information that would undercut the opinion's conclusions." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012).

As a result of NMFS preparing an unlawful Biological Opinion for the USCG's codification of TSS designations off the Southern and Northern California coasts, the USCG's reliance on the Biological Opinion in adopting the TSS designations was arbitrary and capricious, and the USCG violated its substantive duty to ensure no jeopardy to blue whales, fin whales, humpback whales, and leatherback sea turtles.

**CONCLUSION**

For all the reasons stated herein, the Court should grant Plaintiffs' motion for summary judgment, and declare that NMFS and the USCG violated the ESA.[9]

Respectfully submitted this 31st day of January, 2022.

/s/ *Brian Segee*
Brian Segee (Cal. Bar No. 200795)
Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA 90017
tel: (805) 750-8852
bsegee@biologicaldiversity.org

/s/ *Catherine Kilduff*
/s/ *Kristen Monsell*
Catherine Kilduff (Bar No. 256331)
Kristen Monsell (Bar No. 304793)
Center for Biological Diversity
1212 Broadway, Suite #800
Oakland, CA 94612
tel: (510) 844-7100
email: ckilduff@biologicaldiversity.org
kmonsell@biologicaldiversity.org

*Attorneys for Plaintiffs*

---

[9] Because Defendants have agreed to undergo reinitiated consultation, Plaintiffs are not briefing the reinitiation claim and do not include citation to, or discussion of, the significant new scientific information that has arisen subsequent to the February 2017 Biological Opinion that prompted the renewed consultation.