TODD KIM
Assistant Attorney General
SETH M. BARSKY
Section Chief
S. JAY GOVINDAN
Assistant Section Chief
FREDERICK H. TURNER (Maryland Bar)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0641
Fax: (202) 305-0275
Email: frederick.turner@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | ) | Case No. 4:21-cv-345-KAW |
| | ) | |
| Plaintiffs, | ) | **DEFENDANTS' NOTICE OF MOTION, CROSS-MOTION FOR SUMMARY JUDGMENT, AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | ) | |
| NOAA FISHERIES, *et al.*, | ) | |
| Defendants. | ) | **Date:** August 4, 2022 |
| | ) | **Time:** 1:30 p.m. |
| | ) | **Location:** Oakland Courthouse |
| | ) | 1301 Clay St. |
| | ) | Oakland, CA 94612 |

PLEASE TAKE NOTICE that on August 4, 2022, at 1:30 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Kandis A. Westmore, located in the United States District Court for the Northern District of California, Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, the United States will bring for hearing Defendants' Cross-Motion for Summary Judgment and Response to Plaintiffs' Motion for Summary Judgment.

Under Federal Rule of Civil Procedure 56 and Civil Local Rule 7, Defendants cross-move for summary judgment on the claims in Plaintiffs' Complaint. *See* Dkt. No. 1. Defendants are entitled to summary judgment because the National Marine Fisheries Service and the U.S. Coast Guard complied with the requirements of the Endangered Species Act, 16 U.S.C. § 1531 et seq., in issuing the February 2017 Biological Opinion (BiOp) and in relying on the BiOp. Defendants' Cross-Motion is based on the accompanying Memorandum, the Administrative Records, and all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

TABLE OF ACRONYMS ........................................................................................ ix

MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT ....... 1

INTRODUCTION ................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ............................................... 2

    I.    Endangered Species Act ..................................................................... 2

    II.   Marine Mammal Protection Act .......................................................... 3

    III.  Ports and Waterways Safety Act.......................................................... 4

FACTUAL AND PROCEDURAL BACKGROUND ................................................... 5

    I.    Whales on the California Coast ........................................................... 5

        A.    Blue Whales ............................................................................ 5

        B.    Fin Whales .............................................................................. 6

        C.    Humpback Whales ................................................................... 6

        D.    Threats Faced by Whales .......................................................... 7

    II.   Leatherback Sea Turtles ...................................................................... 8

    III.  Establishment and Amendment of TSSs on the California Coast .............. 8

        A.    San Francisco TSS ................................................................... 9

        B.    Santa Barbara Channel, Los Angeles/Long Beach TSSs................... 10

    IV.  Initiation of Section 7 Consultation ................................................... 12

    V.   NMFS's No-Jeopardy BiOp ............................................................ 12

STANDARD OF REVIEW ...................................................................................... 13

ARGUMENT ......................................................................................................... 13

    I.    Plaintiffs Lack Standing...................................................................... 13

        A.    Plaintiffs Have Not Shown Causation. ....................................... 14

        B.    Plaintiffs Have Not Shown Redressability. .................................. 16

II.     NMFS Fully Complied with the ESA...........................................................18

        A.     NMFS Reasonably Structured Its Effects Analysis. ...............................19

        B.     Plaintiffs' Misplaced Assertions About the BiOp's Structure
               Should Be Rejected............................................................................24

               1.     The Court Should Reject Plaintiffs' Red Herring Assumption...........24

               2.     Plaintiffs' Skewed View of the Effects Analysis Should Be Rejected. ...........26

               3.     Plaintiffs' Challenge to the Baseline Has No Basis in the Record....................28

        C.     NMFS Considered the Best Available Data. .........................................30

        D.     NMFS Properly Concluded that an Incidental Take Statement
               Was Unnecessary. .............................................................................33

III.    USCG Satisfied Its Substantive Obligations to Ensure Against Jeopardy. ...............35

CONCLUSION.................................................................................................35

Defs.' Cross-Motion for Summary Judgment          U.S. Department of Justice
                                                  Environment & Natural Resources Division
No. 4:21-cv-345-KAW                    ii          Washington, DC  20044-7611

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page**

*Allen v. Wright*,
    468 U.S. 737 (1984)........................................................................................17

*Aluminum Company of America v. Bonneville Power Administration*,
    175 F.3d 1156 (9th Cir. 1999) ........................................................................28

*Am. Diabetes Ass'n v. U.S. Dep't of the Army*,
    938 F.3d 1147 (9th Cir. 2019) ........................................................................14

*American Rivers v. NOAA Fisheries*,
    No. CV-04-0061-RE, 2006 WL 1455629 (D. Or. May 23, 2006)...........................27, 28

*Arizona Cattle Growers Association v. U.S. Fish & Wildlife*,
    273 F.3d 1229 (9th Cir. 2001) ........................................................................34

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983).........................................................................................13

*Bender v. Williamsport Area Sch. Dist.*,
    475 U.S. 534  (1986).................................................................................14, 16

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971).......................................................................................13

*Colorado by & Through Colorado Dep't of Nat. Res., v. U.S. Fish & Wildlife Serv.*,
    362 F. Supp. 3d 951 (D. Colo. 2018)...............................................................31

*Columbia Riverkeeper v. U.S. Army Corps of Eng'rs*,
    -- F. Supp. 3d -- , No. 19-6071 RJB, 2020 WL 6874871 (W.D. Wash. Nov. 23, 2020). 35

*Ctr. for Biological Diversity v. Haaland.*,
    4:19-cv-5206-JST (N.D. Cal.) ........................................................................27

*Ctr. for Biological Diversity v. Lueckel*,
    248 F. Supp. 2d 660 (W.D. Mich. 2002) ..........................................................17

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    746 F. Supp. 2d 1055 (N.D. Cal. 2009) ...........................................................28

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
    807 F.3d 1031 (9th Cir. 2015) ........................................................................30

*Defenders of Wildlife v. Gutierrez,*
    532 F.3d 913 (D.C. Cir. 2008) ................................................................. 25

*Dow AgroSciences LLC v. NMFS,*
    707 F.3d 462 (4th Cir. 2013) ............................................................. 31, 32

*Fla. Audubon Soc'y v. Bensten,*
    94 F.3d 658 (D.C. Cir. 1996) ................................................................. 15

*Friends of Southeast's Future v. Morrison,*
    153 F.3d 1059 (9th Cir. 1998) ............................................................... 33

*Friends of the Earth v. Laidlaw Env't Servs. (TOC),*
    528 U.S. 167 (2000) ................................................................................ 14

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990) ................................................................................ 14

*Greenpeace v. NMFS,*
    80 F. Supp. 2d 1137 (W.D. Wash. 2000) .............................................. 31

*Hall v. Norton,*
    266 F.3d 969 (9th Cir. 2001) ................................................................. 15

*Intertribal Sinkyone Wilderness Council v. NMFS,*
    970 F. Supp. 2d 988 (N.D. Cal. 2013) ................................................... 32

*Kern Cnty. Farm Bureau v. Allen,*
    450 F.3d 1072 (9th Cir. 2006) ............................................................... 30

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................. 13, 14, 16, 18

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ................................................................................ 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................. 13

*Mt. Graham Red Squirrel v. Espy,*
    986 F.2d 1568 (9th Cir. 1993) ............................................................... 13

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ................................................................................ 34

Defs.' Cross-Motion for Summary Judgment        U.S. Department of Justice
                                           Environment & Natural Resources Division
No. 4:21-cv-345-KAW            iv             Washington, DC  20044-7611

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  Civ. No. 01-640-RE, 2005 WL 1278878 (D. Or. May 26, 2005)...................................27

*Oceana v. Bureau of Ocean Energy Mgmt.*,
  37 F. Supp. 3d 147 (D.D.C. 2014) ...................................................... 12

*Public Employees for Environmental Responsibility v. Beaudreu*,
  25 F. Supp. 3d 67 (D.D.C. 2014) ...................................................... 34

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*,
  898 F.2d 1410 (9th Cir. 1990) ...................................................... 35

*S.F. Baykeeper v. U.S. Army Corps of Eng'rs*,
  219 F. Supp. 2d 1001 (N.D. Cal. 2002) ...................................................... 23

*Salmon Spawning & Recovery All. v. Gutierrez*,
  545 F.3d 1220 (9th Cir. 2008) ...................................................... 17

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ...................................................... 13

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ...................................................... 30

*Sierra Club v. EPA*,
  356 F.3d 296 (D.C. Cir. 2004) ...................................................... 32

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...................................................... 14

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ...................................................... 13

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
  143 F.3d 515 (9th Cir. 1998) ...................................................... 26

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
  100 F.3d 1443 (9th Cir. 1996) ...................................................... 31

*Tulalip Tribes v. Kelly*,
  Civ. No. 17-652 MJP, 2018 WL 453475 (W.D. Wash. Jan. 17, 2018) ...........................25

*Turtle Island Restoration Network v. U.S. Department of Commerce*,
  878 F.3d 725 (9th Cir. 2017) ......................................................27, 28

*Wash. Env't Council v. Bellon*,
    732 F.3d 1131 (9th Cir. 2013) ........................................................................... 14, 15, 16

**Statutes**

5 U.S.C. § 706 ...................................................................................................................... 13

5 U.S.C. § 706(2)(A) ...................................................................................................... 13, 14

5 U.S.C. § 706(2)(D) .......................................................................................................... 14

16 U.S.C. § 1361(1) .............................................................................................................. 3

16 U.S.C. § 1361(2) .............................................................................................................. 3

16 U.S.C. § 1362(9) .............................................................................................................. 3

16 U.S.C. § 1362(20) ............................................................................................................ 3

16 U.S.C. § 1531(b) .............................................................................................................. 2

16 U.S.C. § 1532(6) .............................................................................................................. 2

16 U.S.C. § 1532(15) ............................................................................................................ 2

16 U.S.C. § 1532(16) ............................................................................................................ 2

16 U.S.C. § 1532(19) ............................................................................................................ 3

16 U.S.C. § 1532(20) ............................................................................................................ 2

16 U.S.C. § 1533(f)(1) .......................................................................................................... 2

16 U.S.C. § 1536(a)(2) ............................................................................................... 2, 26, 30

16 U.S.C. § 1536(b)(3)(A) ................................................................................................. 26

16 U.S.C. § 1536(b)(4)(i) ............................................................................................... 3, 34

16 U.S.C. § 1536(b)(4)(ii) .................................................................................................... 3

46 U.S.C. § 70001(a)(1) ........................................................................................................ 4

46 U.S.C. § 70001(a)(4) ...................................................................................................... 18

46 U.S.C. § 70003(a) ...................................................................................................... 4, 18

46 U.S.C. § 70003(c)(1) ............................................................................................... 4

46 U.S.C. § 70003(c)(2) ............................................................................................... 4

46 U.S.C. § 70003(d)(2) ............................................................................................... 4

46 U.S.C. § 70004(1) ................................................................................................... 4

46 U.S.C. § 70004(1)(A)-(I) ......................................................................................... 4

Pub. L. 95-474 ............................................................................................................. 9

Pub. L. 115-282 ........................................................................................................... 4

**Regulations**

33 C.F.R. § 1.05-20 .................................................................................................... 18

33 C.F.R. § 166.105(a) ................................................................................................. 4

