1
2
3
4
5
6
7
8
9
10
11
12

United States District Court
Northern District of California

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>NOAA FISHERIES, et al.,<br><br>   Defendants. | Case No.  4:21-cv-00345-KAW<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 41, 42 |

On January 31, 2022, Plaintiffs Center for Biological Diversity and Friends of the Earth filed a motion for summary judgment, in which they challenge the National Marine Fisheries Service's issuance of a Biological Opinion codifying shipping lanes that vessels use to approach ports, which Plaintiffs allege result in significant numbers of ship strikes with Endangered Species Act-protected species. On March 17, 2022, Defendants NOAA Fisheries, Assistant Administrator Chris Oliver, U.S. Coast Guard, and Commandant Karl L. Schultz filed a cross-motion for summary judgment.

Upon review of the moving papers, the Court finds this matter suitable for resolution without oral argument pursuant to Civil Local Rule 7-1(b), and, for the reasons set forth below, GRANTS Plaintiffs' motion for summary judgment, and DENIES Defendants' cross-motion for summary judgment.

## I. BACKGROUND

### A. Endangered Species Act Statutory Framework

The Endangered Species Act ("ESA") provides for the conservation of fish, wildlife, and plant species that are at risk of extinction by requiring federal agencies to ensure that actions they authorize, fund, or carry out are "not likely to jeopardize the continued existence" of any ESA-

listed species. 16 U.S.C. § 1536(a)(2).  Agencies proposing actions that may affect an ESA-listed species must consult with either the National Marine Fisheries Service ("NMFS" or "Fisheries Service") or the U.S. Fish and Wildlife Service ("FWS") —depending on the species involved— which then reviews the proposed action and prepares a "biological opinion" (or "BiOp") that evaluates whether and the extent to which the action may impact the species. *Id.* § 1536(b); 50 C.F.R. § 402.12. In completing its analysis, NMFS must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The ESA's regulations define to "jeopardize the continued existence of" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. To prepare its biological opinion, NMFS must evaluate the current status of the species overall and in the action area, the environmental baseline, and the effects of the action and cumulative effects on the listed species in the action area. 50 C.F.R. § 402.14(g)(2) & (3). The jeopardy analysis consists of a synthesis of the effects of the action within the action area upon the status of the species as a whole, taking into account the environmental baseline and cumulative effects. 50 C.F.R. § 402.02.

If NMFS or FWS concludes that an action is likely to cause "jeopardy," then it must propose a "reasonable and prudent alternative" to the proposed action. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). On the other hand, if the NMFS or FWS finds that the proposed action would not jeopardize any species' continued existence, it issues a statement permitting the "taking" of a particular number of protected animals "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).  That "incidental take statement" ("ITS") must describe the effect of the incidental taking on the species and set forth those reasonable and prudent measures ("RPMs") that NMFS considers "necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4)(C)(ii). "[A]ny taking that is in compliance with the terms and conditions specified in a written [ITS] . . . shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

United States District Court
Northern District of California

B.    **Factual Background**[1]

i.    **Impacted Endangered Species**

The Pacific Ocean waters off the California coastline include habitat for endangered and threatened whale populations in part due to the presence of seasonal feeding areas for humpback, blue whales, and fin whales. 2017 Biological Opinion ("2017 BiOp"), National Marine Fisheries Service Administrative Record ("NMFS AR") 51. Humpback and fin whale aggregations have been observed year-round. *Id*. Endangered leatherback sea turtles have critical habitat in these same waters. 50 C.F.R. § 226.207(b)(1). Waters off southern and central California are essential to the conservation of these species. *Id*.; NMFS AR 51; NMFS References AR 17760 (Calambokidis et al. 2015); NMFS References AR 16327, 16334, 16341 (Carretta et al. 2016).

Baleen whales and leatherback sea turtles were listed as endangered under the precursor to the Endangered Species Act—the Endangered Species Conservation Act of 1969. 35 Fed. Reg. 8,491 (June 2, 1970).  Humpback, blue, and fin whales and leatherback sea turtles continued to be listed after the 1973 passage of the ESA. Since then, the National Marine Fisheries Service ("NMFS") has reviewed and revised the listed status of the humpback whales, 81 Fed. Reg. 62,260 (Sept. 8, 2016), and designated critical habitat for leatherback sea turtles that feed off of the coast of California, 77 Fed. Reg. 4170 (Feb. 27, 2012). Blue whales and fin whales have remained ESA-listed without further NMFS listing decisions.

The humpback whale, *Megaptera novaeangliae*, is primarily dark gray in color, and is distinguished by wing-like pectoral flippers and the fluke patterns on its underside. NMFS AR 35; 80 Fed. Reg. 22,304, 22,308 (Apr. 21, 2015). They are migratory animals, reproducing in winter months in tropical areas and migrating to colder waters in spring, summer, and fall months to feed, NMFS AR 35, and aggregations have been observed off Southern and Central California year-round. NMFS AR 51. Like fin and blue whales, their primary food source is krill and schooling fish. NMFS AR 35. Like blue whales, humpback whales may follow some of their prey into deeper waters during the daytime and shallower waters at night. NMFS AR 35.

---

[1] The factual background was taken from the parties' joint statement of facts, which was filed on November 10, 2022. (*See* Dkt. No. 51)

United States District Court
Northern District of California

Following the 1994 amendments to the Marine Mammal Protection Act ("MMPA"), NMFS designated the California/Oregon/Washington stock of humpback whales in 1995 in its first stock assessment report. This stock winters primarily off the coast of Central America and Mexico and some of the whales from the northern Washington portion of stock also winter off of the Hawaiian Islands; the stock migrates north in the summer and fall. NMFS AR 38. The minimum population estimate for this MMPA stock in the 2016 Stock Assessment Report was 1,876, and the current trend is an increase of 7.5%. NMFS AR 39-40.