33 C.F.R. § 167.5(b) .................................................................................................... 4

33 C.F.R. § 167.5(c) .................................................................................................... 4

50 C.F.R. § 402.01(b) .................................................................................................. 2

50 C.F.R. § 402.02 ............................................................................................... 12, 27

50 C.F.R. § 402.13(a) (2017) ...................................................................................... 3

50 C.F.R. § 402.14(a) .................................................................................................. 2

50 C.F.R. § 402.14(b) .................................................................................................. 2

50 C.F.R. § 402.14(g)(4) (2019) ................................................................................ 27

50 C.F.R. § 402.14(g)(7) .............................................................................. 3, 26, 34, 35

50 C.F.R. § 402.14(h) .................................................................................................. 3

50 C.F.R § 402.14(i)(1) .............................................................................................. 34

50 C.F.R. § 402.16(a)(1)-(4) ....................................................................................... 3

**Federal Register**

35 Fed. Reg. 8491 (June 2, 1970) ........................................................................ 8

64 Fed. Reg. 32,451 (June 17, 1999) ................................................................... 9

77 Fed. Reg. 4170 (Jan. 26, 2012) ....................................................................... 8

80 Fed. Reg. 22,304 (Apr. 21, 2015) .................................................................... 6

80 Fed. Reg. 26,832 (May 11, 2015) .................................................................. 34

81 Fed. Reg. 62,260 (Sept. 8, 2016) ...................................................... 30, 31, 33

84 Fed. Reg. 44,976 (Aug. 27, 2019) .................................................................... 3

86 Fed. Reg. 21,082 (Apr. 21, 2021) ................................................................. 7, 8

**Other Authorities**

Endangered Species Consultation Handbook (1998) ..................................... 24, 34

International Conference for Safety of Life at Sea (Jan. 20, 1914) ......................... 9

International Convention for the Safety of Life at Sea
    32 U.S.T. 47, T.I.A.S. 9700 (Nov. 1, 1974) ..................................................... 8

International Maritime Organization Resolution MSC.99(73) (Dec. 5, 2000) ......... 8, 9

**TABLE OF ACRONYMS**

| | |
|---|---|
| AIS | Automatic Information System |
| APA | Administrative Procedure Act |
| ASBS | Area of Sensitive Biological Significance |
| BiOp | Biological Opinion |
| CARB | California Air Resources Board |
| DPS | Distinct Population Segment |
| ECA | Emissions Control Area |
| ESA | Endangered Species Act |
| FCRPS | Federal Columbia River Power System |
| IMO | International Maritime Organization |
| ITS | Incidental Take Statement |
| MMPA | Marine Mammal Protection Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| PARS | Port Access Route Studies |
| PBR | Potential Biological Removal |
| PWSA | Ports and Waterways Safety Act |
| RPA | Reasonable and Prudent Alternative |
| SAR | Stock Assessment Report |
| SOLAS | International Convention for Safety of Life at Sea |
| TSS | Traffic Separation Scheme |
| USCG | United States Coast Guard |

**MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Traffic Separation Schemes (TSSs) aid in the organization of vessel movement in the coastal waters around the United States through the establishment of traffic lanes. These oceanic lanes help to increase navigational safety and predictability, and in this way are similar to terrestrial lanes on roads and highways. The TSSs at issue in this case were designated by the U.S. Coast Guard (USCG) and adopted by the International Maritime Organization (IMO) and designed to arrange vessel traffic into and out of two key western U.S. ports—San Francisco and Los Angeles/Long Beach.[1] Under Endangered Species Act (ESA) Section 7(a)(2), action agencies such as USCG are required to consult with the National Marine Fisheries Service (NMFS) when an action may affect marine species listed as endangered or threatened. Here, USCG initiated consultation with NMFS on the effects of the California TSSs on blue, humpback, and fin whales, as well as leatherback sea turtles. NMFS subsequently issued a Biological Opinion (BiOp) in which the agency determined that TSSs were likely to *reduce* the risk posed by vessel traffic to listed species in the approaches to the ports of San Francisco and Los Angeles/Long Beach, and therefore were not likely to jeopardize the ESA-listed species. The administrative records in this case show that NMFS rationally reached this science-based conclusion and that USCG reasonably relied on it.

Plaintiffs' Complaint raises five claims regarding action and inaction by USCG and NMFS. In their Motion for Summary Judgment, Plaintiffs have not advanced merits arguments on Claims III, IV, and V, which relate to reinitiation of consultation, ESA Section 7(d), and take under ESA Section 9, respectively. Instead, they focus on Claims I and II, which challenge the validity of the BiOp and USCG's reliance on it. Plaintiffs contend that NMFS erred in how it structured the BiOp, but their primary assertions are directed at an assumption that NMFS did not make, and thus the crux of their argument is premised on a red herring. Plaintiffs' assertions also run counter to the record evidence, which shows that NMFS applied its expert judgment

---

[1] The San Francisco TSS also leads to the port of Oakland. This brief will refer to these lanes as the San Francisco TSS because the administrative record documents refer to San Francisco when discussing this TSS.

and considered the best available scientific and commercial information. Because both of the agencies fulfilled their Section 7 obligations in this case, the Court should grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

## STATUTORY AND REGULATORY BACKGROUND

### I.   Endangered Species Act

Congress enacted the ESA to establish a program for the conservation of endangered species and threatened species and the ecosystems on which those species depend. 16 U.S.C. § 1531(b). Only those species that meet the statutory definition of an endangered species or a threatened species qualify for the protections of the ESA. An endangered species is one that "is in danger of extinction throughout all or a significant portion of its range," and a threatened species is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(6), (20). "Species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment [DPS] of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). The Secretary of the Interior or Secretary of Commerce must develop and implement recovery plans for "the conservation and survival" of those species listed under the ESA. *Id.* § 1533(f)(1).[2]

Under Section 7(a)(2), federal agencies must ensure that any action funded, authorized, or carried out by the agency is "not likely to jeopardize the continued existence of any endangered species or threatened species" or to destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2). The ESA requires that action agencies consult with NMFS or the Fish and Wildlife Service (together, the Services) whenever the agency's action "may affect" a listed species. *Id.*; 50 C.F.R. § 402.14(a). The action agency must engage in "informal" or "formal" consultation. 50 C.F.R. § 402.14(a), (b). "If during informal consultation it is determined by the [action agency] that the action is not likely to adversely affect listed species or critical habitat,

---

[2] The Secretary of Commerce has jurisdiction over most marine species, including whales and sea turtles, and the Secretary delegated this authority to NMFS. 16 U.S.C. § 1532(15); 50 C.F.R. § 402.01(b). The Secretary of the Interior has jurisdiction over terrestrial species.

the consultation process is terminated." *Id.* § 402.13(a) (2017).[3] If the action is "likely to adversely affect" listed species or critical habitat, the agencies must engage in formal consultation, which culminates in the issuance of a "biological opinion" by the consulting agency. *Id.* § 402.14(h). A BiOp considers whether the proposed action is likely to jeopardize the continued existence of the species or result in the destruction or adverse modification of its designated critical habitat. *See id.* If the consulting agency reaches a no-jeopardy decision, and if "take"[4] is reasonably certain to occur, then the agency must issue an incidental take statement (ITS). 50 C.F.R. § 402.14(g)(7); *see* 16 U.S.C. § 1536(b)(4)(i)-(ii). The ESA regulations also require reinitiation of consultation under certain circumstances. 50 C.F.R. § 402.16(a)(1)-(4).

## II.    Marine Mammal Protection Act

Congress enacted the Marine Mammal Protection Act (MMPA) in 1972 based on its finding that certain species or population stocks of marine mammals are or may be "in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). It found that such mammals "should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimal sustainable population." *Id.* § 1361(2). With respect to any population stock, "optimum sustainable population" means "the number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." *Id.* § 1362(9). The term "potential biological removal [PBR] level" means "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Id.* § 1362(20). Thus, the MMPA aims to protect marine mammals by maintaining the stocks as part of their ecosystems.

---

[3] This regulation has been revised since the time of the 2017 BiOp. *See* 84 Fed. Reg. 44,976 (Aug. 27, 2019). Those regulations are the subject of legal challenges. *See infra* at 27 n.20.

[4] "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

1    **III.    Ports and Waterways Safety Act**

2        The Ports and Waterways Safety Act (PWSA) authorizes USCG to "construct, operate,

3    maintain, improve, or expand vessel traffic services" in any port or place under the jurisdiction

4    of the United States. 46 U.S.C. § 70001(a)(1).[5] Those "vessel traffic services" consist of

5    "measures for controlling or supervising vessel traffic or for protecting navigation and the

6    marine environment." *Id.* In order to provide "safe access routes for the movement of vessel

7    traffic proceeding to or from ports or places," USCG designates voluntary TSSs and fairways

8    for vessels operating in the territorial sea, which extends 12 miles from the shoreline, and the

9    high sea approaches to U.S. ports. *Id.* § 70003(a). USCG regulations define a TSS as "a

10   designated routing measure which is aimed at the separation of opposing streams of traffic by

11   appropriate means and by the establishment of traffic lanes," 33 C.F.R. § 167.5(b), and a traffic

12   lane as "an area within defined limits in which one-way traffic is established," *id.* § 167.5(c).[6]

13       To designate a TSS, USCG must conduct a Port Access Route Study (PARS) that

14   analyzes potential traffic density and the need for safe access routes for vessels. 46 U.S.C. §

15   70003(c)(1). As part of the TSS process, USCG coordinates with the Secretaries of State, the

16   Interior, Commerce, and the Army, and the Governors of affected states, so that it can "take into

17   account all other uses of the area under consideration." *Id.* § 70003(c)(2). USCG must also

18   consider "all relevant factors concerning navigation and vessel safety, protection of the marine

19   environment, and the safety and security of United States ports and waterways." *Id.* § 70004(1);

20   *see id.* § 70004(1)(A) – (I); *id.* § 70031(1) (defining the term "marine environment").

21   Ultimately, a TSS designation must recognize "the paramount right of navigation over all other

22   uses." *Id.* § 70003(a). If USCG determines that it is appropriate to designate or adjust the TSS,

23   the agency publishes a notification in the Federal Register and then submits the TSS proposal to

24   an international body—the International Maritime Organization—for consideration and

25   adoption. *Id.* § 70003(d)(2), (e)(4). IMO adoption ensures international recognition of the TSS.

26   _____

27   [5] Congress moved the PWSA from Title 33 to Title 46 in 2018. *See* Pub. L. No. 115-282 §§ 401, 404, 132 Stat. 4192, 4253, 4265 (Dec. 4, 2018).

28   [6] A fairway is "a lane or corridor in which no artificial island or fixed structure" is permitted. 33 C.F.R. § 166.105(a).

**FACTUAL AND PROCEDURAL BACKGROUND**

This case involves the efforts by NMFS and USCG to reduce the co-occurrence of large ships, or vessels, and four ESA-listed species in the coastal waters of California and to ensure navigational safety and predictability through the designation and adjustment of TSSs in the approaches to ports in those same waters. That designation and adjustment of the TSSs is the "proposed action" that is the subject of the USCG's ESA consultation with NMFS.