NMFS's 2016 ESA rule identified 14 distinct population segments ("DPS") of humpback whales, listed four of those DPSs as endangered, and one as threatened. NMFS AR 32. Two of these—the Central America and Mexico DPSs—are in the action area, which is the waters within and around the Traffic Separation Schemes ("TSSs") of San Francisco and Los Angeles/Long Beach. NMFS AR 16, 33.  At the time of the 2016 listing, population estimates for these two DPSs, were 411 and 3,264, respectively. 81 Fed. Reg. at 62,305, 62,307.  The population trend of the Central America DPS is unknown. 81 Fed. Reg. at 62,307. While there is evidence of population growth in the primary feeding areas of the Mexico DPS, NMFS does not have specific evidence that this DPS is actually increasing in overall population size. 81 Fed. Reg. at 62,306. The MMPA's California/Oregon/Washington stock includes whales from both these two DPSs and the unlisted Hawaii DPS.

The blue whale, *Balaenoptera musculus*, "is not only the largest of the whales, [but] is also the largest living animal," reaching 100 feet in length and weighing as much as 160 metric tons. NMFS References AR 9788 (Mizroch 1984). The name for this baleen whale stems from the blue-gray coloring, which appears light blue under water. The blue whale's oceanic location and movement are determined in large part by krill, which is the primary prey: blue whales are often found at the upwelling zones near the continental shelf, where krill abundance is highest; the whales follow krill into deeper waters during the daytime and shallower waters at night; and the whales migrate seasonally in large part based on krill movement. NMFS AR 23–25.  Globally, there are three subspecies of blue whales—those found in the North Pacific, the North Atlantic, and the Southern Hemisphere—though blue whales are listed as a single species under the ESA.

NMFS AR 22. Based on acoustic evidence, there are two populations within the North Pacific: eastern and western. NMFS References AR 16334 (Carretta et al. 2016). The MMPA stock likely to be affected by the proposed action is the Eastern North Pacific stock. NMFS AR 25.  Nine 'biologically important areas' for blue whale feeding are identified off the California coast, including six in southern California and three in central California. NMFS References AR 17760 (Calambokidis et al. 2015). The U.S. West Coast is certainly one of the most important feeding areas in summer and fall, but, increasingly, blue whales from this [Eastern North Pacific] stock have been found feeding to the north and south of this area during summer and fall. NMFS References AR 16334 (Carretta et al. 2016).  The minimum population estimate in the 2016 Stock Assessment Report for this stock was 1,551 whales. NMFS AR 26—27; NMFS References AR 16335 (Carretta et al. 2016). The "potential biological removal" threshold—defined under the Marine Mammal Protection Act as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population," 16 U.S.C. § 1362(20)—was 2.3 blue whales per year. NMFS References AR 16335 (Carretta et al. 2016).

The fin whale, *Balaenoptera physalus*, has a dark gray upper half while its lower half is cream or white, and the genesis for its name is the dorsal fin located toward the end of its back. NMFS AR 28. Most fin whales migrate seasonally, though they tend to avoid tropical climates. NMFS AR 29. Their primary prey are krill and schooling fish. *Id*. There is insufficient information to determine fin whale population structure, thus while fin whales are listed globally under the ESA, the best available population estimates are referenced by stock, which is a unit to conserve in the context of the Marine Mammal Protection Act or the International Whaling Commission. NMFS AR 29.  The stock of fin whales likely to be affected by the U.S. Coast Guard's ("USCG") action is the California/Oregon/Washington stock. NMFS AR 30. The minimum population estimate for this MMPA-defined stock was 2,598 whales in the 2016 Stock Assessment Report, and the mean population growth rate decreased from an estimated 7% per year in 1996/1997 to 3.5% per year by 2008. NMFS References AR 16342 (Carretta et al. 2016). The potential biological removal threshold was 16 fin whales per year. *Id.*

The leatherback sea turtle, *Dermochelys coriacea*, is the largest sea turtle in the world and one of the largest living reptiles, with their carapace reaching almost 5 feet long and their flippers spanning almost 9 feet. NMFS AR 43. Leatherbacks are distinct because of their eponymous soft shell. They spend most of their lives in the open ocean, often just below the surface of the water and periodically surfacing to breathe. NMFS AR 43–44, 48. According to NMFS, this "may make leatherbacks particularly vulnerable to vessel strikes in foraging areas." NMFS AR 48. Leatherbacks are widely distributed throughout the world. NMFS AR 43–44. Data indicates that leatherbacks found off the U.S. West Coast are from the western Pacific nesting populations. NMFS AR 47. Though rare, leatherback sea turtles can be found feeding along the coast of California because of the high density of primary prey, the brown sea nettle. NMFS AR 44, 48. NMFS designated critical habitat for leatherbacks along the U.S. West Coast in 2012, including waters off California. 77 Fed. Reg. 4170 (Jan. 26, 2012); NMFS AR 17.  There have been substantial declines of some populations throughout the Pacific. NMFS AR 43, 45-46. According to NMFS scientists, leatherbacks' large range—some migrate over 6,000 miles to California to feed—and extensive movements spanning entire ocean basins and national waters of many countries has complicated conservation and management efforts that are largely local or national in nature. NMFS References AR 19797 (Benson et al. 2011).  The most recent estimate at the time the BiOp was written was 178 leatherbacks off the coast of California. NMFS AR 47–48. The threats to leatherbacks off California include fishery bycatch, vessel strikes, marine debris, and climate change. NMFS AR 48–50, 60.