**I.    Whales on the California Coast**

NMFS's BiOp considered three species of cetaceans—blue, fin, and humpback whales. As required by the ESA, NMFS focused on whether the proposed action was likely to jeopardize the whales; however, for the status of the species discussion of these whales, NMFS relied in part on the concept of "stocks" as that term is used under the MMPA. NMFS did so to provide the best available status information and population estimates of whale populations in the waters affected by the proposed action. NMFS AR 24.[7] As part of this reliance on MMPA stocks, NMFS also included the PBR in the BiOp discussion. But it is important to note that the PBR assessment under the MMPA is *not*, as Plaintiffs erroneously suggest, a number above which a species is unable to recover for purposes of the ESA. *See*, *e.g.*, Dkt. No. 41 (Pls.' Mot.) at 4 ("NMFS has determined that this population cannot sustain more than 2.3 human-caused deaths annually if the population is to recover."). In fact, the best available science shows the relevant whale populations are increasing or stable. NMFS AR 24, 30, 39-40.

**A.    Blue Whales**

The blue whale, *Balaenoptera musculus*, was listed as endangered under the precursor law to the ESA and remained on the list after Congress passed the ESA. NMFS AR 21-22. The name for this baleen whale stems from the blue-gray coloring, which appears light blue under

---

[7] Citations to NMFS's Administrative Record are noted by (1) "NMFS AR" and a page cite corresponding to the Bates number at the bottom of the page for the Consultation Documents; (2) "NMFS References" plus a page cite to the corresponding Bates number for the Scientific References and document number in the record index; or (3) "NMFS Supporting Docs" and a page cite to the corresponding Bates number for Supporting Documents. Citations to USCG's Administrative Record are noted by "USCG AR" and a page cite corresponding to the Bates number at the bottom of the page. For ease of reference, these citations do not include the zeros preceding the Bates numbers.

U.S. Department of Justice
Environment & Natural Resources Division
Washington, DC  20044-7611

water. The blue whale's oceanic location and movement are determined in large part by krill, which is the primary prey: blue whales are often found at the upwelling zones near the continental shelf, where krill abundance is highest; the whales follow krill into deeper waters during the daytime and shallower waters at night; and the whales migrate seasonally in large part based on krill movement. NMFS AR 23-25. Globally, blue whales are separated into three subspecies—those found in the North Pacific, the North Atlantic, and the Southern Hemisphere. NMFS AR 22. The MMPA stock likely to be affected by the proposed action is the Eastern North Pacific stock of the first subspecies. NMFS AR 25. The minimum population estimate for this stock is 1,551 whales. NMFS AR 26-27.

**B. Fin Whales**

The fin whale, *Balaenoptera physalus*, is another baleen whale that was listed as endangered under the precursor law to the ESA and remained on the list after Congress passed the ESA. NMFS AR 28. Its upper half is dark gray, while its lower half is cream or white, and the genesis for its name is the dorsal fin located toward the end of its back. *Id.* Most fin whales migrate seasonally, though they tend to avoid tropical climates. NMFS AR 29. Their primary prey are krill and schooling fish. *Id.* The stock of fin whales likely to be affected by the proposed action is the California/Oregon/Washington stock. NMFS AR 30. The minimum population estimate for this MMPA-oriented stock is 2,598 whales, and abundance in the stock increased 51% between 1996 and 2008. NMFS AR 30-31.

**C. Humpback Whales**

The third baleen whale covered by the BiOp is the humpback whale, *Megaptera novaeangliae*. Humpback whales were listed as endangered in 1973. NMFS AR 32. Humpback whales are primarily dark gray in color, and they are distinguished by wing-like pectoral flippers and the fluke patterns on their underside. NMFS AR 35; 80 Fed. Reg. 22,304, 22,308 (Apr. 21, 2015). They are migratory animals, spending winter months in tropical areas and spring, summer, and fall months in polar areas. NMFS AR 35. Like fin whales, their primary food source is krill and schooling fish. *Id.* And, like blue whales, humpback whales follow their prey into deeper waters during the daytime and shallower waters at night. *Id.*

There exist four stocks of humpback whales in the North Pacific, one of which is most relevant for the action area covered by the BiOp: the California/Oregon/Washington stock. NMFS AR 38. This stock winters primarily off the coast of Central America and Mexico and migrates north in the summer and fall. *Id.* The minimum population estimate for this MMPA stock in 2016 was 1,876, and the current trend is an increase of 7.5%. NMFS AR 39-40. In 2016, NMFS published a Final Rule identifying 14 distinct population segments (DPSs) of humpback whales, and listing four of those DPSs as endangered, and one as threatened. NMFS AR 32. Two of these—the Central America and Mexico DPSs—are in the action area, which is the waters within and around the TSSs of San Francisco and Los Angeles/Long Beach. NMFS AR 16, 33. NMFS's BiOp analyzed the effects of the action on the endangered Central America DPS and the threatened Mexico DPS. *See*, *e.g.*, NMFS AR 40, 72, 93.

## D. Threats Faced by Whales

Blue, fin, and humpback whales face a number of threats, including:  vessel strikes; interactions with fisheries and whale-watching boats; disturbance caused by scientific research, noise, climate change, and marine pollution; reduced prey abundance; and habitat degradation. NMFS AR 27-28, 31-32, 40-43. The multiplicity of threats has informed the recovery plans for the whales. *See* NMFS References 9536-83 (Doc. 197, Reeves *et al.* 1998), 10446-566 (Doc. 169, NMFS (2010)). Plaintiffs cabin their threats discussion to vessel strikes only while simultaneously misconstruing those parts of the record specifically related to vessel strikes. For example, the blue whale recovery plan indicates that NMFS should "identify and implement methods to reduce such collisions," but it later qualifies that direction: "The practicality and effectiveness of measures to reduce ship strike mortalities should be assessed." NMFS References 9560, 9565 (Doc. 197). For humpback whales, Plaintiffs invoke a critical habitat designation that was issued well after the BiOp. Pls.' Mot. at 7 (citing 86 Fed. Reg. 21,082 (Apr. 21, 2021)). This presentation poses two problems. First, challenges to agency action cannot rely on NMFS's findings that post-date the challenged decision. Second, and ironically, NMFS's designation of critical habitat along the California coast for both the Central America and Mexico DPSs of humpback whales fundamentally undermines Plaintiffs' insinuation that

NMFS has not taken the type of activity required by the recovery plans.[8] 86 Fed. Reg. at 21,155-56.

## II.    Leatherback Sea Turtles

The leatherback sea turtle, *Dermochelys coriacea*, was listed as endangered under the precursor law to the ESA and remained on the list after Congress passed the ESA. *See* 35 Fed. Reg. 8491 (June 2, 1970)); NMFS AR 43. Critical habitat was designated in 2012. 77 Fed. Reg. 4170 (Jan. 26, 2012). Leatherbacks are distinct because of their eponymous soft shell, and they lead a pelagic existence, which means that they are often found just below the surface of the water. NMFS AR 43-44, 48. Leatherbacks are widely distributed throughout the world, and in the eastern Pacific generally nest in Mexico, Costa Rica, and Nicaragua. NMFS AR 43-44. They are often found aggregating along the coast of California because of the high density of primary prey, which is the brown sea nettle. NMFS AR 44, 48. Due to the turtles' extensive range, studies of their abundance and distribution are difficult; however, the most recent estimate at the time the BiOp was written was 178 leatherbacks off the coast of California.[9] NMFS AR 47-48. The threats to leatherbacks include fishery bycatch, impacts to nesting beaches, predation, marine debris, climate change, and vessel strikes. NMFS AR 48-50, 60.

## III.    Establishment and Amendment of TSSs on the California Coast

Ship movement is governed at the global level by the IMO, which has authority under the International Convention for the Safety of Life at Sea (SOLAS) to adopt routing measures, such as TSSs. *See* 32 U.S.T. 47, T.I.A.S. No. 9700 (Nov. 1, 1974).[10] The first version of

---

[8] Plaintiffs also overlook evidence in the record showing other efforts taken by NMFS and USCG to identify and implement measures prior to the 2017 BiOp. USCG AR 483-88.

[9] In another impermissible reference to a post-decisional document, Plaintiffs invoke a Federal Register notice about leatherback DPSs in order to indicate a lower population estimate. Pls.' Mot. at 7-8. Plaintiffs state that the estimate was 54 turtles, but the page cited for this number and the quoted language refer to a 2018 study.

[10] The section of SOLAS 1974 on "Ships' routing" was moved from Chapter V, Regulation 8 to Chapter V, Regulation 10 in 2000. *See* IMO Resolution MSC.99(73) (adopted Dec. 5, 2000), https://wwwcdn.imo.org/localresources/en/KnowledgeCentre/IndexofIMOResolutions/MSCResolutions/MSC.99(73).pdf (last visited Mar. 17, 2022). Regulation 10 states that the IMO "is

SOLAS was signed in 1914 after the Titanic disaster, and thus TSSs in the North Pacific and elsewhere have their origins in the North Atlantic.[11] The first TSSs off San Francisco, in the Santa Barbara Channel, and in the approaches to Los Angeles/Long Beach were adopted by the IMO in 1968, 1969, and 1975, respectively. 64 Fed. Reg. 32,451 (June 17, 1999).

In 1978, Congress amended the PWSA to give USCG responsibility for vessel traffic services. Pub. L. 95-474, 92 Stat. 1471 (Oct. 17, 1978). One year after those amendments, USCG initiated PARS for 32 areas around the United States, including those areas along the coast of California. NMFS AR 120. Over the next two decades, USCG engaged in various PARS related to the ports in San Francisco and Los Angeles/Long Beach, and submitted numerous proposals to amend TSSs to the IMO, which were subsequently adopted. NMFS AR 123; USCG AR 359-60, 433-35. In late 2009 and early 2010, USCG determined that it should re-evaluate the existing TSSs in the California ports based on new information. USCG AR 27-30, 152-55. The resulting PARS led USCG to propose amendments to the existing TSSs, which were adopted by the IMO in December 2012. USCG AR 459-505.

**A.  San Francisco TSS**

The record reveals that USCG engaged in a thorough process for amending the San Francisco TSS. First, the PARS announcement invited public comment. USCG AR 28-30. Next, USCG hosted public meetings. *E.g.*, USCG AR 231-54, 269-70. The final PARS included responses to the comments received during the process and an explanation of USCG's recommendation. USCG AR 351-94. Of particular relevance, USCG determined that adjustments to the northern approach would shift it away from the Cordell Bank and Point Reyes Areas of Sensitive Biological Significance (ASBS). USCG AR 376, 384-85. Likewise, the extension and reconfiguration of the western approach would reduce the risk of whale strikes by moving the outer edge past the continental shelf and would help avoid the Farallon

---

recognized as the only international body for developing guidelines, criteria and regulations on an international level for ships' routeing systems." *Id.* at 122.

[11] SOLAS 1914 is available at https://archive.org/details/textofconvention00inte /page/n5/mode/2up?view=theater (last visited Mar. 17, 2022).