### ii.    Threats to Protected Species

Blue, fin, and humpback whales face a number of threats, including: vessel strikes; interactions with fisheries and whale-watching boats; disturbance caused by scientific research, noise, climate change and marine pollution; reduced prey abundance; and habitat degradation. NMFS AR 27–28, 31–32, 40–43.  In part because their distribution overlaps significantly with the transit routes of large commercial ships in the BiOp's action area, humpback whales are highly vulnerable to vessel strikes. NMFS AR 41. This is especially true for younger whales that spend more time at the surface and closer to shore. *Id.* Humpback mortality goes unreported when the

6

whales do not strand on a beach or strand without obvious signs of trauma. *Id.* Some vessel strikes may not be fatal; scientists have photographed humpback whales with large gashes that appear to be from vessel strikes. *Id.* Vessel collisions pose one of the greatest threats to the Central America DPS of humpback whales and especially high levels of large vessel traffic are found in its range off Panama, Southern California, and San Francisco. 81 Fed. Reg. at 62,307.

Humpback whales are also vulnerable to deaths from fishing gear entanglements. They are the most commonly observed whale species entangled in fishing gear off the U.S. west coast. NMFS AR 62. For the period 1998 to 2013, i.e. 16 years, NMFS reported 53 humpback whales seriously injured or dead due to fishing gear entanglements, which is on average 3.3 humpbacks per year. *Id.*; NMFS References 16132–657 (Carretta *et al.* 2016). NMFS recorded 31 confirmed humpback deaths resulting from entanglements off the coasts of California, Oregon, and Washington in 2015 alone. 81 Fed. Reg. at 62,305.  The increased number of reported fishing gear entanglements poses a moderate extinction risk to the Mexico and Central America DPSs, *id.* at 62,274, and will likely moderately reduce population size or growth rate of both DPSs. *Id.* at 62,305, 62,307.

Vessel strikes are the primary threat currently facing blue whales. NMFS AR 27.  Threats to fin whales include vessel strikes, fishery entanglements, and other factors. NMFS AR 31.

The threats to leatherbacks off California include fishery bycatch, vessel strikes, marine debris, and climate change. NMFS AR 48–50, 60.

Since the 1970s, marine mammal stranding programs have provided a basis for documenting collisions between ships and whales. NMFS References AR 19110 (Laist et al. 2001). These records reflect that whales struck by ships suffer violent, painful, and likely often slow deaths with propeller cuts, gashes, fractured or shattered skulls, broken vertebrae, blunt trauma, bruises, and other grievous injuries. NMFS References AR 19111–19112 (Laist et al. 2001). For some species, including humpback whales, a high proportion of struck whales are calves or juveniles. NMFS References AR 19124 (Laist et al. 2001).

Ship strikes are rarely witnessed and typically go undocumented because the carcasses of most whales killed by collisions sink before "stranding" or washing up on a beach. NMFS

United States District Court
Northern District of California

7

References AR 19596 (Redfern et al. 2013); *see also* NMFS References AR 17966 ("Dead whale strandings along the coast related to ship strikes may represent only a small portion of true ship strike mortality; most cetacean deaths are never recovered because they either sink or do not come ashore.").  Blue, fin, and humpback whales are negatively buoyant (i.e., they sink after death). NMFS References AR 19596. Thus, for each documented ship strike mortality of these whales, scientists estimate that there are numerous additional undocumented deaths. See NMFS References AR 11633.  Ship strikes of large whales off the California coast are believed to be most prevalent around the State's major ports. NMFS References AR 18776 ("Documented vessel strikes appear to be most prevalent around California's major ports of San Diego, Los Angeles/Long Beach, and the entrance to San Francisco Bay.").

Ships are more dispersed in the absence of TSSs. NMFS References 18024–31 (Fonnesbeck *et al.* 2008); NMFS References 18000-08 (Lageux *et al.* 2011); NMFS References 18960–73 (Guzman *et al.*2013); NMFS References 18894–912 (McKenna *et al.* 2012); NMFS References 17864–82 (Dransfeld *et al.* 2014). One study stated: "Although our results revealed that the current shipping lane layout reduced the area of the vessel traffic footprint within the sanctuaries by 69% and reduced overlap with areas modeled as highly used by humpback whales by 76% (when considering the  top 2 to 4% of highest use areas), the resulting changes in ship-strike risk cannot be determined without a more explicit exploration of the effects of concentrating shipping traffic." NMFS References 17878 (Dranfseld *et al.* 2014). It added that a "vessel footprint area does not account for several important aspects of ship-strike risk, including frequency, speed, size and density patterns within the shipping lanes and variability between lanes." NMFS References 17878 (Dransfeld et al.2014).

An average of 1 humpback whale, 1.8 blue whale, and 1.2 fin whale ship strikes were documented per year along the California coast from 2005 to 2010. AR 19596 (Redfern et al. 2013). To correct these observations for undocumented ship strikes, NMFS scientists assumed a 17% carcass-detection rate and estimated that 5.9 humpback whales, 10.6 blue whales, and 7.1 fin whales were struck by ships each year. *Id.*

For purposes of the MMPA, the estimated number of ship-strikes for humpback and fin

whales "is below their potential biological removals and thus suggests the number of strikes may be sustainable." NMFS References 19598 (Redfern *et al.* 2013). For blue whales, even "conservative estimates of the number of blue whale ship strikes . . . are higher than the potential biological removal level" each year. NMFS References AR 19598 (Redfern et al. 2013).