1   Islands ASBS. USCG AR 384-85. USCG also considered extending the southern approach by

2   8.5 nautical miles to improve predictability as vessels moved through fishing grounds. *Id.*

3        Aided by the PARS, the United States submitted to the IMO proposed amendments to

4   the San Francisco TSS. That document explained that blue, humpback, and fin whales are found

5   in the approaches to San Francisco, often along the continental shelf break and near the Cordell

6   Bank and south of the Farallon Islands. USCG AR 469. It added that the proposal would

7   "reduce spatial overlap of ships and whales" in these areas. *Id.* These adjustments are captured

8   in the following map, which is taken from USCG AR 645.



21  **B. Santa Barbara Channel, Los Angeles/Long Beach TSSs**

22       USCG followed a similar process for the amendments to the approaches to the ports of

23  Los Angeles/Long Beach and to the configuration of the lanes in the Santa Barbara Channel.

24  USCG began by seeking public comment on the PARS and then holding public meetings.

25  USCG AR 153-55, 229. The final PARS considered narrowing the Santa Barbara Channel TSS,

26  and thus shifting it away from the Channel Islands, and considered establishing a new TSS

27  south of the Channel Islands where voluntary lanes established by the Los Angeles-Long Beach

28  Harbor Safety Committee already exist. USCG AR 435-47, 453-57. In response to the proposal

1  to eliminate the existing Santa Barbara Channel TSS, USCG stated that doing so "could result

2  in marine casualties and irregular traffic patterns with potential for increased impacts on marine

3  mammals." USCG AR 450.

4          The United States' submission to the IMO contained three documents. First, the United

5  States proposed amending the Santa Barbara Channel TSS by narrowing the separation zone

6  and moving the southernmost boundary of the inbound lane one nautical mile to the north. This

7  proposal recognized that the "channel's abundant marine life and high seasonal production of

8  krill play an important role in the feeding patterns of migratory whales" and aimed to "reduce

9  the co-occurrence of ships and whales." USCG AR 460-66. The Santa Barbara Channel

10 proposal to the IMO did not include a lane south of the Channel Islands because it would

11 overlap with the Navy's Point Mugu Sea Range and IMO-adoption of a TSS in the location

12 could pose a risk to public safety and national security. *See* USCG AR 260-67, 522-23. Second,

13 the United States provided background on the rationale for shifting the Santa Barbara Channel

14 lane. USCG AR 483-88. Third, the United States proposed a narrowing of the western

15 approaches into Los Angeles/Long Beach to align with the Santa Barbara Channel. USCG AR

16 475-81.These changes to the TSSs are captured in the following map from USCG AR 646.



17

18

19

20

21

22

23

24

25

26

27

28

The IMO adopted all of the United States' proposed amendments to the California TSSs in December 2012. USCG AR 490-505.

## IV.    Initiation of Section 7 Consultation

Against this backdrop, which is largely ignored by Plaintiffs, USCG determined that it needed to consult with NMFS under ESA Section 7, and thus initiated consultation in October 2014. USCG AR 515-25. In a letter to NMFS, USCG stated that California TSSs have "no influence on the volume, type, or speed of vessel traffic to and from the subject ports," but do "increase vessel traffic safety and predictability and reduce the probability of vessel collisions that could cause fuel or other chemical spills" while also potentially reducing the effects on ESA-listed species and critical habitat by "steering vessels away from known breeding grounds and migratory corridors." USCG AR 524.

## V.    NMFS's 2017 No-Jeopardy BiOp

NMFS issued its BiOp on the California TSSs on February 23, 2017. NMFS AR 1-143.[12] Because NMFS had not previously consulted on any of these TSS designations, it considered the proposed action to cover the *entirety* of the TSSs adopted by the IMO in 2012, and not simply the adjustments to the previously adopted TSSs. NMFS AR 9. To inform this broader scope, NMFS included a history of shipping lanes in California. NMFS AR 119-24. Then NMFS thoroughly reviewed the status of each of the four species that may be adversely affected and examined the environmental baseline. NMFS AR 20-65, 125-43. Pursuant to the ESA implementing regulations, the baseline considered the "past and present impacts of *all* Federal, State, or private actions and other human activities in the action area." 50 C.F.R. § 402.02 (emphasis added). Specifically, NMFS looked at shipping, fishing, wildlife watching, scientific research, noise, and climate change. Next, the agency analyzed the effects of the proposed action, which is USCG's designation and adjustments of TSSs in California coastal waters. NMFS examined the effects flowing from that action through three lenses: (1) exposure;

---

[12] USCG reinitiated consultation in 2020. NMFS AR 144-49. The ongoing consultation does not render the existing BiOp invalid. *See Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 181 n.32 (D.D.C. 2014) ("courts have found that re-initiation of consultation does not render a former Biological Opinion invalid") (citation omitted).

(2) response; and (3) risk. NMFS AR 65-98. NMFS determined that the overall risk of vessel strikes to whales and turtles would be reduced by the TSSs. NMFS AR 94. Consistent with the ESA regulations, NMFS did not include an ITS because take is not reasonably certain to occur from the proposed action. NMFS AR 98.

## STANDARD OF REVIEW

Challenges to agency consultations under Section 7 of the ESA are reviewed under the Administrative Procedure Act (APA). 5 U.S.C. § 706; *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, courts may set aside an agency's action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency determination is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court must only "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Id.* This standard of review is narrow and "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Courts are most deferential "where, as here, the challenged decision implicates substantial agency expertise." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993); *see Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).

## ARGUMENT

### I.   Plaintiffs Lack Standing.

Before this Court considers the merits of the issues raised, it must determine whether it has jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). The declarations provided by Plaintiffs' members in support of standing fail to satisfy the second and third elements—causation and redressability—and therefore the Court lacks jurisdiction. The constitutional minimum of standing contains three elements. *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560-61 (1992). First, a plaintiff must allege an invasion of a legally protected interest that is concrete and particularized and that is actual or imminent and not conjectural. *Id.* at 560; *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Second, there must be a causal connection between the injury and the conduct complained of. *Lujan*, 504 U.S. at 560. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 561. A plaintiff has the burden of alleging facts that "affirmatively" and "clearly" demonstrate standing. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citations omitted). And, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (citations omitted). An organization can establish standing as a representative of its members or on its own behalf. *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019). In their Motion, organizational Plaintiffs assert standing on behalf of their members, but they fail to demonstrate that a member from each organization "would otherwise have standing to sue in their own right." *Friends of the Earth v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 181 (2000).

**A. Plaintiffs Have Not Shown Causation.**[13]

To satisfy the second prong of standing—causation—"Plaintiffs must show that the injury is causally linked or 'fairly traceable' to the Agencies' alleged misconduct, and not the result of misconduct of some third party not before the court." *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013). Plaintiffs fail to meet this requirement because their standing declarations do not show a causal link between their alleged injuries and NMFS's and

---

[13] Plaintiffs may contend that Claim I centers on a procedural violation and is thus subject to a lower threshold for causation and redressability. That argument would be flawed as Plaintiffs have lodged substantive challenges to the BiOp based on allegations that it was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); Dkt. No. 1 at 32, Prayer for Relief ¶ 1. None of the substantive arguments allege any omitted procedure set forth in APA Section 553, nor do any of the arguments allege that NMFS acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Construing an arbitrary and capricious challenge as a procedural violation would render Congress's distinction between APA Section 706(2)(A) and 706(2)(D) superfluous. Thus, the Court should evaluate Plaintiffs' standing under the traditional Article III standing inquiry. Even if the bar is lowered, however, Plaintiffs still cannot meet the causation and redressability requirements.

USCG's actions related to the BiOp. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546  (1986) (stating that a plaintiff's basis for standing must "affirmatively appear in the record"). The declarants suggest, in very broad terms, that they are harmed by vessel strikes because such collisions may reduce their ability to observe whales and turtles, but the declarants fail to connect any dots between vessel strikes and NMFS's BiOp, or vessel strikes and USCG's actions taken in reliance on the BiOp. In fact, none of the declarants even mentions the BiOp. Instead, the declarants use "vague, conclusory statements." *Wash. Env't Council*, 732 F.3d at 1142; *see*, Dkt. No. 41-3 (Bevington Decl.) ¶ 29 ("the government will not take steps to protect these species from vessel strikes"); Dkt. No. 41-4 (Hartl Decl.) ¶ 4 (referring to USCG and NMFS "fail[ing] to comply with the [ESA] and establish protective measures"); Dkt. No. 41-5 (Keever Decl.) ¶ 10 (expressing concern about the agencies "not ensur[ing] that the shipping lanes avoid or mitigate harm"). The Court lacks jurisdiction to hear such generalized complaints divorced from "some substantive government decision that may have been wrongly decided." *Fla. Audubon Soc'y v. Bensten*, 94 F.3d 658, 668 (D.C. Cir. 1996) (en banc); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (noting that challenges to actions are not ripe for review "until the scope of the controversy has been reduced to more manageable proportions").

The lack of causation is further underscored by the timing and uncertainty around the statements in the declarations. For example, the only definitive whale-watching trips discussed in the Keever Declaration occurred in 2009 and 2010. Keever Decl. ¶ 6. But these timeframes precede the issuance of the BiOp and any actions taken in reliance of the BiOp. Moreover, the only declaration to mention injured whales—the Bevington Declaration—describes seeing a dead humpback whale and a dead sperm whale, but the humpback was "likely" killed by ship strike and he is "uncertain" whether the sperm whale was a ship strike. Bevington Decl. ¶¶ 24-25. Those sightings also occurred before the BiOp was issued. The timing and uncertainty undermine the link between not only vessel strikes and plaintiffs' injury, but also the agencies' actions and vessel strikes. Without more, the declarants fail to establish with a "reasonable probability" that the challenged actions posed a threat to Plaintiffs' interests. *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001).

Plaintiffs cannot salvage causation by reference to their Complaint because at this stage of a case, "the plaintiff can no longer rest on . . . 'mere allegations.'" *Lujan*, 504 U.S. at 567. Rather, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts.'" *Id.* at 561. Nor can Plaintiffs' standing be inferred from their opening brief because the "necessary factual predicate [for jurisdiction] may not be gleaned from the briefs and arguments themselves." *Bender*, 475 U.S. at 547 (citations omitted). Even assuming *arguendo* that Plaintiffs could lean on these slender reeds, they would not bear the weight because "a multitude of independent third parties are responsible for . . . Plaintiffs' injuries." *Wash. Env't Council*, 732 F.3d at 1144. Namely, the vessels and their operators represent third parties that directly cause the harm to ESA-listed whales and turtles. Indeed, the Keever Declaration highlights the conduct of these intervening non-defendant parties when it states that Plaintiff Friends of the Earth "strives for a healthier and just world, in particular, by protecting marine ecosystems from *shipping industry* and *industrial vessel* traffic impacts. . . ." Keever Decl. ¶ 7 (emphasis added). The impacts attributable to vessel strikes are caused by the independent, discretionary choices of vessel operators, who are not parties to this suit. *See Lujan*, 504 U.S. at 562.