Ship strikes are a documented threat to leatherbacks, but stranding records provide only minimum information about the magnitude of that threat. NMFS AR 60. From 1989 through 2014 there were 12 reported incidents of vessel-struck leatherback sea turtles in California. NMFS AR 60–61. Observations of turtles struck by vessels underestimate the actual impact. NMFS AR 60. Leatherbacks spend nearly half of their time at the ocean's surface, which "may make [them] particularly vulnerable to vessel strikes in foraging areas." NMFS AR 48.

"[T]he most pragmatic means of reducing vessel strikes to whales are to (1) reduce the probability of a vessel encountering a whale through modified vessel routing (seasonal or otherwise), (2) reduce the lethality of vessel strikes, should a collision occur, through vessel-speed restrictions, and (3) reduce overall risk through modified routing coupled with speed restrictions." NMFS AR 73.

### iii.    The Port Access Route Studies and TSS Designations

Ship movement is governed at the global level by the International Maritime Organization ("IMO"), which has authority under the International Convention for the Safety of Life at Sea to adopt routing measures, such as TSSs. *See* 32 U.S.T. 47, T.I.A.S. No. 9700 (Nov. 1, 1974).  The first TSSs off San Francisco, in the Santa Barbara Channel, and in the approaches of Los Angeles/Long Beach were adopted by the IMO in 1968, 1969, and 1975, respectively. 64 Fed. Reg. 32,451 (June 17, 1999).

In 1978, Congress amended the Ports and Waterways Safety Act to provide USCG with responsibility for vessel traffic services and directed the agency to "provide safe access routes" for vessels through the establishment of TSSs. 46 U.S.C. §§ 70001, 70003(a). Before establishing a TSS, the Ports and Waterways Safety Act requires that USCG "undertake a study of the potential traffic density and need for safe access routes." *Id.* § 70003(c)(1); Pub. L. 95-474, 92 Stat. 1471 (Oct. 17, 1978).  One year after those amendments, USCG initiated Port Access Route Studies

1   ("PARS") for 32 areas around the United States, including the California ports.  Over the next two

2   decades, USCG engaged in various PARS related to the California ports. NMFS AR 123; U.S.

3   Coast Guard Administrative Record ("USCG AR") 359–60; 433–35.  These TSSs have all been

4   adopted by the IMO. NMFS AR 123; USCG AR 359–60, 433–35.

5        After the initial TSS designation for Southern California, "[t]he area which showed the

6   most significant change was the Santa Barbara Channel." 47 Fed. Reg. 27,430, 27,431 (June 24,

7   1982). USCG stated that the increase in mariner use of the Channel "seems to indicate that

8   mariners have become more comfortable with the TSS as it has been in existence since 1969." *Id*.

9        In late 2009 and early 2010, USCG determined that it would re-evaluate the existing TSSs

10   in the California ports based on new information. USCG AR 27–30, 152–55. USCG completed

11   PARS for the approaches to the Los Angeles-Long Beach and San Francisco Bay ports in 2011.

12   USCG AR 952–53.  For Los Angeles/Long Beach, USCG began by seeking public comment on

13   the PARS and then holding public meetings. USCG AR 153–55, 229.  USCG considered multiple

14   TSS configurations during the study process for both ports, including configurations that would

15   significantly differ from the existing TSS designations. The agency considered five options in

16   Southern California, including an option that would have eliminated the existing Santa Barbara

17   Channel TSS and created a new TSS south of the Channel Islands, an option that would have

18   retained the Santa Barbara Channel TSS but also created a new TSS on the southern side of the

19   northern Channel Islands, an option that would narrow the Santa Barbara Channel TSS and move

20   the southernmost boundary to the north and thus shift the lane away from the Channel Islands, and

21   an option to establish a new TSS south of the Channel Islands where voluntary lanes established

22   by the Los Angeles-Long Beach Harbor Safety Committee already exist. USCG AR 435–57.

23        USCG stated that research conducted by NMFS and the Channel Islands National Marine

24   Sanctuary "indicates a single TSS south of the Channel Islands would appear to minimize the

25   overall risk of ship strikes on whales. Although it would increase the risk for fin whales, it would

26   reduce the risk for blue and humpback whales." USCG AR 442.

27        The United States' submission to the IMO contained three documents. First, the United

28   States proposed amending the Santa Barbara Channel TSS by narrowing the separation zone and

United States District Court
Northern District of California

10

moving the southernmost boundary of the inbound lane one nautical mile to the north. This proposal recognized that the "channel's abundant marine life and high seasonal production of krill play an important role in the feeding patterns of migratory whales" and aimed to "reduce the co-occurrence of ships and whales." USCG AR 460–66. The Santa Barbara Channel proposal to the IMO did not include a lane south of the Channel Islands because it would overlap with the Navy's Point Mugu Sea Range, IMO-adoption of a TSS in the location could pose a risk to public safety and national security, and it could result in "irregular traffic patterns with potential for increased impacts on marine mammals. *See* USCG AR 260–67, 449–50. Second, the United States provided background on the rationale for shifting the Santa Barbara Channel lane. USCG AR 483–88. Third, the United States proposed a narrowing of the western approaches into Los Angeles/Long Beach to align with the Santa Barbara Channel. USCG AR 475–81.

The PARS for San Francisco announcement invited public comment. USCG AR 28–30. Next, USCG hosted public meetings. *E.g.*, USCG AR 231–54, 269–70. USCG considered seven TSS options in the San Francisco Port Access Route Study. 76 Fed. Reg. 35,805 (June 20, 2011). In contrast to the single TSS approach to Los Angeles-Long Beach ports, there are three TSS approaches to San Francisco: northern, western, and southern.