### B. Plaintiffs Have Not Shown Redressability.

Plaintiffs also fail to satisfy the third prong of standing—redressability—because their declarations do not show that the relief requested is "'likely,' as opposed to merely 'speculative,'" to redress any of their alleged injuries. *Lujan*, 504 U.S. at 561 (citation omitted). Plaintiffs ask the Court to declare that NMFS and USCG are violating the ESA, order the agencies to complete reinitiated consultation, and order USCG to adopt measures pending completion of the reinitiated consultation.[14] Dkt. No. 1, Prayer for Relief ¶¶ 1-7. Because Plaintiffs have not advanced merits arguments on Claims III, IV, and V, they presumably have abandoned the related relief, i.e., declarations that the agencies have violated ESA Section 7(a)(2) for failing to reinitiate, ESA Section 7(d), and ESA Section 9, as well as orders tied to the reinitiated consultation. *Id.* ¶¶ 3-7. Thus, Plaintiffs' remaining relief would be a declaration

---

[14] Defendants recognize that remedy briefing will occur, if at all, following the merits, but discuss remedy here to present Defendants' position on redressability, which requires examination of the connection between the alleged injury and requested relief.

that the BiOp and USCG's reliance on it violate Section 7(a)(2). Plaintiffs have not asked for the BiOp to be remanded or vacated. Nor have they asked for the TSSs to be vacated.

As with causation, the declarations fail to show with any specificity how this remaining declaratory relief is likely to redress Plaintiffs' alleged injuries. The Hartl Declaration makes no reference to relief from the Court. The only part of the Bevington Declaration that could be viewed as referring to redress is a generalized statement that the "litigation protects my recreational interests . . . by seeking to force action." Bevington Decl. ¶ 27. And the sole mention of redress in the Keever Declaration is a conclusory statement that a favorable decision would "mean that I will be less concerned that whales will be struck and killed," Keever Decl. ¶ 11. Such "general statements" in Plaintiffs' affidavits "do not satisfactorily show how or why the [relief] will ameliorate the alleged harm." *Ctr. for Biological Diversity v. Lueckel*, 248 F. Supp. 2d 660, 675 (W.D. Mich. 2002), *aff'd*, 417 F.3d 532 (6th Cir. 2005). Much more is needed to adequately establish redressability at this stage.

Even if parts of Plaintiffs' requested relief are not foreclosed by a failure to pursue the claims, and even if Plaintiffs could escape the holes in the declarations by relying on counsel's articulations, "redress[a]bility poses an upstream battle" because of the possible breaks in the causal chain. *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1228 (9th Cir. 2008); *see Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984) (describing causation and redressability as "two facets of a single causation requirement"). First, if the Court declares that the BiOp is unlawful, vessels would still enter and exit the California ports, and thus they would still pose a threat to turtles and whales. The fundamental problem with Plaintiffs' challenge is that the BiOp does not authorize vessel transit, and setting aside the BiOp simply would not reduce the level of vessel traffic moving into and out of the ports or reduce vessel speeds. The same would be true if the Court declares that USCG acted unlawfully. Moreover, if the Court orders the United States to amend or alter the TSSs, any U.S. proposal would be subject to review by the IMO, which could reject or modify the changes. In either scenario, there would be intervening parties that are not before the Court—the vessel operators and the IMO. Where, as here, redressability "depends on the unfettered choices made by independent actors not before

1    the courts . . . it becomes the burden of the plaintiff to adduce facts showing that those choices

2    have been or will be made in such manner as to produce causation and redressability of injury."

3    *Lujan*, 504 U.S. at 562 (citation omitted). Plaintiffs utterly fail to meet this burden.

4          In addition, to the extent Plaintiffs are seeking an order requiring USCG to adopt a

5    measure related to ship speed pending completion of the reinitiation, USCG does not have the

6    authority under the PWSA, or any other statute that it administers, to require speed limits for the

7    sole purpose of protecting marine species. *See* 46 U.S.C. § 70003(a) (stating that in designating

8    TSSs, the Secretary "shall recognize, within the designated area, the paramount right of

9    navigation over all other uses"); *id.* § 70001(a)(4) (stating that the Secretary "may control vessel

10    traffic in areas subject to the jurisdiction of the United States that the Secretary determines to be

11    hazardous, or under conditions of reduced visibility, adverse weather, vessel congestion, or other

12    hazardous circumstances"). Relatedly, Plaintiffs incorrectly assert they have no other remedy at

13    law. Dkt. No. 1 ¶ 19. Interested parties can petition for the issuance, amendment, or repeal of a

14    rule. 5 U.S.C. § 553(e); *see* 33 C.F.R. § 1.05-20. In fact, Plaintiffs fail to mention that Plaintiff

15    Center for Biological Diversity has availed itself of the petition process for ship speeds.[15]

16   **II.    NMFS Fully Complied with the ESA.**

17          The 2017 BiOp issued by NMFS represents a careful, science-based analysis of how the

18    organization of vessel traffic through the TSSs may affect the ESA-listed whales and turtles in

19    the areas around the ports of San Francisco and Los Angeles/Long Beach, including the Santa

20    Barbara Channel. NMFS determined that the TSSs would reduce the overall risk to the ESA-

21    listed species and that the TSSs would not jeopardize the ESA-listed species. NMFS AR 19-20;

22    97-98. NMFS reached these conclusions through an exposure analysis that identified potential

23    effects of the TSSs and then compared those effects with the absence of TSSs, which it

24    described as a no-lane scenario. This approach was not an effort to "obscure," as Plaintiffs

25    insinuate. Pls.' Mot. at 23. Instead, this comparison was an effort to isolate and amplify the

26    potential effects not only of the TSS amendments that were adopted in 2012, but of the TSSs *in*

27

28    [15] The petition is available at https://www.biologicaldiversity.org/campaigns/boat_strikes/pdfs
/21-04-28-Ship-speed-petition.pdf (last visited Mar. 17, 2022).

Defs.' Cross-Motion for Summary Judgment            U.S. Department of Justice
                                            Environment & Natural Resources Division
No. 4:21-cv-345-KAW            18                  Washington, DC  20044-7611

*their entirety*. To fully understand these effects, and in order to avoid the type of piecemeal, gradual assessment that courts have rejected, NMFS considered a scenario in which the lanes were removed *entirely*. The difference between no TSSs at all and the TSSs as they exist now thus provided NMFS with the best opportunity to understand the effects of the *entire* action. This analysis represents the type of comprehensive analysis that Plaintiffs claim to want in this case. Based on this analysis of the full effects, NMFS calculated that the potential risk of the entire action was lower than no action at all, i.e., a shipping world without TSSs. NMFS AR 94-97. A close reading of the BiOp shows that NMFS's conclusions are sound.

Plaintiffs' effort to cast doubt on NMFS's conclusions should be rejected. First, Plaintiffs fundamentally misunderstand NMFS's no-lane approach to the exposure analysis. Pls.' Mot. at 17-25. Among other errors, they ignore the key element of NMFS's analysis—that traffic will be more dispersed without TSSs—and instead rely on a nonexistent assumption that "TSS designations have no effect." *Id.* at 20. Also telling is what Plaintiffs do not say in their motion: although they challenge the structure of the exposure analysis, they do not criticize the details of that analysis, including the overlay between the TSSs and whale densities and the studies that examine the difference between areas with TSSs and areas without TSSs. Plaintiffs' assertions on the best available science related to humpback whales are wide of the mark. *Id.* at 25-28. In addition, Plaintiffs fail to rebut NMFS's rational conclusion that an ITS is not necessary because take is not reasonably certain to occur. *Id.* at 28-30.

**A.  NMFS Reasonably Structured Its Effects Analysis.**

At the heart of NMFS's BiOp is a conservative analysis aimed at magnifying the potential exposure between vessels and the listed whales and turtles. NMFS AR 65-70. To determine the exposure for each part of the California TSSs, NMFS engaged in a two-pronged analysis. First, NMFS relied on various tools, including habitat-based models, a report on key biological areas, and satellite data on individual whales, to predict whale densities and overlaid each of the TSSs onto those densities. NMFS AR 70-71. Second, NMFS compared the California TSSs with the no-lane scenario. *Id.* The no-lane scenario was based on the reasonable assumptions that "ship traffic would generally occur in the same areas" with or without the

TSSs and that "the distribution in the no-lane scenario would be more dispersed or fanned out than with the TSSs in place," with the exception of areas that had physical constraints, such as oil platforms. NMFS AR 67-68. Both of these assumptions find support in the literature reviewed by NMFS related to areas *without* traffic lanes. *Id.* For example, the Fonnesbeck *et al.* (2008) and Lageux *et al.* (2011) studies showed that for ports in Georgia and Florida without lanes, the vessel movement was not only occurring but also fanned out. NMFS AR 68 (citing NMFS References 18024-31 (Doc. 88, Fonnesbeck *et al.*); 18000-08 (Doc. 132, Lageux *et al.*); *see also* NMFS References 18960-73 (Doc. 97, Guzman *et al.* (2013)); NMFS References 18894-912 (Doc. 148, McKenna *et al.* (2012)). Drawing a comparison to the no-lane scenario makes sense here because the lanes do not alter the *volume* of traffic; rather, they impact the *location* of those vessels. *See* NMFS AR 69 ("NMFS is assessing the effects of the organization of shipping traffic into these lanes, not the number, frequency, type, or speed of the traffic.").

NMFS employed this approach to all of the TSSs, and the text of the BiOp, which Plaintiffs largely ignore, shows how the agency conducted that analysis. NMFS divided the Santa Barbara Channel into two sections, with Section 1 running through the Channel itself and Section 2 running between Ventura and Los Angeles counties. For the first prong of the analysis on Section 1, NMFS examined whale densities from the Redfern *et al.* study (2013), and found that the likelihood of co-occurrence between whales and vessels would be highest in those areas with greater concentrations of blue and humpback whales, which occur at the western endpoint and the 200-meter depth, and in areas with greater concentrations of fin whales, which occur beyond the end of the TSS. NMFS AR 74-78; NOAA Reference 19590-600 (Doc. 196, Redfern *et al.* (2013)). For the second prong, NMFS considered the exposure in the absence of TSSs. NMFS AR 77-78; *see* NMFS References 9367-76 (Doc. 116, Irvine *et al.* (2014)). In essence, this involved NMFS removing the overlaid TSSs from the whale density maps and applying more dispersed vessel traffic.[16] Although NMFS acknowledged that dispersal in Section 1

---

[16] Satellite data in the Irvine *et al.* (2014) study identified a high concentration of blue whales just south of the TSS's western end and determined that dispersed vessels would more likely overlap with those hotspots. NMFS AR 77-78.

would be limited by the oil platforms and the physical location of the Channel Islands, it determined that distribution would nevertheless be wider without the TSS and rationally concluded that the TSS "decreases the overlap of ships and whales." NMFS AR 78. In other words, the whales' exposure to ships would be reduced. NMFS reached a similar conclusion for leatherbacks, though the species is less likely to be present. NMFS AR 78-79.

The analyses performed for Section 2 of the Channel Islands and the TSS approaches to Los Angeles/Long Beach were more straightforward but no less relevant. NMFS AR 78-79. For the first prong, NMFS noted that neither of the areas is a predictable feeding location, but noted that whales and turtles have been observed and thus could be affected by vessels. NMFS AR 79. However, under the second prong, NMFS found that the areas were not constrained by oil platforms and geography, and thus greater dispersal of vessels in the absence of TSSs was likely. NMFS AR 79-80.