The final PARS included responses to the comments received during the process and an explanation of USCG's recommendation. USCG AR 351–94. USCG determined that adjustments to the northern approach would shift it away from the Cordell Bank and Point Reyes Areas of Sensitive Biological Significance ("ASBS"). USCG AR 376, 384–85. Likewise, the extension and reconfiguration of the western approach would reduce the risk of whale strikes by moving the outer edge past the continental shelf and would help avoid the Farallon Islands ASBS. USCG AR 384–85. USCG also considered extending the southern approach by 8.5 nautical miles to improve predictability as vessels moved through fishing grounds. *Id.*

The United States submitted to the IMO proposed amendments to the San Francisco TSS. That document explained that blue, humpback, and fin whales are found in the approaches to San Francisco, often along the continental shelf break and near the Cordell Bank and south of the Farallon Islands. USCG AR 469. It added: "This proposal will reduce spatial overlap of ships and

United States District Court
Northern District of California

1   whales by shifting traffic away from these areas and extending the TSS over the shelf break." *Id.*

2   The IMO adopted all of the United States' proposed amendments to the California TSSs in

3   December 2012. USCG AR 490–505.

4       Both TSS changes became effective June 1, 2013. NMFS AR 7.  On October 24, 2013,

5   USCG wrote to NMFS to initiate ESA section 7 consultation on its codification of the TSS

6   designations. USCG AR 515–525. In its letter, USCG stated that the action may affect blue, fin,

7   and humpback whales, leatherback sea turtles, and other species. NMFS AR 7778–7788; USCG

8   AR 515–525.  On December 9, 2013, NMFS wrote to USCG acknowledging the request for ESA

9   section 7(a)(2) consultation. NMFS Supporting Docs AR 7445–7450.

10          **iv.**    **The Biological Opinion**

11       On February 23, 2017, NMFS issued a Biological Opinion ("BiOp") regarding the U.S.

12   Coast Guard's ("USCG") codification of Traffic Separation Schemes ("TSS") near the port of Los

13   Angeles/Long Beach ("LA/LB") and the Santa Barbara Channel and the port of San Francisco

14   ("SF"). 2017 BiOp, NMFS AR 1-143.  The TSS governs the shipping lanes vessels use to

15   approach the ports, and NMFS "developed a no-lane scenario" to "evaluate the effects of

16   codification of the TSSs." NMFS AR 20.  NMFS describes the no-lane scenario as "the proposed

17   action areas with no TSSs and the likely behavior of ships absent the TSSs and the exposure and

18   risk to the species." NMFS AR 20; NMFS AR 65 ("To evaluate the likely effects of the proposed

19   action ... NMFS considered the likely patterns of shipping traffic without the proposed action, that

20   is, shipping in the proposed action areas without the TSSs (a no-lane scenario)."  NMFS states that

21   "[t]he TSSs have been in place since the late 1960's, so research and reasonable assumptions were

22   required to characterize a no-lane scenario of shipping absent the TSSs." NMFS AR 20.  NMFS

23   states that "[t]his no-lane scenario was helpful to evaluate the effects of codifying the TSSs on the

24   resulting ship traffic patterns and resultant impacts on listed species in the action areas, although

25   we recognize that the prior forms of the lanes themselves have been used for several decades."

26   NMFS AR 20.

27       "NMFS conducted research to characterize ship traffic and patterns and shipping trends in

28   the proposed action areas to define the no-lane scenario. NMFS then considered how the

United States District Court
Northern District of California

codification of the TSSs and resultant ship traffic using the TSSs was different from the no-lane scenario and how [] this difference would affect the exposure, response and risk of interactions between whales and leatherback sea turtles in the proposed action areas." NMFS AR 20.  NMFS states that "[w]e also considered the behavior and natural history of species likely to be affected by the proposed action and the behavior and patterns of ships to evaluate risks of take resulting from codification of the TSSs versus take that occurs as a result of the shipping itself." NMFS AR 20.  NMFS states that "[t]his no-lane scenario approach conservatively magnifies the potential effects of the proposed codification of the TSS by assessing the consequences of organizing and condensing traffic patterns versus a potentially dis-organized and spread-out pattern of shipping traffic."  NMFS AR 66.

With respect to general shipping patterns, NMFS concluded that "it is reasonable to assume that shipping existed in the general areas where TSSs were later implemented as reflective of a no-lane scenario." NMFS AR 66; NMFS AR 119–124; NMFS AR 67 ("Based on influences on ship traffic from regulatory and non-regulatory forces, including economics and international trade, NMFS assumes that ship traffic would generally occur in the same areas, that is, the ports of LA/LB and SF and through the [Santa Barbara Channel], with the TSSs in place or under the no-lane scenario.").  With respect to specific shipping patterns, NMFS stated: "Based upon the available information from these areas, where there are no constraints on vessel traffic, NMFS assumes that ship distribution in the no-lane scenario would be more dispersed or fanned than with the TSSs in place in the SF and LA/LB TSS areas." NMFS AR 68.

NMFS used the no-lane scenario to determine the effects of the proposed action through an analysis of "exposure, response and risk." NMFS AR 69.  NMFS "[f]irst ... considered the likely exposure between the ships, whales, and turtles under a no-lane scenario and compared this to ships using the TSSs." NMFS AR 69.  NMFS describes the two "fundamental questions" in the exposure analysis as "1) would ships using the TSSs be expected to co-occur in space and time with blue, fin, and humpback whales and 2) how does this exposure compare to the no-lane scenario?" NMFS AR 73–74.  NMFS concluded that "[i]n the LA/LB, [Santa Barbara Channel] TSSs and the SF TSS, the result of the proposed codification of the IMO approved lanes is that the

1    overall exposure profile for whales and leatherback sea turtles is expected to decrease compared to

2    the no-lane scenario." This is based upon the assumption that generally all large ships will use the

3    TSSs and that without the TSSs ships would be spread out or fanned over a larger area than they

4    would be when using the TSSs." NMFS AR 90. NMFS states that "[t]he baseline risk of vessel

5    strikes is a result of the existence of ships and shipping traffic to, from, and between the ports,"

6    and is "not an effect of the proposed action." NMFS AR 90.