NMFS engaged in a similar analysis for each of the three approaches to the port of San Francisco. NMFS AR 80-89.[17] As part of the first prong of the analysis, NMFS reviewed habitat models of whale density for the fin, humpback, and blue whales, as well as sighting and automatic identification system (AIS) data. The overlay with the TSS revealed that humpback and blue whale densities in and around the port are greater than the fin whale density. NMFS AR 83-85 (citing NMFS References 19985-20035 (Doc. 33, Becker *et al.* (2012)). NMFS also looked closely at each approach. "Based on habitat models and sighting data," NMFS determined that the southern approach "is not an area of high density of blue, fin or humpback whales relative to the surrounding area." NMFS AR 86. For the western approach, NMFS determined that the lane passes over and extends past the 200-meter isobath and the continental slope, which are highly productive parts of the ocean and thus important foraging areas for whales.[18] NMFS AR 87, 51. For the northern approach, NMFS ascertained that the lane passes through an area of higher relative abundance of blue and humpback whales. NMFS AR 88.

---

[17] As with the Santa Barbara Channel and Los Angeles/Long Beach TSSs, this analysis included an assessment of leatherback sea turtles. NMFS AR 81, 86-90; *see also* NMFS AR 71.

[18] An isobath is a measurement that connects points having the same depth.

1    Next, NMFS effectively removed the TSSs from the maps and models to conduct the

2  second prong of the analysis for each approach to San Francisco. Looking southward first,

3  NMFS concluded that the vessels would be distributed more widely under the no-lane scenario.

4  NMFS AR 86. This conclusion meant that the existence of the lane reduced the co-occurrence

5  of whales and ships. *Id.* One study provided insights for both the western and northern

6  approaches—namely, the Dransfield *et al.* (2014) study illustrated the impact of 2012 TSS

7  amendments on ship distribution. NMFS AR 88-89; NMFS References 17864-82 (Doc. 78,

8  Dransfield *et al.* (2014)). NMFS recognized that this was not exactly the same as a no-lane

9  scenario because it compared two versions of the lanes, but nonetheless, the study proved useful

10  for understanding distribution in an area without a TSS. In particular, the images in Figure 19

11  show that ship traffic was more widely distributed to the west and north under the TSS prior to

12  2012, which did not extend as far. NMFS AR 89.



24    These images are particularly relevant because they also show the density of humpback

25  whales and demonstrate that the broader the distribution, the greater the likelihood of co-

26  occurrence. NMFS also returned to the Irvine *et al.* (2014) study for the analysis on the northern

27  approach; this study suggested that there may be a small difference in the core feeding areas.

28  NMFS AR 88-89. This evidence, combined with the literature on areas without TSSs, supports

NMFS's conclusion that the TSSs reduce the overall exposure profile for these approaches. The conclusion is bolstered by evidence on blue and humpback whale sightings at the Point Blue Conservation Center, which shows that "almost all of the observed and reported animals were seen outside of the shipping lanes." NMFS AR 90-92. Thus, in a scenario without TSSs, the evidence indicates that there would be a higher chance of whale-ship interactions.

Based on this methodical analysis, NMFS determined that while there may be an increase in exposure at the site-specific level due to the increase in concentration of vessels in the lanes, it is "generally outweighed by the overall decreased overlap between shipping traffic and areas where whales and leatherback turtles may occur." NMFS AR 90. But the jeopardy analysis did not end there. NMFS also considered potential responses from the ESA-listed species, and concluded that the agency did not have information indicating a response based on the concentration of vessels. NMFS AR 93-94. Lastly, NMFS analyzed the risk to whales and turtles based on the exposure and response conclusions. Here, NMFS returned to the studies on areas that do not have TSSs, which provided relevant statistics. For example, Fonnesbeck *et al.* (2008) compared ship routes in the Southeast United States with baseline ship traffic with no lanes and found a 27-44% reduction in co-occurrence in time and space of whales and ships with TSSs. NMFS AR 94. Similarly, Lagueux *et al.* (2011) showed a risk reduction of 54.3% following implementation of routes in the critical habitat of Northern right whales. *Id.*

Applying this evidence, NMFS concluded that any effects on fin whales and leatherbacks were extremely unlikely and thus not likely to adversely affect them. NMFS AR 95-96. NMFS further determined that the Santa Barbara Channel, Los Angeles/Long Beach, and the southern and western approaches of the San Francisco TSSs would decrease the risk of whale exposure to vessels, and that while the northern approach to San Francisco could increase exposure, the "overall risk of a strike is decreased by constriction of shipping traffic patterns to the designated lane versus the no-lane scenario." NMFS AR 96-97. NMFS's conclusions were reasonable and should be upheld. *See S.F. Baykeeper v. U.S. Army Corps of Eng'rs*, 219 F. Supp. 2d 1001, 1024 (N.D. Cal. 2002) (finding that based on a "comparison of 1996 and 2010 ballast water discharges, the agencies reasonably concluded that ballast water discharges would decline over

1    time" and adding that "even when compared with the 'without project' alternative, the projects

2    are predicted to result in a long-term decrease in ballast water discharge").

3    **B. Plaintiffs' Misplaced Assertions About the BiOp's Structure Should Be Rejected.**

4         Rather than engage with record evidence, Plaintiffs present flawed assertions about the

5    no-lane scenario and the consideration of the environmental baseline. Pls.' Mot. at 17-25.

6    **1. The Court Should Reject Plaintiffs' Red Herring Assumption.**

7         As an initial matter, Plaintiffs mischaracterize NMFS's ultimate conclusion on jeopardy

8    as a finding that TSSs would "essentially have no effect on listed species." *Id.* at 17; *see also id.*

9    at 1 (misstating that the BiOp found the TSS would have "a negligible effect" on species). To be

10   clear, this is not a situation where the action agency determined the action would have "no

11   effect" on ESA-listed species. Endangered Species Consultation Handbook (1998) at xvi,

12   https://media.fisheries.noaa.gov/dam-migration/esa_section7_handbook_1998_opr5.pdf (last

13   visited Mar. 17, 2022) (defining "no effect"). Rather, USCG determined that the TSSs "may

14   affect" certain whales and turtles and then engaged in formal consultation with NMFS, which in

15   turn concluded that the action may adversely affect, but is not likely to jeopardize the continued

16   existence of those whales and turtles.

17        More problematic for Plaintiffs, however, is their misguided assault on the assumptions

18   underlying NMFS's BiOp. According to Plaintiffs, the no-lane scenario "is based upon an

19   arbitrary, nonsensical assumption that TSS designations have essentially no impact on shipping

20   traffic patterns." Pls.' Mot. at 17. But Plaintiffs overlook one of NMFS's two well-grounded

21   assumptions—that vessel traffic would be more dispersed if there were no TSSs. As described

22   above, that assumption is based in scientific literature and is central to NMFS's analysis of the

23   specific TSSs and the evaluation of the California TSSs as *a whole. See supra* at 20. Plaintiffs

24   also misconstrue NMFS's other assumption. Contrary to Plaintiffs' view, NMFS has *not*

25   concluded that "TSS designations have no effect." *Id.* at 20. Rather, NMFS assumed that vessel

26   traffic would "*generally* occur in the *same areas*" around the ports in the absence of TSSs.

27   NMFS AR 67; *see* NMFS AR 66 ("it is reasonable to assume that shipping existed in the

28   *general areas* where TSSs were later implemented" (emphases added)). Stated simply, this

means that ships have historically docked in San Francisco and Los Angeles/Long Beach and would continue to do so. Plaintiffs' "no impact" assumption is a red herring at best and a mischaracterization at worst.[19] Indeed, it is not clear why the United States would undertake to establish or modify TSSs if they had zero potential to influence vessel location and thus increase navigational safety. The Court should decline Plaintiffs' invitation to rule against NMFS based on this red herring assumption.

Plaintiffs build off of their misconceived notions about the assumptions when they invoke *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913 (D.C. Cir. 2008), and *Tulalip Tribes v. Kelly*, Civ. No. 17-652 MJP, 2018 WL 453475 (W.D. Wash. Jan. 17, 2018), but this effort collapses under scrutiny. Pls.' Mot. at 19-20. Plaintiffs contend that the opinions in those cases addressed the same assumption that "TSS designations have no real impact." *Id.* at 19. But in doing so, Plaintiffs misinterpret the cases. *Defenders of Wildlife* involved two questions—one related to the merits of NMFS's denial of a petition for an emergency rulemaking that would limit ship speed and one related to whether USCG's designation of TSS was final agency action for purposes of the APA. 532 F.3d at 918-19. The court upheld the petition denial and found that USCG had engaged in final agency action. *Id.* at 927-28. In *Tulalip Tribes*, USCG moved to dismiss on two grounds—USCG challenged standing and argued that plaintiffs' claim was time-barred. 2018 WL 453475, at *2. Thus, neither court rejected an argument that TSS have "no consequence." Pls.' Mot. at 19. Further, *Defenders of Wildlife* and *Tulalip Tribes* are inapt because USCG had not engaged in Section 7 consultation in either case. This case, by contrast, is a challenge to a BiOp that exists only because USCG has already determined that TSS designations may affect ESA-listed species.

Plaintiffs also err in their effort to undermine NMFS's effects analysis by referring to the options reviewed by USCG through the PARS process. Pls.' Mot. at 18-19 (stating that NMFS "expressly concluded" that USCG did not choose an option for the Santa Barbara Channel that

---

[19] Plaintiffs assert that there is "no rational basis in fact or law" for NMFS's assumption about TSS not directing traffic, but NMFS is not required to provide a basis for an assumption it did *not* make. *Id.* at 17-18. Moreover, the assumptions that NMFS did make were supported by background materials and scientific literature. NMFS AR 67-68, 119-43.

1   "would appear to minimize the overall risk of ship strikes on whales") (quoting USCG AR 442).

2   Contrary to Plaintiffs' suggestion, Section 7 consultation does not require that NMFS consider

3   whether a more protective option was available. Under Section 7, NMFS examines whether the

4   *proposed action* is likely to jeopardize ESA-listed species. 16 U.S.C. § 1536(a)(2); *see Sw. Ctr.*

5   *for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998) ("The

6   Secretary was not even required to pick the best alternative or the one that would most

7   effectively protect the [species] from jeopardy."). Plaintiffs' assertion also elides the record

8   evidence that explains why this particular option was not selected, namely, the overlap with the

9   Point Mugu Naval Area. *See supra* at 11.

10      Plaintiffs' misapprehension of Section 7 also undermines their complaint that the BiOp

11   is of "little conservation value" because it does not contain an ITS or reasonable and prudent

12   alternatives (RPAs). Pls.' Mot. at 20. Section 7 does not require an ITS and RPAs for every

13   agency action. Instead, Section 7 requires agencies to ensure against jeopardy and, where an

14   action may affect a species, this requirement is achieved through a consultation process. 16

15   U.S.C. § 1536(a)(2). In those cases where formal consultation occurs, a BiOp is issued by the

16   consulting agency, but an ITS and RPAs are required if, and only if, take is reasonably certain

17   to occur (with respect to an ITS) and the action is likely to jeopardize species (with respect to

18   RPAs). 50 C.F.R. § 402.14(g)(7); 16 U.S.C. § 1536(b)(3)(A). Contrary to Plaintiffs' suggestion,

19   conservation value can flow from the consultation process itself and the agency's biological

20   opinion. Plaintiffs also ignore the conservation recommendations for USCG included at the end

21   of the BiOp. NMFS AR 98-99. Those recommendations highlight the coordination between

22   USCG and NMFS on issues related to whales and ship strikes.

23      **2.   Plaintiffs' Skewed View of the Effects Analysis Should Be Rejected.**

24      Plaintiffs compound their flawed arguments about NMFS's effects analysis with

25   assertions that NMFS failed to engaged in a "comprehensive" jeopardy analysis on the "entire

26   proposed action" and that NMFS created an "elaborate" and "unlawful comparative lens." Pls.'