7         NMFS next considered the response of the listed species, concluding that it has "very little

8    information to suggest that whales and leatherback sea turtles will change their behaviors or

9    distribution patterns in response to the ships using the lanes that are to be codified under the

10   proposed action." NMFS AR 93.  NMFS states that "[a]t this time we do not have information to

11   indicate that concentrating ships in the lanes changes the acoustic profiles in the areas or makes

12   other changes to the marine environment that could cause a response in the animals." NMFS AR

13   94.

14        Lastly, NMFS considered the risk of ship strikes in the "TSSs compared to a no-lane

15   scenario." NMFS AR 94.  NMFS states that "[i]n almost all cases, the proposed action is expected

16   to reduce co-occurrence by reducing the spatial distribution of ships in areas where whale density

17   appears to be consistent across an area or by keeping ships away from habitat features where it is

18   expected whales or leatherback sea turtles aggregate. As a result, because we anticipate that

19   exposure to shipping lanes is reduced overall, we also similarly expect that the overall risk of

20   vessel strikes is reduced." NMFS AR 94.  NMFS recognized, however, that "exposure to vessel

21   traffic still occurs and [examined] whether the proposed codification of the lanes increases the risk

22   of a vessel strike occurring within the lanes."  NMFS AR 94.

23        NMFS found during its examination that "a number of [scientific] papers have concluded

24   that shipping lanes or recommended routes and their use by ships reduces the overall risk of whale

25   collision by reducing exposure (i.e., the area of overlap between ship traffic and whales)."  NMFS

26   AR 95.  With respect to "the LA/LB TSS and some of the SF TSS," NMFS concludes that "the

27   distribution of blue and humpback whales is such that the use of the TSSs by ships decreases the

28   risk of exposure to ships." NMFS AR 96.  With respect to the SF TSS northern lane, NMFS

United States District Court
Northern District of California

14

1  concludes that "the USCG's action appears to influence ships to travel through or near a possible

2  higher relative use feeding area of blue and humpback whales compared to a no-lane scenario in

3  which ships are likely to travel throughout the northern portion of the SF TSS action area

4  (including the area of the northern lane). However, for the reasons articulated here, NMFS does

5  not believe that the take of blue and humpback whales is reasonably certain to occur as a result of

6  implementing the action." NMFS AR 96.

7      NMFS concludes that "the overall risk of a strike is decreased by the constriction of

8  shipping traffic patterns to the designated lane versus the no-lane Scenario," and that "[a]s a result,

9  we find that the likelihood of a whale being struck in the proposed action is indistinguishable from

10  the existing risk of a strike and this likelihood is not increased by the proposed action." NMFS AR

11  97.

12      Having assessed exposure, response, and risk through the comparative analysis using the

13  no-lane scenario, and then adding the expected changes in exposure, response, and risk to the

14  environmental baseline, the BiOp concludes that the action "is not likely to jeopardize the

15  continued existence of blue or humpback whales," and "that the effects of the TSS on fin whales

16  and leatherback sea turtles are extremely unlikely, and therefore discountable." NMFS AR 97–98.

17      The Incidental Take Statement section of the BiOp explains, that "'Incidental take' is

18  defined by regulation as takings that result from, but are not the purpose of, carrying out an

19  otherwise lawful activity conducted by the Federal agency or applicant (50 CFR 402.02)."  NMFS

20  AR 98.  NMFS explains that it "evaluated the proposed action and determined that the effects on

21  fin whales and leatherbacks are extremely unlikely and therefore discountable, not rising to the

22  level of take."  NMFS AR 98.  NMFS also evaluated the proposed action's effects on humpback

23  and blue whales and based upon the overall reduced exposure of whales to vessel traffic, the

24  behavior and number of ships in the action area and the relative density and variability in habitat

25  use by whales, "NMFS could not detect a change in the risk profile from the proposed action such

26  that take is considered likely to occur as a result of the proposed action." NMFS AR 98.  "Because

27  NMFS does not anticipate incidental take of listed species from the proposed action, an incidental

28  take statement is not included" in the BiOp. NMFS AR 98.

United States District Court
Northern District of California

1    On April 29, 2020, USCG wrote to NMFS requesting reinitiation of consultation because

2  new information shows that the TSS designations may affect listed species in a manner or to an

3  extent not analyzed in that BiOp. NMFS AR 144. On April 30, 2020, NOAA Fisheries wrote to

4  USCG acknowledging the agency's request for reinitiation of consultation. NMFS AR 145.

5    **C.    Procedural Background**

6    On January 14, 2021, Plaintiffs filed this lawsuit, which seeks declaratory and injunctive

7  relief that the 2017 BiOp is unlawful and that NMFS and USCG are in violation of the ESA, an

8  order compelling the agencies to complete reinitiated consultation within six months, and the

9  implementation of measures (such as mandatory speed reductions) intended to reduce ship strikes

10  pending completion of such consultation. (Compl., Dkt. No. 1 ¶ 9.)

11    On January 31, 2022, Plaintiffs filed a motion for summary judgment on the first two

12  causes of action.[2] (Pls.' Mot., Dkt. No. 41 at 1.)  On March 17, 2022, Defendants filed an

13  opposition to the motion for summary judgment and cross-motion for summary judgment. (Defs.'