27   Mot. at 21-24. The first part of this argument cannot be squared with the record evidence. As

28   noted above, NMFS examined more than the 2012 TSS amendments; it considered the *full*

scope of the TSSs adopted by the IMO because "NMFS and USCG ha[d] not previously engaged in consultation on the lanes as they existed prior to these IMO approved changes." NMFS AR 9. That analysis of the TSSs was comprehensive because it covered all of the approaches designated under the TSSs and not simply the adjustments. And, contrary to Plaintiffs' insinuation, NMFS added that effects analysis to the environmental baseline. NMFS AR 65 (referring to 50 C.F.R. § 402.02).[20]

For the second part of their argument, Plaintiffs invoke cases in which courts invalidated certain types of comparative analysis, Pls.' Mot. at 22-23, but, while there may be a superficial overlap here because NMFS has engaged in a "comparison," a close reading of those other cases and the facts in this one shows that the cases are inapposite. Plaintiffs lean heavily on the line of cases involving the Federal Columbia River Power System (FCRPS), but as Plaintiffs themselves acknowledge in their quotes from one of the decisions, that comparison was different in kind. Pls.' Mot. at 22-23 (citing, *inter alia*, *Nat'l Wildlife Fed'n (NWF) v. Nat'l Marine Fisheries Serv.*, Civ. No. 01-640-RE, 2005 WL 1278878 (D. Or. May 26, 2005)). In the BiOp reviewed in *NWF*, NMFS analyzed only the effects of the discretionary actions related to the operation of the FCRPS and consigned the other effects, including the non-discretionary actions, to the baseline. 2005 WL 1278878, at *13. Those circumstances are not presented here because NMFS did not engage in any segregation of the actions between discretionary and non-discretionary actions or, as discussed below, consign any effects of the action to the baseline.

Plaintiffs face a similar roadblock for their reference to *Turtle Island Restoration Network v. U.S. Department of Commerce*, 878 F.3d 725 (9th Cir. 2017), and *American Rivers v. NOAA Fisheries*, No. CV-04-0061-RE, 2006 WL 1455629 (D. Or. May 23, 2006). Pls.' Mot.

---

[20] Plaintiffs quote a version of a regulation that post-dates the challenged decision. Pls.' Mot. at 21 (citing 50 C.F.R. § 402.14(g)(4) (2019)). The relevant regulatory language at the time of the BiOp stated that the Services had to "[f]ormulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4) (2017). This improper reference to post-decisional regulatory language is all the more remarkable given that Plaintiff Center for Biological Diversity has challenged the 2019 regulations in litigation. *Ctr. for Biological Diversity v. Haaland*, 4:19-cv-5206-JST (N.D. Cal.). In any event, NMFS's analysis was proper under either version of the regulations.

at 23. In the sentence that follows the one quoted by Plaintiffs, the *Turtle Island* court stated: "The BiOp's no jeopardy opinion is premised on the proportionally low risk that the shallow-set fishery poses to the loggerheads *relative to other threats*. . . ." *Id.* at 738 (emphasis added). Here, unlike *Turtle Island*, NMFS's no-jeopardy opinion did not turn on whether the TSSs were more or less threatening to whales and turtles than other factors in the environmental baseline, but that the effects of the proposed action when added to the environmental baseline were not likely to result in an appreciable reduction in the species' likelihood of survival and recovery. Meanwhile, *American Rivers* involved a BiOp on the upper Snake River operations, which had been segmented from the FCRPS operations. 2006 WL 1455629, at *5. No such segmentation occurred here. Plaintiffs' misunderstanding of the BiOp is further highlighted by their citation to *Aluminum Company of America v. Bonneville Power Administration*, 175 F.3d 1156 (9th Cir. 1999). Pls.' Mot. at 24. NMFS's analysis looked at more than staying the course—it investigated the TSSs writ large.

In sum, Plaintiffs' view that NMFS set up a "comparative sieve" is wrong. Pls.' Mot. at 24. NMFS's reliance on the no-lane scenario allowed it to more accurately assess the full scope of the effects of the TSSs. That analysis showed that between the entire action—establishment of TSSs—and the status quo ante—no TSSs—the former would reduce the overall risk. NMFS AR 90. Thus, "unlike in *NWF* where the true adverse impact of the proposed agency action was distorted and minimized—and possibly placing the listed species in 'jeopardy'—here the proposed agency actions improve the status quo." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1106 (N.D. Cal. 2009).

### 3. Plaintiffs' Challenge to the Baseline Has No Basis in the Record.

Plaintiffs' final argument about the structure of the BiOp overlooks record evidence, confuses the effects of established shipping lanes with vessel strikes more broadly, and presents another faulty gloss on their argument about the no-lane scenario. Pls.' Mot. at 24-25. Plaintiffs baldly assert that the BiOp "conflates" effects of the action with the baseline, but their only support is a citation to a part of the BiOp that examines the shipping into and out of the ports and a reference to the definition of environmental baseline. *Id.* at 24 (citing NMFS AR 52-61).

1   A review of those portions of the BiOp reveals that NMFS covered the issue of shipping

2   generally, first by analyzing shipping patterns in and around the ports of California, and then by

3   examining regulatory measures, including: a rule issued by the California Air Resources Board

4   (CARB) that shifted traffic to the water south of the Channel Islands and to the western

5   approach in San Francisco; an Emissions Control Area (ECA) approved by the IMO; and the

6   vessel tracks for the Monterey Bay National Marine Sanctuary adopted by the IMO in 2001 to

7   reduce the risk of oil spills and collisions in a part of the coast that has neither TSSs nor

8   fairways. NMFS AR 52-57. These are quintessential aspects of an environmental baseline and

9   underscore that the TSSs are one piece of a larger regulatory puzzle in the California waters.

10  Plaintiffs also fail to mention that NMFS expanded its discussion about shipping in Attachment

11  2 to the BiOp, which considered, *inter alia*, international shipping and which was referenced

12  multiple times in the environmental baseline section. NMFS AR 125-143, 52, 57-58.

13       Next, NMFS considered ship speed and strikes as part of the baseline. NMFS AR 58-61.

14  Contrary to Plaintiffs' suggestion, this wider lens on the impacts of ships did not blur the line

15  between baseline and effects; instead, it provided an appropriately broad geographical view by

16  covering the U.S. west coast rather than just the TSSs. And, as discussed above, the effects of

17  the TSSs were fully considered in the effects analysis. In addition, the mere fact that NMFS

18  referenced the TSSs when discussing California coastal shipping patterns more generally does

19  not mean, *a fortiori*, that TSSs were discretionary actions incorrectly embedded in the baseline.

20  Pls.' Mot. at 25.[21] These TSSs have been in place since the late 1960s, and thus assessments of

21  baseline impacts tied to shipping over the last several decades are related, in part, to TSSs. In

22  fact, the existence of the TSSs at the time of this formal consultation is exactly why NMFS

23  utilized the no-lane scenario—otherwise, it would have been analyzing only the 2012

24  modifications, rather than the TSSs *in their entirety*. NMFS AR 7.

25

26

27

28  _____
    [21] Here, too, Plaintiffs improperly invoke the regulations promulgated in 2019. Pls.' Mot. at 25.

Plaintiffs' arguments about the structure of the BiOp are misdirected. Moreover, Plaintiffs' silence on NMFS's analysis of whale densities and literature about the absence of TSSs speaks volumes about the soundness of the underlying science.

### C. NMFS Considered the Best Available Data.

To fulfill the Section 7 consultation requirements, agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The record evidence in this case demonstrates that NMFS fully satisfied its obligation to consider both types of data in its BiOp. The BiOp's references include more than 250 documents, many of which are scientific studies on whales and turtles. NMFS AR 100-18. These studies play a critical role in each part of NMFS's analysis, especially the status of the species section. NMFS also relied on the best available commercial data when making its determinations about the environmental baseline, and especially the section on shipping.

According to Plaintiffs, NMFS failed to use the best available scientific information, Pls.' Mot. at 25-28, but Plaintiffs chart a misguided course. First, Plaintiffs contend that NMFS "ignored" the best available science on the humpback whales. *Id.* at 26. Yet the requirement to rely on the best available data "merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1047 (9th Cir. 2015) (quoting *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006)). "An agency complies with the best available science standard so long as it does not ignore available studies." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). Here, Plaintiffs do not allege that NMFS "actually omitted" the Final Rule (81 Fed. Reg. 62,260 (Sept. 8, 2016)) that revised the listing status of humpback whales to include four endangered DPSs and one threatened DPS. *Kern*, 450 F.3d at 1081. Nor do Plaintiffs allege that NMFS omitted the studies relied on in that Final Rule, including Wade *et al.* (2016), Bettridge *et al.* (2015), or Calambokidis *et al.* (2008).

Instead, Plaintiffs argue that NMFS acted arbitrarily by not incorporating the final abundance numbers from the Final Rule for the Central America and Mexico DPSs. Pls.' Mot. at

26. That is incorrect. The final abundance number for the Central America DPS identified in the Final Rule (411) is within the range outlined in the BiOp (400-600). 81 Fed. Reg. at 62,307. Further, while the abundance number for the Mexico DPS (3,264) is below the range outlined in the BiOp (6,000-7,000), "gaps and imperfections" in the analysis "do not rise to the level of an arbitrary and capricious decision." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1448 (9th Cir. 1996). Also, Plaintiffs have not shown *how* that difference in degree "diminish[ed] the true import of the threat of ship strikes." Pls.' Mot. at 27. Indeed, Plaintiffs ignore evidence in the BiOp showing that NMFS fully acknowledged the implications of that Final Rule. Citing the very study that informed the Final Rule's abundance estimates (Wade *et al.* (2016)), NMFS discussed the mean probability of encountering a Central America DPS humpback off the west coast as 10.4% with a 95% confidence interval of 1%-19.7%, and the mean probability of encountering a Mexico DPS humpback as 89.6%. NMFS AR 34. NMFS highlighted its concern with the Central America DPS in particular "due to its low abundance and the persistence of threats to these animals from human activities on and along the west coast." *Id.* Because of this concern, NMFS estimated that up to 20% of humpbacks encountered off of California and Oregon would be from that DPS while 90% would be from the Mexico DPS. *Id.* The agency "recognize[d] that this equates to more than 100% of the animals that could be affected but is *protective* of Central American DPS when assessing potential consequences." NMFS AR 35 (emphasis added).