14  Opp'n, Dkt. No. 42.)  On May 2, 2022, Plaintiffs filed an opposition to the cross-motion and a

15  reply in support of the motion for summary judgment. (Pls.' Reply, Dkt. No. 43.)  On June 16,

16  2022, Defendants filed a reply in support of their cross-motion. (Defs.' Reply, Dkt. No. 44.)

17    On August 31, 2022, the Court ordered the parties to provide supplemental briefing

18  regarding the appropriate remedy should Plaintiffs' motion be granted. (Dkt. No. 46.)  On

19  September 9, 2022, Plaintiffs filed a supplemental brief. (Pls.' Br., Dkt. No. 47.)  On September

20  16, 2022, Defendants filed a responsive brief. (Defs.' Br., Dkt. No. 48.)

21    On October 18, 2022, the Court issued an order requiring the parties to file a joint

22  statement of facts. (Dkt. No. 50.)  The parties filed the joint statement of facts on November 10,

23  2022. (Dkt. No. 51.)

24    **II.    LEGAL STANDARD**

25    Summary judgment may be granted only when, drawing all inferences and resolving all

26  doubts in favor of the nonmoving party, there are no genuine issues of material fact and the

27  

28  [2] Plaintiffs' motion for summary judgment only addresses the first two claims, and does not seek summary judgment on the third through fifth causes of action.

United States District Court
Northern District of California

16

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A court reviews final agency actions under the "arbitrary and capricious" standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 980–81 (9th Cir.1985). Under the APA, the court "shall" set aside any agency decision that it finds "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Review under this "arbitrary and capricious" standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *League of Wilderness Defenders v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir.2008). Despite this narrow scope of review, the court's inquiry must be "searching and careful." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). Ultimately, "the agency must articulate a rational connection between the facts found and the conclusions made." *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997) (citing *U.S. v. Louisiana–Pac. Corp.*, 967 F.2d 1372, 1376 (9th Cir.1992)).

## III.     DISCUSSION

### A.     Plaintiffs satisfy Article III Standing

To establish standing, plaintiffs must show that: (1) they are under threat of suffering "injury-in-fact" that is concrete and particularized, and that threat must be actual and imminent, not conjectural or hypothetical; (2) the alleged harm must be fairly traceable to the challenged

United States District Court
Northern District of California

1    action of the defendant; and (3) it must be likely that a favorable judicial decision will prevent or

2    redress the injury. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81

3    (2000). An organization has standing when (1) at least one of its members would have standing to

4    sue in his or her own right; (2) the interest it seeks to protect is germane to its purpose; and (3)

5    "neither the claim asserted nor the relief requested requires the participation of individual

6    members in the lawsuit." *Cottonwood Envtl. Law Ctr. v. U. S. Forest Serv.*, 789 F.3d 1075, 1079

7    (9th Cir. 2015) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

8        "An organization can satisfy the concrete harm requirement by alleging an injury to the

9    recreational or even the mere esthetic interests of its members." *Cottonwood* at 1079; *see also*

10   *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2004) (injury-in-fact

11   is shown through "an aesthetic or recreational interest in a particular place, or animal, or plant

12   species" if "that interest is impaired by defendant's conduct.").

13       Defendants argue that Plaintiffs do not have standing under Article III, because they lack

14   causation and redressability. (Defs.' Opp'n at 13.)  Specifically, Defendants argue that Plaintiffs'

15   "standing declarations do not show a causal link between their alleged injuries and NMFS's and

16   USCG's actions related to the BiOp." *Id.* at 14-15.  Defendants' reliance on *Bender v.*

17   *Williamsport Area School District*, 475 U.S. 534, 546 (1986) for the proposition that there must be

18   a causal link in the declarations is misplaced, because *Bender* involved a narrow standing issue

19   that could not be corrected on appeal, which is not present here. *Id.* at 15.  As Plaintiffs argue, the

20   standing declarations are not required to "connect the dots" regarding causation and redressability,

21   but they need only to provide the factual basis necessary to demonstrate injury-in-fact.  *See Nat.*

22   *Res. Def. Council v. Zinke*, 347 F. Supp. 3d 465, 511 (E.D. Cal. 2018) ("The Court can identify no

23   authority that suggests causation and redress must be proved by member declarations.")

24       Taken together, the declarations explain why the members and their respective

25   organizations have an interest in preserving the endangered species, and how the ship strikes cause

26   them injury. (*See generally* Decl. of Douglas Bevington, "Bevington Decl.," Dkt. No. 41-3; Decl.

27   of Brett Hartl, "Hartl Decl.," Dkt. No. 41-4; Decl. of Marcie Keever, "Keever Decl.," Dkt. No. 41-

28   5.)

United States District Court
Northern District of California

1    Thus, the Court finds that Plaintiffs have established standing under Article III.

2        **B.      Whether NMFS violated the ESA**

3    Plaintiffs argue that NMFS violated the ESA by failing to properly evaluate the impacts of

4    shipping lane designations on endangered whales and sea turtles and by failing to develop a lawful

5    incidental take statement. (Pl.'s Mot. at 16, 28.)  At the completion of formal consultation, the

6    NMFS issues a biological opinion, providing its evaluation of whether the agency action may

7    jeopardize any listed species' continued existence.

8        Here, Plaintiffs contend that the Government's use of the "no-lane" analytical framework

9    is unlawful, because

10               (1) the no-lane framework is based upon an arbitrary, nonsensical
                 assumption that TSS designations have essentially no impact on
                 shipping traffic patterns; (2) in using this framework, NMFS
11               produced a fundamentally flawed comparative analysis of effects
                 rather than comprehensive approach demanded by the ESA and its
12               implementing regulations; and (3) NMFS further minimized and
                 concealed the effects of the TSS designations by improperly
13               characterizing those effects as part of the environmental baseline.