Plaintiffs cannot rescue this line of argument by reference to case law. *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000), is not analogous because there the agency admitted to overlooking evidence. Here, by contrast, NMFS's "conclusion was not arbitrary and capricious; it was thoroughly reasoned and supported by relevant data" that included much "more than a dozen scientific studies to supports its findings—none of which are challenged by Plaintiffs." *Colorado by & Through Colorado Dep't of Nat. Res., v. U.S. Fish & Wildlife Serv.*, 362 F. Supp. 3d 951, 970 (D. Colo. 2018). Plaintiffs' reference to *Dow AgroSciences LLC v. NMFS*, 707 F.3d 462, 473 (4th Cir. 2013), does not support their position. Indeed, in the sentence prior to the one Plaintiffs quote, the court states: "We should point out

1   that an agency need not revise its action every time new data or a new model is announced

2   because doing so 'would lead to significant costs and potentially endless delays in the approval

3   processes.'" *Id.* (citation omitted). Plus, the *Dow* court cited *Sierra Club v. EPA,* 356 F.3d 296,

4   308 (D.C. Cir. 2004), which concluded that the use of an old model was appropriate where a

5   new modeling tool was available for only one year before the plans were approved. Here, the

6   Final Rule that Plaintiffs devote so much attention to was not published until September 2016,

7   when NMFS was revising the draft BiOp. *See*, *e.g.*, NMFS Supporting Docs 1000-03

8   (discussing the Proposed Rule in comments in a draft of the BiOp). Likewise, Plaintiffs'

9   reliance on *Intertribal Sinkyone Wilderness Council v. NMFS*, 970 F. Supp. 2d 988 (N.D. Cal.

10  2013), is misplaced. The court distinguished *Sierra Club* by noting that the "data was available

11  years, not months, before the NMFS issued the [] BiOp." *Intertribal Sinkyone*, 970 F. Supp. 2d

12  at 1001. The timing in this case is closer to *Sierra Club* than *Intertribal Sinkyone*.

13          In the face of this headwind, Plaintiffs tack and argue that NMFS's reliance on

14  population information drawn from MMPA stock data is "inexplicabl[e]." Pls.' Mot. at 27. This

15  approach fares no better because NMFS's use of the MMPA stocks is explained, and rationally

16  so. *See* NMFS AR 24 (noting that blue whale population estimates are reported in MMPA stock

17  assessment reports (SARs), and thus the best available population estimates are referenced by

18  MMPA stock); NMFS AR 38 (referring back to the discussion on why the MMPA SARs

19  provide the best available information). Moreover, NMFS synergized the existing data on the

20  California/Oregon/Washington MMPA stock, which winters in coastal *Central America and*

21  *Mexico* and migrates to California and southern Canada in the summer and fall, with

22  information related to the newly identified *Central America and Mexico* DPSs. NMFS AR 38;

23  *contra* Pls.' Mot. at 27. The record evidence shows that the discreteness of the DPSs was

24  embraced and placed in the context of the trends seen in the MMPA stock. *See* NMFS AR 38-

25  40 (showing an increase of 7.5%). NMFS's application of its expert judgment on the integration

26  of the relevant population data should not be disturbed.

27          Plaintiffs incorrectly contend that NMFS failed to consider a data point on humpback

28  deaths from entanglements that was discussed in the Final Rule on the humpback DPSs. Pls.'

Defs.' Cross-Motion for Summary Judgment

No. 4:21-cv-345-KAW                          32

U.S. Department of Justice
Environment & Natural Resources Division
Washington, DC  20044-7611

Mot. at 28 (citing 81 Fed. Reg. at 62,305). Plaintiffs do not argue that NMFS overlooked the issue of entanglements in the context of fisheries interactions. Nor could they, because the BiOp covers the issue, including numbers on entanglements through 2013 and studies from 2014 and 2015. NMFS AR 61-63. Instead, Plaintiffs quibble with the fact that the BiOp did not itself specifically refer to the Final Rule's reference to a report on 31 deaths in 2015. But a court may not "fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies." *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) (citation omitted). This is especially true when the technical deficiency is based on a data point in a Final Rule issued just months before the BiOp was finalized. Ultimately, Plaintiffs fail to meet their burden of showing that this data point is needed for a lawful jeopardy analysis.

**D. NMFS Properly Concluded that an Incidental Take Statement Was Unnecessary.**

At the conclusion of the BiOp, NMFS added a section in which it explained that incidental take was not reasonably certain to occur and determined that an ITS was thus not necessary. NMFS AR 98. This decision is not only supported by the analysis in the BiOp but also entirely consistent with the ESA and the implementing regulations.

NMFS's analysis of incidental take picked up where the risk analysis left off. First, NMFS "determined that the effects on fin whales and leatherbacks are extremely unlikely and therefore discountable, not rising to the level of take." *Id.* Next, NMFS concluded that take of humpback and blue whales was considered not likely to occur based on "the overall reduced exposure of whales to vessel traffic, the behavior and number of ships in the action area and the relative density and variability in habitat use by whales." *Id.* Because the risk assessment was rational, *see supra*, these conclusions about take were reasonable and are entitled to deference.

Plaintiffs' argument about incidental take is largely derivative of their flawed arguments about the effects analysis, and therefore should be rejected. Pls.' Mot. at 30. However, Plaintiffs also imply that NMFS was required to do more in the ITS. *Id.* at 28-30. This approach rests on a misapplication of the relevant regulatory provisions and misunderstanding of the case law. As an initial matter, it is undisputed that an ITS is not required for every BiOp. *Id.* at 28 (stating that a BiOp "must analyze *whether* a 'taking' of listed species may occur" and "*[w]henever*

'such take is reasonably certain to occur"); *see* 16 U.S.C. § 1536(b)(4)(i) (stating the ITS will

specify "the impact of *such* incidental taking"); 50 C.F.R § 402.14(i)(1) (requiring the issuance

of an ITS only when the "*resultant* incidental take of listed species will not violate section

7(a)(2)") (emphasis added). Thus, Plaintiffs' argument turns on what the appropriate standard is

and whether it has been met here. As discussed below, NMFS easily met that standard.

     The standard for when an ITS is required was clarified by the Services in 2015. 80 Fed.

Reg. 26,832 (May 11, 2015). In that rulemaking, the Services noted that the 1998 Consultation

Handbook applied a standard of "reasonably likely" in determining whether an ITS was needed

and that while the Ninth Circuit did not definitively resolve the issue in *Arizona Cattle Growers*

*Association v. U.S. Fish & Wildlife*, 273 F.3d 1229 (9th Cir. 2001), the court "cited favorably to

the lower court's application of the standard of 'reasonable certainty' for issuance of an [ITS]."

80 Fed. Reg. at 26,836. Against this backdrop and in light of the language about "reasonably

certain to occur" in the context of indirect effects, the Services changed the standard for an ITS

from "may occur" to "reasonably certain to occur." *Id.* at 26,836-37. The Services also squarely

addressed the suggestion in cases such as *Public Employees for Environmental Responsibility v.*

*Beaudreu*, 25 F. Supp. 3d 67 (D.D.C. 2014), that a lower standard applies for issuance of an ITS:

"that is not the Services' interpretation. The language of § 402.14(g)(7) cannot be read in

isolation. The Services implement § 402.14(g)(7) together with the more particular requirements

of § 402.14(i)." 80 Fed. Reg. at 26,837. This statement undermines Plaintiffs' reliance on the

*Public Employees* case.[22] Pls.' Mot. at 30. As part of the 2015 rulemaking, the Services provided

further explanation for how to proceed when take is not reasonably certain to occur. They wrote:

> Where formal consultation results in a determination that take is not "reasonably
> certain," then consistent with § 402.14(g)(7) and the Services' Section 7 Handbook,
> the Services provide a section entitled "incidental take statement" along with a short
> paragraph explaining that incidental take is not anticipated. Thus, the statement
> does not go on to provide an amount or extent of take, reasonable and prudent
> measures, or the other components of an incidental take statement.

---

[22] The Services' reading is entitled to deference despite the decision in *Public Employees*
because "allowing a judicial precedent to foreclose an agency from interpreting an ambiguous
statute . . . would allow a court's interpretation to override an agency's." *Nat'l Cable &*
*Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

80 Fed. Reg. at 26,387. This is exactly what NMFS did here. Pursuant to the ESA implementing regulations, NMFS applied the proper standard when it concluded that take was not "reasonably certain to occur." 50 C.F.R. § 402.14(g)(7); *see Columbia Riverkeeper v. U.S. Army Corps of Eng'rs*, -- F. Supp. 3d -- , No. 19-6071 RJB, 2020 WL 6874871, at *2 (W.D. Wash. Nov. 23, 2020) (noting that an ITS is needed only "[i]f the NMFS concludes in the [BiOp] that the proposed action will not likely jeopardize the continued existence of a listed species but is reasonably certain to result in an incidental take"). And, consistent with the 2015 rulemaking, NMFS appropriately stated in a section entitled "Incidental Take Statement" that take is not anticipated. NMFS AR 98.

Plaintiffs have not pointed to any record evidence indicating that take is reasonably certain to occur from the proposed action, and thus have failed to show that NMFS acted arbitrarily or capriciously in reaching its decision on incidental take. Moreover, Plaintiffs devote more than a page of their brief to citing cases that describe the elements of an ITS, including a reinitiation trigger. Pls.' Mot. at 29-30. But all of these cases are irrelevant because an ITS was not necessary in the first instance.

### III.   USCG Satisfied Its Substantive Obligations to Ensure Against Jeopardy.

Plaintiffs assert that USCG violated ESA Section 7 by relying on the BiOp, Pls.' Mot. at 30-31, but this argument is premised on the mistaken conclusions about the BiOp. Here, NMFS's BiOp represented a thorough and reasoned analysis of the proposed action and its effects when added to the baseline and cumulative effects. *See supra*; *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) (holding that the action agency did not act arbitrarily and capriciously in its reliance on a valid BiOp). Therefore, USCG acted reasonably by relying on NMFS's BiOp.

### CONCLUSION

For all the reasons stated herein, Plaintiffs' Motion for Summary Judgment should be denied, and Defendants' Cross-Motion for Summary Judgment should be granted.

Dated:  March 17, 2022                    Respectfully submitted,

                                          TODD KIM
                                          Assistant Attorney General
                                          SETH M. BARSKY
                                          Section Chief
                                          S. JAY GOVINDAN
                                          Assistant Section Chief

OF COUNSEL:

                                          */s/ Frederick H. Turner*
PEYTON COLEMAN                            FREDERICK H. TURNER (Maryland Bar)
U.S. Coast Guard                          Trial Attorney
Office of Claims and Litigation           U.S. Department of Justice
Washington, DC                            Environment and Natural Resources Division
                                          Wildlife and Marine Resources Section
DEANNA HARWOOD                            Ben Franklin Station, P.O. Box 7611
U.S. Department of Commerce               Washington, D.C. 20044-7611
NOAA, Office of General Counsel           Phone: (202) 305-0641
Southwest Section                         Fax: (202) 305-0275
Long Beach, CA                            Email: frederick.turner@usdoj.gov

                                          *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2022, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court for the Northern District of California by

using the CM/ECF system, which will serve a copy of the same on the counsel of record.


        */s/ Frederick H. Turner*
        FREDERICK H. TURNER (Maryland Bar)
        Trial Attorney
        U.S. Department of Justice
        Environment and Natural Resources Division
        Wildlife and Marine Resources Section
        Ben Franklin Station, P.O. Box 7611
        Washington, D.C. 20044-7611
        Phone: (202) 305-0641
        Fax: (202) 305-0275
        Email: frederick.turner@usdoj.gov

        *Attorney for Defendants*