14    (Pl.'s Mot. at 17.)  As a result, Plaintiffs argue that the BiOp failed to properly analyze the effects

15    of the TSS designations on the ESA-listed species. *Id.*

16        In opposition, Defendants contend that Plaintiffs mischaracterize NMFS's ultimate

17    conclusion that the TSSs would have no effect on the listed species. (Defs.' Opp'n at 24.)  Rather,

18    Defendants argue that the USCG determined that the TSSs "may affect" certain whales and turtles,

19    but then it engaged in formal consultation with NMFS and ultimately concluded "that the action

20    may adversely affect, but is not likely to jeopardize the continued existence of those whales and

21    turtles." *Id.*

22        According to the BiOp, the TSSs have been in use since the late 1960s, so it makes no

23    sense to use a hypothetical no-lane scenario to determine whether the proposed action poses a

24    danger to the protected species. *See* AR 20.  In coming up with a hypothetical comparator, NMFS

25    found that it was "reasonable to assume that shipping existed in the general areas where TSSs

26    were later implemented as reflective of a no-lane scenario." AR 66.  As a result, the BiOp assumes

27    that the TSSs will have no effect on the species, and that, in fact, "the result of the proposed

28    codification of the IMO approved lanes is that the overall exposure profile for whales and

United States District Court
Northern District of California

1    leatherback sea turtles is expected to decrease compared to the no-lane scenario." *See* AR 90.

2           When a federal action is not likely to jeopardize a listed species, a biological opinion must

3    include an incidental take statement ("ITS") whenever a taking is reasonably certain to occur. 50

4    C.F.R. § 402.14(g)(7), (i).  An incidental take statement is generally required to specify the

5    authorized take of each affected species by way of numerical limit or a combination of numbers

6    and estimates. *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273

7    F.3d 1229, 1249 (9th Cir. 2001).  Here, it is undisputed that the BiOp is devoid of an ITS, but

8    Defendants contend that it is not required, because incidental take was not reasonably likely to

9    occur. (Defs.' Reply at 24.)  That is not entirely accurate.  The BiOp explicitly declines to provide

10   an ITS, because it assumes that, compared to the hypothetical no-lane scenario, the TSSs will

11   result in fewer ship strikes. *See* AR 90.  The problem is that TSS have been in use for more than

12   50 years, rendering the no-lane scenario a false comparator.  The cases cited by Defendants

13   required ITSs, so the Court is unpersuaded that they support the absence of an ITS entirely. *See,*

14   *e.g., Arizona Cattle Growers' Ass'n,* 273 F.3d 1229, 1249 (9th Cir. 2001); *Ctr. for Biological*

15   *Diversity v. Salazar,* 695 F.3d 893, 910 (9th Cir. 2012).  Here, as was the case in *Center for*

16   *Biological Diversity v. Salazer,* the endangered species are present and are reasonably certain to be

17   impacted by the proposed TSSs, and in this case, by lethal ship strikes. *See* 695 F.3d at 910.  To

18   simply state that there is no taking because some hypothetical scenario would kill more protected

19   species is suspect. Even so, under *Arizona Cattle Growers* and *Center for Biological Diversity v.*

20   *Salazar,* there should have been an incidental take statement that specified the amount of the

21   authorized fatalities.

22          While the court will give some deference to the no-lane scenario, generally, Defendants

23   run afoul of the ESA when they use the no-lane scenario to determine that there is no incidental

24   taking simply because more species would be harmed by the hypothetical, no-lane scenario than

25   by the TSS lanes. Such a determination defies logic particularly when it is undisputed that the

26   impacted, protected species are harmed by TSS lanes. *See* discussion, *supra*, Part I.B.ii (scientific

27   references regarding documented and undocumented ship strikes). While that lesser taking is

28   surely incidental, as it is estimated to be less than having no dedicated lanes, that does not excuse

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants from quantifying the incidental take.  Thus, at the very least, the absence of an

2    incidental take statement renders the biological opinion arbitrary, capricious, an abuse of

3    discretion, and not in accordance with law. 5 U.S.C. § 706(2).

4         Accordingly, Plaintiffs are entitled to summary judgment on their first cause of action for

5    violation of the Endangered Species Act, and the Court need not address the additional arguments

6    made.

7         **C.      Whether the USCG arbitrarily relied on the BiOp.**

8         The second cause of action alleges that USC's reliance on the 2017 BiOp violated the

9    ESA, 16 U.S.C. § 1536(a)(2).  Since Plaintiffs' argument is premised on the fact that the BiOp

10   violated the ESA, the USCG's reliance on the BiOP is also arbitrary and capricious.

11        Accordingly, for the reasons set forth above, Plaintiffs are entitled to summary judgment

12   on their second cause of action. *See* discussion, *supra,* Part III.B.

13                      **IV.      CONCLUSION**

14        Based on the foregoing, the Court GRANTS Plaintiffs' motion for summary judgment on

15   the first and second causes of action, and it DENIES Defendants' cross-motion for summary

16   judgment on the grounds that the 2017 Biological Opinion failed to comply with the Endangered

17   Species Act, rendering the decision arbitrary, capricious, an abuse of discretion, and not in

18   accordance with law. 5 U.S.C. § 706(2).

19        Accordingly, the 2017 Biological Opinion is VACATED AND SET ASIDE.

20        IT IS SO ORDERED.

21   Dated: December 7, 2022

22                                            _____
                                             KANDIS A. WESTMORE
23                                           United States Magistrate Judge

24

25

26

27

28